

# POLICING
## —— for ——
# PROFIT
The Abuse of Civil Asset Forfeiture

by **Marian R. Williams, Ph.D.**
**Jefferson E. Holcomb, Ph.D.**
**Tomislav V. Kovandzic, Ph.D.**
**Scott Bullock**

**IJ**
INSTITUTE FOR JUSTICE

March 2010

Plaintiff's Ex. # 1, p. 1
Littlepage v. DC, 14-899 (ESH)

# POLICING
## —— for ——
# PROFIT

## The Abuse of Civil Asset Forfeiture

by Marian R. Williams, Ph.D.
Jefferson E. Holcomb, Ph.D.
Tomislav V. Kovandzic, Ph.D.
Scott Bullock



INSTITUTE FOR JUSTICE

March 2010

**Plaintiff's Ex. # 1, p. 2**
**Littlepage v. DC, 14-899 (ESH)**

# Table of Contents

| | | |
|---|---|---|
| Executive Summary | | 6 |
| Foreword by Scott Bullock | | 9 |
| Part I:  Policing for Profit | | 15 |

**Part I: Policing for Profit**

| | |
|---|---|
| What is Civil Asset Forfeiture? | 15 |
| Incentives for Abuse of Civil Asset Forfeiture | 15 |
| Profit Motive | 17 |
| An Unlevel Playing Field for Property Owners | 20 |
| Standard of Proof | 20 |
| Burden on Innocent Owners | 23 |
| Federal Equitable Sharing | 23 |
| Extent and Nature of Asset Forfeiture in the United States | 27 |
| Data Sources | 27 |
| Findings | 29 |
| Is Law Enforcement Policing for Profit? | 35 |
| Analysis | 37 |
| Results | 37 |

| | |
|---|---|
| Part II:  Grading the States | 41 |

**Part II**

| | |
|---|---|
| How to Use "Grading the States" | 41 |
| State Grades | 43 |
| Alabama | 46 |
| Alaska | 47 |
| Arizona | 48 |
| Arkansas | 49 |

**Part II: Grading the States**

| | |
|---|---|
| California | 50 |
| Colorado | 51 |
| Connecticut | 52 |
| Delaware | 53 |
| Florida | 54 |
| Georgia | 55 |
| Hawaii | 56 |
| Idaho | 57 |
| Illinois | 58 |
| Indiana | 59 |
| Iowa | 60 |
| Kansas | 61 |
| Kentucky | 62 |
| Louisiana | 63 |
| Maine | 64 |
| Maryland | 65 |
| Massachusetts | 66 |
| Michigan | 67 |
| Minnesota | 69 |
| Mississippi | 71 |
| Missouri | 72 |
| Montana | 73 |
| Nebraska | 74 |
| Nevada | 75 |

**Part II:  Grading the States**

| | |
|---|---|
| New Hampshire | 76 |
| New Jersey | 77 |
| New Mexico | 78 |
| New York | 79 |
| North Carolina | 80 |
| North Dakota | 81 |
| Ohio | 82 |
| Oklahoma | 83 |
| Oregon | 85 |
| Pennsylvania | 86 |
| Rhode Island | 88 |
| South Carolina | 89 |
| South Dakota | 90 |
| Tennessee | 91 |
| Texas | 92 |
| Utah | 94 |
| Vermont | 95 |
| Virginia | 96 |
| Washington | 98 |
| West Virginia | 100 |
| Wisconsin | 101 |
| Wyoming | 102 |

Stories of Civil Forfeiture Abuse

| Stories of Civil Forfeiture Abuse | | |
|---|---|---|
| | Shakedown in Tenaha, Texas | 16 |
| | Extravagance with Forfeiture Funds in Camden County, Ga. | 19 |
| | Data Reveals Texas Law Enforcement's Dependence on Forfeiture Funds | 21 |
| | Canine Sniffs Yield Unreliable Evidence for Forfeiture | 24 |
| | Despite State Protections, Nebraska Troopers Seize Cash | 28 |
| | Forfeiture as Extortion in Jim Wells County, Texas | 33 |
| | In Lamar County, Ga., "They had guns and badges and they just took it." | 36 |
| | Seizing Elderly Woman's Home in Philadelphia | 38 |

Appendix A:  Methods                                      105

Appendix B:  Detailed Statistical Results                 108

Endnotes                                                  113

**Plaintiff's Ex. # 1, p. 6**
**Littlepage v. DC, 14-899 (ESH)**

## Executive Summary

*Policing for Profit: The Abuse of Civil Asset Forfeiture* is the most comprehensive national study to examine the use and abuse of civil asset forfeiture and the first study to grade the civil forfeiture laws of all 50 states and the federal government.

Under state and federal civil asset forfeiture laws, law enforcement agencies can seize and keep property suspected of involvement in criminal activity. Unlike *criminal* asset forfeiture, with *civil* forfeiture, a property owner need not be found guilty of a crime—or even charged—to permanently lose her cash, car, home or other property.

### Incentives for Abuse

In most states and under federal law, law enforcement can keep some or all of the proceeds from civil forfeitures. This incentive has led to concern that civil forfeiture encourages policing for profit, as agencies pursue forfeitures to boost their budgets at the expense of other policing priorities.

These concerns are exacerbated by legal procedures that make civil forfeiture relatively easy for the government and hard for property owners to fight. For example, once law enforcement seizes property, the government must prove it was involved in criminal activity to forfeit or permanently keep it. But in nearly all states and at the federal level, the legal standard of proof the government must meet for civil forfeiture is lower than the strict standard of "beyond a reasonable doubt" required for criminal convictions.

Likewise, many jurisdictions provide an "innocent-owner" defense that allows owners to get their property back if they had no idea it was involved in a crime. However, in most places, owners bear the burden of establishing their innocence. In other words, with civil forfeiture, property owners are effectively guilty until proven innocent.

Finally, federal civil forfeiture laws encourage abuse by providing a loophole to law enforcement in states with good laws for property owners: "equitable sharing." With equitable sharing, state law enforcement can turn over seized assets to the federal government, or they may seize them jointly with federal officers. The property is then subject to *federal* civil forfeiture law—not state law. Federal law provides as much as 80 percent of the proceeds to state law enforcement and stacks the deck against property owners. Thus, the equitable sharing loophole provides a way for state and local law enforcement to profit from forfeitures that they may not be able to under state law.

### Extent of Forfeiture Use

In Part I of this study, criminal justice researchers Marian R. Williams and Jefferson E. Holcomb of Appalachian State University and Tomislav V. Kovandzic of the University of Texas at Dallas find the use of asset forfeiture is extensive at all levels of government and growing:

- In 2008, for the first time in history, the U.S. Department of Justice's Assets Forfeiture Fund (AFF) held more than *$1 billion* in net assets—that is, money forfeited from property owners and now available for federal law enforcement activities after deducting various expenses. A similar fund at the U.S. Treasury Department held

Unlike criminal asset forfeiture, with civil forfeiture, a property owner **need not be found guilty** of a crime—or even charged—to permanently lose her cash, car, home or other property.

6

Plaintiff's Ex. # 1, p. 7
Littlepage v. DC, 14-899 (ESH)

more than $400 million in net assets in 2008.  By contrast, in 1986, the year after the AFF was created, it took in just $93.7 million in deposits.

- State data reveal that state and local law enforcement also use forfeiture extensively:  From 2001 to 2002, currency forfeitures alone in just nine states totaled more than $70 million.  This measure excludes cars and other forfeited property, as well as forfeitures from many states that did not make data available for those years, and so likely represents just the tip of the forfeiture iceberg.

- Equitable sharing payments to states have nearly doubled from 2000 to 2008, from a little more than $200 million to $400 million.

**Policing for Profit**

Civil forfeiture encourages policing for profit according to an analysis of national data by Williams, Holcomb and Kovandzic.  Specifically, they find that when state laws make forfeiture more difficult and less rewarding, law enforcement instead takes advantage of easier and more generous federal forfeiture laws through equitable sharing.

The researchers tested three elements of state law and found that all three, either independently or in combination, affect equitable sharing proceeds.  As state laws improve for property owners, use of the equitable sharing loophole rises:

- Profit Motive:  Law enforcement agencies in states with no profit motive (no forfeiture proceeds to law enforcement) will receive more in equitable sharing than agencies in states with a 100-percent profit motive—an

increase of $30,000 per year for an average-sized law enforcement agency, representing an increase of 25 percent of equitable sharing dollars.

- Innocent Owner Burden:  Presuming owners are innocent instead of guilty, thus better protecting owners and making civil forfeiture harder for law

> When laws make civil forfeiture **easier and more profitable**, law enforcement engages in more of it.

enforcement, leads to an increase in equitable sharing of $27,600 per year for an average-sized law enforcement agency, growth of about 23 percent.

- Standard of Proof:  In states where owners are presumed innocent, raising by one level the standard of proof the government must meet to forfeit property leads to an increase in equitable sharing payments of $16,860 per year for an average-sized agency, an increase of about 14 percent.

These results demonstrate not only that federal equitable sharing is a loophole that state and local law enforcement use to circumvent strict state laws but also that pursuit of profit is a significant motivator in civil forfeiture actions.  Simply put, when laws make civil forfeiture easier and more profitable, law enforcement engages in more of it.

**Grading Forfeiture Laws and Behavior**

In Part II, Institute for Justice attorney Scott Bullock details the civil forfeiture laws and data for each state and the federal government.  He also grades the states based on the same three elements of state law Williams, Holcomb and Kovandzic test, as well how much state and local law enforcement use the equitable sharing loophole.

7

**Plaintiff's Ex. # 1, p. 8**
**Littlepage v. DC, 14-899 (ESH)**

Bullock finds:

- Only three states—Maine, North Dakota and Vermont—receive a combined grade of B or higher. The other 47 states all receive Cs or Ds.

- Most state civil forfeiture laws provide little protection to property owners. Six states receive an F and 29 states receive a D for their laws alone. Lax federal laws earn the federal government a law grade of D-.

- Eight states receive a B or higher for their laws: Indiana, Maine, Maryland, Missouri, North Carolina, North Dakota, Ohio and Vermont. But extensive use of equitable sharing pulls down the final grades of five of those states: Indiana (C+), Maryland (C+), Missouri (C+), North Carolina (C+) and Ohio (C-).

- The lowest-graded states overall, combining both poor laws and aggressive use of equitable sharing, are Georgia, Michigan, Texas, Virginia and West Virginia.

- Public accountability over civil asset forfeiture in the states is extremely limited. Only 29 states clearly require law enforcement to collect and report forfeiture data, and just 19 of those states responded to freedom-of-information requests with usable data—and the data provided were often meager. In most states, we know nothing or next-to-nothing about the use of civil forfeiture or its proceeds.

In most states, we know **nothing or next-to-nothing** about the use of civil forfeiture or its proceeds.

Based on these findings, Bullock offers in a foreword to this study several recommendations for reform to better protect property rights. Short of abolishing civil forfeiture, he advocates eliminating the profit motive, leveling the playing field for property owners, providing more public accountability and closing the equitable sharing loophole.



8

<table>
<tr><td></td></tr>
</table>

| Foreword |
| --- |
| By Scott Bullock |

**Foreword**

    Imagine being pulled over and a law enforcement officer decides to take your car, cash or other personal property.  The officer claims that he has probable cause to believe not necessarily that *you* are guilty of any illegal conduct but that your *property* was used to facilitate illegal activity.  Perhaps the officer thinks you are carrying a larger-than-normal amount of cash or that your travel pattern is "suspicious."

Once your property is taken, the government will—perhaps—send you a notice letting you know that the burden is on you to try to get your property back.  If you do not respond within the right time frame and in the proper manner, law enforcement automatically gets to keep your seized property.  But even if you do try to win back your property in court, you will have to wait several months, if not more than a year, to get a hearing.  At that hearing, you will find yourself in a legal maze where the government holds most of the advantages, and you carry most of the burdens.

Welcome to the down-is-up and white-is-black world of civil forfeiture.

Civil forfeiture laws represent one of the most serious assaults on private property rights in the nation today.  Civil forfeiture is the power of law enforcement to seize and keep property suspected of involvement in criminal activity.  Under this power, it is not necessary for the government to demonstrate that a property owner is guilty of criminal misconduct.  Indeed, civil forfeiture can take place even when criminal charges are never filed against a property owner.

But perhaps the most troubling aspect of modern civil forfeiture laws is the profit incentive at their core.  The overriding goal for law enforcement officials—both prosecutors and police—should be fair and impartial administration of justice.  However, civil forfeiture laws at the federal level and in 42 states dangerously shift law enforcement priorities instead toward the pursuit of property and profit.

How?  As this study demonstrates, the government often holds most of the advantages in prosecuting civil forfeitures cases, and law enforce-ment agencies are usually entitled to keep at least some of the money and property confiscated from individuals, thus giving them a direct financial stake in the outcome of forfeiture efforts.  Such statutory schemes pervert law enforcement's responsibility to enforce the law fairly and spell disaster for property owners caught up in forfeiture proceedings.

And this is not just theory.  In Part I of this report, criminal justice researchers Marian R. Williams and Jefferson E. Holcomb of Appalachian State University and Tomislav V. Kovandzic of the University of Texas at Dallas provide the most thorough national analysis yet of whether law enforcement agencies respond to incentives by increasing the use of forfeiture when they can keep a higher percentage of forfeiture revenue for their own use and do so more easily.  Unfortunately for property owners across the country, the analysis finds that they do just that.

**How Did We Get Here?**
**A Brief History of Civil Forfeiture**

Under laws at both the federal and state levels, governments can forfeit property either criminally or civilly.  Criminal forfeiture is tied to the criminal conviction of an individual, where the government needs to show that an offender is guilty beyond a reasonable doubt and the accused is afforded all the rights under the Constitution.  In other words, with criminal forfeiture, the government must actually demonstrate in court that the property owner obtained his property illegally.

But civil forfeiture is a legal fiction that enables law enforcement to take legal action against inani-

9

mate objects for participation in alleged criminal activity, regardless of whether the property owner is guilty or innocent—or even whether the owner is charged with a crime.  Civil forfeiture actions are *in rem* proceedings, which means literally "against a thing"—the property itself is charged with a crime.  That is why civil forfeiture proceedings have bizarre

## The most troubling aspect of modern civil forfeiture laws is the **profit incentive** at their core.

titles, such as *United States v. $10,500 in U.S. Currency* or *People v. Certain Real and Personal Property*.  And because they are civil proceedings, most of the constitutional protections afforded criminal defendants do not apply to property owners in civil forfeiture cases.

Of course, objects such as cash, property, cars or boats sued for participation in criminal activity do not act or think.  The doctrine of *in rem* forfeiture arose from Medieval ideas, rooted in the ancient law of "deodand."[1]  Kings, for instance, could seize an instrument that caused the death of another in order to finance the deceased's funeral mass.[2]  The idea arose from a superstitious belief that objects acted independently to cause death.[3]

While the concept of deodand gives rise to the "guilty property" legal fiction, American forfeiture law did not arise strictly from this concept but rather from the British Navigation Acts of the mid-17th century.[4]  The Acts were passed during England's vast expansion as a maritime power.  The Acts required imports and exports from England to be carried on British ships.  If the Acts were violated, the ships or the cargo on board could be seized and forfeited to the crown regardless of the guilt or innocence of the owner.

Using the British statutes as a model, the first U.S. Congress passed forfeiture statutes to aid in the collection of customs duties, which provided 80 to 90 percent of the finances for the federal government during that time.[5]  Civil forfeiture was introduced in American law through these early customs

statutes.  The forfeiture power was upheld in early Supreme Court cases.[6]

The most important aspect of these early forfeiture cases, however, is the very limited justification provided for the application of civil forfeiture even to innocent property owners.  The Supreme Court held that civil forfeiture was closely tied to the practical necessities of enforcing admiralty, piracy and customs laws.  *In rem* forfeiture permitted courts to obtain jurisdiction over property when it was virtually impossible to seek justice against property owners guilty of violating maritime law because, for example, they were overseas.

Therefore, with civil forfeiture, the government could ensure that customs and other laws were enforced even if the owner of the ship or the cargo was outside the court's jurisdiction.  Justice Story wrote that the "vessel which commits the aggression is treated as the offender, as the guilty instrument or thing to which the forfeiture attaches, without any reference whatsoever to the character or conduct of the owner."[7]  However, Story justified such forfeitures "from the *necessity* of the case, as the *only* adequate means of suppressing the offence or wrong, or insuring an indemnity to the injured party."[8]

Although the Supreme Court had permitted the government to expand the forfeiture power during the Civil War, throughout most of the 20th century, civil forfeiture remained a relative backwater in American law with one exception:  It was used extensively during Prohibition against automobiles and other vehicles transporting illegal liquor.

Modern civil forfeiture use then exploded during the early 1980s as government at all levels stepped up the war on drugs, and Congress and the states created new incentives for the use and arguably the abuse of civil forfeiture.  For most of American history, the proceeds from forfeitures went not to the law enforcement agencies responsible for the seizures but to the government's general fund.  However, in 1984, Congress amended portions of the Comprehensive Drug Abuse and Prevention Act of 1970 to create the Assets Forfeiture Fund, into

10

which the Attorney General was to deposit all net forfeiture proceeds for use by the Department of Justice and other federal law enforcement agencies.[9]

Subsequent amendments dramatically expanded what law enforcement could do with these funds, including allowing their use for expenses such as purchasing vehicles and overtime pay.[10]  In short, after the 1984 amendments, federal agencies were able to retain and spend forfeiture proceeds—subject only to very loose restrictions—giving them a direct financial stake in generating forfeiture funds.  With these changes, the modern era of policing and prosecuting for profit had begun.

Meanwhile, many states followed the federal government's profit-making example by amending their civil forfeiture laws to give law enforcement agencies a direct share of forfeited proceeds.  Law enforcement agencies in 42 states receive some or all of the civil forfeiture proceeds they seize.

In 2000, Congress passed the Civil Asset Forfeiture Reform Act (CAFRA), amending various provisions of federal forfeiture law.[11]  CAFRA offered a number of modest reforms, but it did not change how forfeiture proceeds are distributed or otherwise ameliorate the profit incentive law enforcement agencies have in civil forfeiture.[12]

No longer is civil forfeiture tied to the practical difficulties of obtaining personal jurisdiction over an individual.  Released from its historical limitation as a necessary means of enforcing admiralty and customs laws, the forfeiture power has instead become a commonly used weapon in the government's crime-fighting arsenal.  And Congress

and the states have expanded its application even beyond alleged drug violations to include a plethora of crimes at the federal and state levels.  Today, there are more than 400 federal forfeiture statutes relating to a number of federal crimes, and all states have statutory provisions for some form of asset forfeiture.

## Forfeiture Use Explodes

One consequence of the changes in forfeiture laws is the dramatic increase of forfeiture activity that took place in their wake.  As discussed in Part I, in 1986, the second year after the creation of the Department of Justice Assets Forfeiture Fund, the Fund took in $93.7 million in proceeds from forfeited assets.  By 2008, the Fund for the first time in history topped $1 billion in net assets, i.e., forfeiture proceeds free-and-clear of debt obligations and now available for use by law enforcement.  Data on civil forfeitures under state law are shockingly sparse, but the researchers point to evidence indicating that use of state forfeiture is extensive and growing.

Such growth in the amount of forfeiture is the result of governmental officials responding to incentives.  All people work to better their position.  Just as private citizens are motivated by self-interest, so too does it motivate government officials.[13]  While many individuals within a government organization may share a principled commitment to carrying out the mission of the agency, government officials, operating in what they perceive as their own self-interest,

> After the 1984 amendments, federal agencies were able to retain and spend forfeiture proceeds—subject only to very loose restrictions—giving them a **direct financial stake** in generating forfeiture funds.

11

will also attempt to maximize the size and budget of their agency. Larger budgets will benefit everyone within an agency through higher salaries, greater job security, better equipment and increased power and prestige. Such incentives can affect even the most well-intentioned law enforcement officers.

The difference between self-interest in the public and private spheres is that the private citizen must *persuade* to achieve his ends, while the government official can employ force. It is therefore a constant threat that those in positions of power will use that force to serve their own self-interest at the expense of the broader populace. This concern reaches its zenith when government officials stand to aggrandize themselves by seizing individuals' private property for their own benefit.

So-called "equitable sharing" thus provides a way for state and local law enforcement agencies to **circumvent unfavorable state forfeiture procedures.**

### Evading State Law

Even in those states where the profit incentive is prohibited or limited, law enforcement officials circumvent state law and work with federal agents to "share" in forfeiture proceeds. The 1984 amendments allow state and local law enforcement agencies to transfer assets they seize to federal law enforcement agencies. Federal law enforcement officials can take possession of this property and initiate federal forfeiture actions as long as the "conduct giving rise to the seizure is in violation of federal law and where federal law provides for forfeiture." When property is forfeited under these arrangements, agencies at the federal, state and local levels all share in the bounty—with state and local officials receiving as much as 80 percent back.

This so-called "equitable sharing" thus provides a way for state and local law enforcement agencies to circumvent unfavorable state forfeiture procedures. As Williams, Holcomb and Kovandzic conclude, when state law makes forfeiture more difficult and limits how much forfeiture revenue law enforcement may keep, state and local law enforcement officials will participate more in equitable sharing with the federal government. Thus, state and local law enforcement officials defy the will of their citizens in order to profit along with their federal counterparts.

### Dependence on Forfeiture Funds

It should also not be surprising that, given the structures and incentives of civil forfeiture law, a substantial number of law enforcement agencies are now dependent on civil forfeiture proceeds and view civil forfeiture as a necessary source of income. Williams, Holcomb and Kovandzic point to a survey of nearly 800 law enforcement executives, in which nearly 40 percent of police agencies reported that civil forfeiture proceeds were a *necessary* budget supplement. And they note that this dependency is also present at the federal level, where the Department of Justice in the past has urged its lawyers to increase their civil forfeiture efforts so as to meet the Department's annual budget targets.

The Institute for Justice collected data on forfeiture proceeds and budget data from a random sample of 52 law enforcement agencies in Texas. We found that forfeiture proceeds represent an average of more than 14 percent of law enforcement budgets—a sizable share of an agency's budget. Indeed, we found that many law enforcement agencies were counting on this revenue by including it in their budget estimates.

One consequence of giving law enforcement a pecuniary interest in forfeiture proceeds is that it can cause them to over-enforce

Plaintiff's Ex. # 1, p. 13
Littlepage v. DC, 14-899 (ESH)

crimes that carry the possibility of forfeiture to the neglect of other law enforcement objectives. This makes basic economic sense;

# Eighty percent of persons whose property was seized by the federal government for forfeiture were **never even charged with a crime**.

as the return to enforcing certain crimes increases, one would expect law enforcement agencies to devote a higher percentage of their resources to those aims.[14] And, again, this is not simply theory. Earlier research found that in states where agencies get to keep the lion's share of forfeiture proceeds, drug arrests—which often have the potential of a related civil forfeiture—constitute a significantly higher percentage of all arrests.[15]

## Stacking the Deck Against Property Owners

One of the reasons why law enforcement prefers civil forfeiture to criminal forfeiture is because the procedure stacks the deck against property owners. As detailed in this report, in civil proceedings, for instance, the government usually only needs to prove the property's connection to alleged criminal activity by a mere "preponderance of evidence" standard—or sometimes under an even lower standard—not proof "beyond a reasonable doubt" as in criminal cases.

Because it is the property itself that is the target of the lawsuit, the owner of the property need not be convicted of or even charged with any criminal activity for the government to forfeit the property. Indeed, one study found that approximately 80 percent of persons whose property was seized by the federal government for forfeiture were never even charged with a crime.[16]

Moreover, in most states, if property is used illegally without the owner's knowledge or consent, the burden is placed on the property owner to establish her innocence in court, not the government to prove otherwise. In other words, a property owner is guilty until proven innocent.

In reality, few property owners, especially low-income individuals, can meet the burdens of civil forfeiture proceedings and often do not challenge seizures of their property. This is especially true when government seizes property the value of which would be greatly exceeded by the time, attorney fees and other expenses necessary to fight the forfeiture. As a result, many property owners do not and cannot challenge forfeitures, and the government obtains the property by default.

## Limited Public Oversight and Accountability

Incredibly, given the ability of law enforcement through civil forfeiture to raise off-budget funds, often without limitation, many states do not even require law enforcement agencies to report how much money has been raised and on what items the money has been spent. As of 2003, only 29 states required this basic level of public oversight—and only 19 of those states responded to freedom of information requests with reliable information. And those states that did respond often provided very limited data.

## Recommendations for Reform

In Part II of this report, I summarize the civil forfeiture laws of all 50 states and the federal government and provide all available data for each state. I also grade each state on its forfeiture laws and behavior using objective criteria that measure how easy and profitable state law makes forfeiture and how often state and local law enforcement appear to evade state law through equitable sharing. The results are not encouraging: Only three states earned a B or higher.

13

Plaintiff's Ex. # 1, p. 14
Littlepage v. DC, 14-899 (ESH)

Given the undermining of property rights that civil forfeiture law inevitably entails, the abuses that have been documented in this report and elsewhere, and the research findings set forth here, what should be done?  Here are some key recommendations:

Ideally, civil forfeiture should be abolished, at least outside of its narrow historical use in enforcing admiralty and customs laws.  Governments should have to tie forfeiture to criminal convictions of specific individuals.

Short of abolishing civil forfeiture entirely, governments at the very least should:

- End the direct profit incentive under civil forfeiture laws.  Civil forfeiture revenue should be placed into a neutral fund, such as one for education or drug treatment, or, most desirably, in the general revenue fund of the county or state government.

- Impose a high standard of proof on law enforcement in civil forfeiture proceedings, requiring that it prove its forfeiture case at least by clear and convincing evidence.

- Provide a meaningful defense for innocent owners by removing the burden on property owners to prove their innocence and instead placing the burden of proof on the government.

- Require all agencies to track and report civil forfeiture revenue and distributions and make that information readily available to the public.

- Respect federalism principles by abolishing equitable sharing arrangements with the federal government.  If a state has decided to end the practice of policing for profit, officials in that state should not be allowed to do an end-run around those procedures by teaming up with the federal government to forfeit property.

## Conclusion

Private property is one of this nation's most cherished principles, but it is a principle under assault by modern civil forfeiture law.  The changes to civil forfeiture that gave law enforcement agencies a percentage of forfeiture proceeds while also giving them the upper hand in forfeiture proceedings have created a powerful incentive:  seize, forfeit and profit.  But this pecuniary interest and the other advantages granted the government under civil forfeiture laws have distorted law enforcement priorities, altered officer and prosecutor behavior and led to a number of police and prosecutorial abuses.  This study will hopefully lead the way toward curbing these abuses and protecting one of our most important rights.

14

## Part I:  Policing for Profit

### What is Civil Asset Forfeiture?

In everyday language, if something is "forfeited," it means that an owner voluntarily relinquishes the property.  In legal forfeiture actions, however, "forfeited" property has been taken by the government without compensation, not voluntarily given up.[17]

Federal and most state laws allow both civil and criminal asset forfeitures.  In civil asset forfeiture, action is taken against a person's property or assets, not against an individual.  A person's property is the target of the legal proceeding, and the owner is secondary.  The owner does not have to be arrested or convicted of a crime to have his property taken.  By contrast, criminal forfeitures occur against a person after conviction for an underlying criminal offense.

Critics charge that law enforcement officers prefer civil forfeiture because it affords property owners fewer protections than criminal proceedings, thus making it easier to seize assets, and indeed, one prominent prosecutor has admitted that criminal forfeiture is "a much more *limited* tool of law enforcement than is civil forfeiture."[18]

In the forfeiture context, a "seizure" is when an officer of the law takes possession of an individual's property.  This is typically the first step in the asset forfeiture process.  For the police to seize an individual's property, most jurisdictions require that the officer merely have "probable cause" to believe the property is subject to forfeiture.  The laws in some jurisdictions, however, have additional requirements before real property, such as a home, can be seized.

What happens after a seizure depends on the jurisdiction, the type of property seized and the type of forfeiture that is being sought.  In some cases, the police may simply declare a property forfeited—permanently taken from its owner—without judicial involvement.  Prosecutors or district attorneys may also initiate forfeiture proceedings in court.  A judge will then determine if the assets are to be forfeited; if forfeited, ownership of the assets is transferred to the government.

As this report details, state and federal law then dictates what can be done with the property or, if sold, its proceeds.  Federal law and laws in most states allow 50 percent or more of the property or proceeds to go to law enforcement agencies.  This includes cash, cars, cell phones and homes that can be kept for official use.  Some states dictate that forfeiture proceeds or a percentage of them fund drug education and rehabilitation programs or the general fund of the city, county or state.[19]

### Incentives for Abuse of Civil Asset Forfeiture

Supporters of civil asset forfeiture, including law enforcement officers and prosecutors, argue that it is an essential tool for fighting crime, both by reducing the profitability of crimes and by removing the assets required for certain criminal activity.[20]  Forfeiture is especially important, proponents claim, for reducing the rewards of financially motivated crimes such as drug trafficking and sales, gambling and vice, and organized crime.[21]

Proponents also argue that asset forfeiture protects the public's interest and promotes the

Plaintiff's Ex. # 1, p. 16
Littlepage v. DC, 14-899 (ESH)

# Shakedown in Tenaha, Texas

In October 2007, law enforcement officials in Tenaha, Texas, pulled Roderick Daniels over for allegedly traveling 37 mph in a 35 mph zone.  Upon discovering $8,500 in cash that the Tennessee man had planned to use to buy a new car, the officers took Daniels to jail and threatened to charge him with money-laundering unless he turned over the cash.  Daniels surrendered his property.  "To be honest, I was five, six hundred miles from home.  I was petrified," he said.[1]

Daniels' experience was far from unusual in Tenaha.  Between 2006 and 2008, local officials stopped more than 140, mostly black, out-of-state drivers, including a grandmother from Akron, a black family from Maryland and an interracial family from Houston.  Once arrested, officers took them to jail and threatened to file charges unless they signed pre-notarized statements relinquishing any claim to their valuables.  Officers seized cash, cars, cell phones, jewelry and even sneakers.  In most cases, criminal charges were never filed and there was no evidence to conclude the motorists were engaged in illicit activity.[2]

A federal lawsuit filed in July 2008 accuses authorities of targeting minorities driving rental cars or vehicles with out-of-state plates.  "My take on the matter is that the police in Tenaha, Texas, were picking on and preying on people that were least likely to fight back," said David Guillory, who represents eight plaintiffs.[3]

Although law enforcement alleges that the stretch of road on which the stops are made is a major drug corridor between Shreveport, La., and Houston, Texas, none of the plaintiffs has been arrested for, much less convicted of, violating drug laws.

Jennifer Boatright and her husband Ronald Henderson relinquished more than $6,000 after police and the Shelby County District Attorney threatened to charge them with money-laundering and put their two children in foster care.  "I said, 'If it's the money you want, you can take it, if that's what it takes to keep my children with me and not separate them from us.  Take the money,'" said Boatright.[4]

Maryland resident Amanee Busbee was traveling to Houston with her son, fiancé and business partner to complete the purchase of a restaurant.  "The police officer would say things to me like, 'Your son is going to child protective services because you are not saying what we need to hear,'" said Busbee.[5]

Guillory says of the 40 motorists he contacted, 39 were black.  He estimates officials seized $3 million between 2006 and 2008 from improper seizures.  Public records requests revealed that the District Attorney used some of the money to buy a $524 popcorn machine, $195 for candy and $400 for catering.  Seized funds also went to the local Chamber of Commerce, a youth baseball league and a local church.

Officials have denied any wrongdoing but have returned Roderick Daniels's possessions as well as Boatright and Henderson's.[6]  The civil rights lawsuit is currently in discovery.

---

1    Tuchman, G., & Wojtecki, K. (2009, May 5). Texas police shake down drivers, lawsuit claims. *CNN.com*. Retrieved September 16, 2009, from http://www.cnn.com/2009/CRIME/05/05/texas.police.seizures/.

2    Witt, H. (2009, March 10). Highway robbery in Texas?; Lawsuit says motorists, disproportionately black, are forced by police to forfeit cash, cars and more--or be charged with trumped-up crimes. *Chicago Tribune*, p. C4; Sandberg, L. (2009, February 7). Property seizures seen as piracy. *San Antonio Express-News*, p.1A.

3    2nd Amended Complaint at 1, *Morrow v. City of Tenaha No. 2:08cv288* (E.D. Tx. filed Jun. 30, 2009). Tuchman and Wojtecki, 2009.

4    *Morrow v. City of Tenaha No. 2:08cv288* at 9; Tuchman and Wojtecki, 2009.

5    Tuchman and Wojtecki, 2009.

6    Witt, 2009; Tuchman and Wojtecki, 2009

Plaintiff's Ex. # 1, p. 17
Littlepage v. DC, 14-899 (ESH)

social good by compensating individual victims, funding victim compensation funds, and, where allowed by law, funding schools, drug treatment and drug education programs.[22]  Finally, proponents argue that civil asset forfeiture makes additional funds available for important law enforcement activities.[23]

However, critics charge that the lure of potential financial rewards affects law enforcement activities and priorities.  The combination of tremendous financial incentives and limited protections for property owners creates a situation ripe for abuse.

### Profit Motive

Law enforcement agencies face tremendous financial incentives to "police for profit."[24]  Table 1[25] shows the percentage of forfeiture proceeds that may be used for law enforcement purposes in all 50 states.[26]  Only eight states

bar the use of state forfeiture proceeds by law enforcement.  In the other 42 states, at least 50 percent goes to law enforcement, and in 26 states, it is 100 percent.[27]  This provides opportunities for self-generating substantial agency resources.

Criminologists, economists and legal scholars who have studied forfeiture behavior have found evidence indicating that police departments are taking advantage of lenient forfeiture statutes to "pad their budgets."[28]  Financial incentives may be particularly powerful for state and local law enforcement agencies that have limited resources and are susceptible to changes in budget allocations.[29]  According to a 2008 investigative series on National Public Radio, some Texas sheriffs' departments rely on forfeited money for up to one-third of their budgets.[30]

Given the considerable sums of money that some departments receive and the limited

*Table 1 Proceeds Distributed to Law Enforcement*

| | |
|---|---|
| 0% | Indiana, Maine, Maryland, Missouri, North Carolina, North Dakota, Ohio, Vermont |
| 50% | Colorado, Wisconsin |
| 60% | Connecticut, New York |
| 63% | Oregon |
| 65% | California |
| 75% | Nebraska |
| 80% | Louisiana, Mississippi |
| 85% | Florida |
| 90% | Illinois, Minnesota, New Hampshire, Rhode Island, Texas |
| 95% | South Carolina |
| 100% | Alaska, Alabama, Arkansas, Arizona, Delaware, Georgia, Hawaii, Idaho, Iowa, Kansas, Kentucky, Massachusetts, Michigan, Montana, Nevada, New Jersey, New Mexico, Oklahoma, Pennsylvania, South Dakota, Tennessee, Utah, Virginia, Washington, West Virginia, Wyoming |

**Plaintiff's Ex. # 1, p. 18**
**Littlepage v. DC, 14-899 (ESH)**

expenditure oversight in many jurisdictions, it is not surprising that investigations have revealed some highly questionable expenditures of forfeiture proceeds:

- in Camden County, Ga., a $90,000 Dodge Viper for the county's DARE program;
- in Colorado, bomber jackets for the Colorado State Patrol;
- in Austin, Texas, running gear for the police department;
- in Fulton County, Ga., football tickets for the district attorney's office,
- in Webb County, Texas, $20,000 for TV commercials for the district attorney's re-election campaign;
- in Kimble County, Texas, $14,000 for a "training seminar" in Hawaii for the staff of the district attorney's office;
- in Albany, N.Y., over $16,000 for food, gifts and entertainment for the police department.[31]

A sheriff in Georgia has even been the subject of a grand jury investigation for alleged misuse of forfeited assets (see also "Extravagance with Forfeiture Funds in Camden County, Ga." on p. 19).  In this particular county,

- $3,000,000 was used to build a sheriff's substation;
- vehicles were purchased not only for the department but also for other county departments and neighboring law enforcement agencies;
- $250,000 was donated to the sheriff's alma mater for a scholarship.[32]

FBI agent and researcher Gregory Vecchi and criminal justice professor Robert Sigler note, "[W]hat is evident from their behavior is that federal, state, and local governments use assets forfeiture to generate revenue, despite their claims otherwise."[33]  For example, the U.S. Attorney General stated in 1990, "We must significantly increase forfeiture production to reach our budget target.  Failure to achieve

the $470 million projection would expose the Department's forfeiture program to criticism and undermine confidence in our budget predictions.  Every effort must be made to increase forfeiture income in the three remaining months of fiscal year 1990."[34]

More recently, AssetRecoveryWatch.com, a forfeiture training and advocacy organization, cited a senior U.S. Justice Department official who, speaking at a conference in July 2009, "urged prosecutors and law enforcement officials to seize and forfeit more ill-gotten gains."[35] AssetRecoveryWatch.com (marketing slogan: "Is that house (or car, or boat) worth seizing? Our experts *help* you decide") is part of a cottage industry of for-profit and non-profit organizations that has developed to assist government officials in seizing and forfeiting assets.[36]

Criminologist John Worrall surveyed 770 police managers and executives and found that almost 40 percent of respondents agreed or strongly agreed with the statement that civil forfeiture is "*necessary* as a budget supplement" (emphasis added).[37]

And criminal justice professor Mitchell Miller and Lance Selva found that police supervisors were keenly aware of the financial benefit of engaging in forfeiture activities and frequently made operational decisions to maximize perceived financial rewards.[38]  They report observing "many such cases in which the operational goal was profit rather than the incarceration of drug offenders.  The pursuit of profit clearly influenced policies on case selection."[39]

An example of how law enforcement maintains its "addiction" to forfeiture funds is the practice of "reverse stings," in which police pose as drug sellers rather than buyers.[40]  Forfeiture advocates' claims of "preventing crime and putting major offenders away" are inconsistent with practices such as reverse stings because they target relatively low-level, non-trafficking drug offenders who are subject to less severe criminal penalties than those arrested for drug sales and do not affect drug supply.  Instead, law enforcement targets buyers

18

# Extravagance with Forfeiture Funds in Camden County, Ga.

In March 2007, Camden County, Ga., deputies pulled over Michael Annan, a 43-year-old immigrant from Ghana, for speeding on I-95 on his way home from work.  After a search, officers found no evidence of illegal activity but confiscated $43,720 in cash.  Annan said the money was his life savings and that he was afraid to put it into a bank.

A canine search found no trace of drugs and a background check on Annan yielded no drug arrests.

Nevertheless, officers kept the money for further investigation and told Annan to call back in two weeks.  Annan says that he did call, multiple times, but made no progress securing his money.  A visit to the county seat in person was unsuccessful—the sheriff was too busy to see him.

Finally, Annan hired a lawyer, who faxed tax and work records to the sheriff's office proving Annan earned his money legitimately.  The county did return the $43,720; however, Annan had to pay $12,000 to his attorney—more than a quarter of his life savings.[1]

Months after Annan was pulled over, the Georgia Bureau of Investigation began looking into expenditures by then-Camden County Sheriff Bill Smith, who had helped orchestrate the seizure of some $20 million over 15 years.

Smith used the forfeiture fund for extravagant purchases with questionable utility for law enforcement—such as a $90,000 sports car and a $79,000 boat.  He also used the fund to retain a private lawyer, to pay tuition for favored deputies at area colleges and to buy gas for employees' personal vehicles, among other improprieties.[2]  Smith further paid jail inmates to work on his own property, his girlfriend's and his ex-wife's.[3]

Camden County voters unseated Smith, who had been sheriff for 23 years, in July 2008.[4]

1       Burnett, J. (2008, June 16). Cash seizures by police prompt court fights. *National Public Radio*. Retrieved September 15, 2009, from http://www.npr.org/templates/story/story.php?storyId=91555835.

2       Burnett, J. (2008). Sheriff under scrutiny over drug money spending. *National Public Radio*. Retrieved September 16, 2009, from http://www.npr.org/templates/story/story.php?storyId=91638378&ps=rs; Pinkham, P. (2008, July 6). Sheriff's spending revealed; Smith used $615,000 in federal funds for tuition, a lease, private lawyer and more. *Florida Times-Union*, p. A1.

3       Pinkham, P. (2007, October 14). Inmates reportedly did work out of state; Camden County Sheriff Bill Smith defends his handling of the trusty program, in which witnesses say he used inmate labor on private properties, even taking some to work on his former wife's home in South Carolina. *Florida Times-Union*, p. A1; Pinkham, P. (2007, September 20). Smith insists he's done no wrong; He responds to the lawsuit against him. *Florida Times-Union*, p. B1.

4       Pinkham, P. (2008, July 20). Voters say it's time for a change; Camden County seeks a fresh start after a scandalous year under Sheriff Bill Smith. *Florida Times-Union*, p. A1.



**Plaintiff's Ex. # 1, p. 20**
**Littlepage v. DC, 14-899 (ESH)**

rather than sellers because buyers tend to have more cash on hand subject to forfeiture.[41]

Indeed, evidence indicates that a significant percentage of state and local forfeiture actions are initiated against suspected low- to moderate-level offenders, especially low-level drug offenders, rather than the high-level targets that forfeiture advocates claim to be aiming for.[42]

Prosecutors also benefit from asset forfeiture. Assistant U.S. Attorney Craig Gaumer calls asset forfeiture "a prosecutor's secret weapon."[43] The National District Attorneys Association has promulgated several policy statements and guidelines regarding asset forfeiture, recommending its use.[44] Perhaps not surprisingly, there is evidence that prosecutorial discretion has been inappropriately influenced by the presence of asset forfeiture options.[45]

Current and former justice officials have acknowledged the powerful incentives of financial rewards from forfeiture.[46] In the NPR series, the police chief of a small town in Texas made it clear that the retention of forfeited assets is a very attractive consideration:

> Law enforcement has become a business, and where best to hit these narcotics organizations other than in the pocketbook ... and then to be able to turn around and use those same assets to benefit our department, that's a win-win situation as far as we're concerned.[47]

Perhaps the clearest evidence of the importance that law enforcement places on generating revenues through forfeiture is the political pressure the law enforcement lobby has exerted to prevent reforms to asset forfeiture laws at the state and federal level.[48] As law professors Eric Blumenson and Eva Nilsen and others have documented, lobbying by law enforcement has resulted in considerable revisions and modifications beneficial to law enforcement to forfeiture reform efforts.[49]

One egregious example is law enforcement's lobbying efforts against amendments to federal asset forfeiture laws that would have required that state proceeds from equitable sharing with the federal government be subject to state law—meaning that if state law demands that 50 percent of proceeds go to drug treatment or the general fund, the same would apply to equitable sharing payments.[50] The amendments were repealed before they became effective.[51]

### *An Unlevel Playing Field for Property Owners*

The profit motive in civil asset forfeiture laws provides a critical incentive for abuse. By contrast, property owners' ability to reclaim seized property is a check on forfeiture power. The better legal procedures protect this ability, the more difficult it is for law enforcement to forfeit property. This report examines two key factors that determine how easily property owners can defend their interests in civil asset forfeiture proceedings: the standard of proof required to demonstrate that the property should be forfeited and the strength of an "innocent owner" defense.[52]

### Standard of Proof

The "standard of proof" means how much evidence the government must present at trial and how compelling that evidence must be in order to successfully claim property through civil asset forfeiture. The higher the standard of proof set by state law, the harder forfeiture is for the government and the more protection afforded property owners.

The highest standard is "beyond a reasonable doubt," commonly associated with convictions on criminal charges. As shown in Table 2, only four states require such a high standard for civil forfeiture proceedings, and one of those, California, only uses it when certain property is at issue. (Most commonly, in states with two forfeiture standards, the higher one is for the forfeiture of real property such as land and homesteads.) In another of those states, North

**Plaintiff's Ex. # 1, p. 21**
**Littlepage v. DC, 14-899 (ESH)**

# Data Reveals
# Texas Law Enforcement's
# Dependence on Forfeiture Funds

Just how much do law enforcement agencies rely on forfeiture proceeds?  To find out, the Institute for Justice examined the budgets of the top 10 forfeiture-earning agencies in Texas, as well as a random sample of 52 other agencies.  Texas is one of the worst states for civil forfeiture, with bad laws and aggressive use of equitable sharing with the federal government.

We found that forfeiture proceeds represent, on average, more than 14 percent of the budgets of these law enforcement agencies.  The average agency budget in Texas is a little more than $1 million; 14 percent of that comes to a bit more than $47,000.  In Texas, that would pay for any one of the following:[1]

- One law enforcement agency chief executive
- Almost one-and-a-half police sergeants
- Almost two police officers

Clearly, 14 percent is a sizable share of an agency budget.  Indeed, the records we requested indicated that many agencies actually count on securing forfeiture proceeds to fund their budgets.

But the biggest forfeiture money-makers in Texas are even more reliant on forfeited funds: The top 10 forfeiture earners take in, on average, about 37 percent of their budgets in forfeiture funds.  (To calculate that percentage, we removed one agency, the 76th District Attorney in Camp County, from the top 10 because its forfeiture proceeds represented an astonishing 1,344 percent of its budget, and that skewed the average.)

Civil forfeiture advocates often claim that the process is used primarily by large agencies to target "high-profile" offenders.  But we found that rural agencies in our sample of 52 Texas agencies appear to be even more dependent on forfeiture funds than others, with forfeiture proceeds representing, on average, nearly one fifth—18.3 percent—of their budgets.

Similarly, the smaller agencies (those serving less than 1 million people) among the top ten forfeiture earners report forfeiture proceeds in excess of 65 percent of annual budgets.  (Again, we removed the 76th District Attorney in Camp County for this calculation.)

It seems unlikely that smaller and rural agencies meet more high-profile offenders than their urban counterparts—and more likely that forfeiture in rural areas is sweeping in instead every-day residents and visitors passing through, as stories of abuse in places like Tenaha suggest (see p. 16).

---

1 Calculations based on 2003 LEMAS data.

Plaintiff's Ex. # 1, p. 22
Littlepage v. DC, 14-899 (ESH)

Carolina, all forfeitures are criminal actions; civil asset forfeiture essentially does not exist in North Carolina. Only Nebraska and Wisconsin require beyond a reasonable doubt for all civil forfeiture.

"Probable cause" is the lowest standard used for forfeiture, and it is the standard for some property in 14 states. Probable cause is the same standard used to justify search warrants and the arrest of suspected law violators and means merely that the government has a reasonable belief that a person has committed a crime. It is also the standard law enforcement must meet in most states for a seizure of property—the first step in the forfeiture process.

As Table 2 shows, 27 states employ a "preponderance of the evidence" standard for forfeiture of some property, and so does the federal government, making it the most common standard. It is considered higher than mere probable cause and generally equates to the idea that it is more likely than not that the property is related to criminal conduct and thus subject to forfeiture. Finally, 13 states use a "clear and convincing" standard for some property. It poses a greater challenge for government to prove its case than probable cause or preponderance, but less than reasonable doubt.

In short, in the vast majority of states and at the federal level, the standard of proof required to forfeit an individual's property is lower than the standard required to prove that the individual was guilty of the criminal activity that supposedly justified the forfeiture in the first place. Given this situation, it is not surprising that upwards of 80 percent of forfeitures occur absent a prosecution.[53]

*Table 2 Standard of Proof in State Forfeiture Laws\**

| More difficult to forfeit assets | | |
|---|---|
| Prima Facie/Probable Cause | Alabama, Alaska, Delaware, Illinois, Massachusetts, Missouri, Montana, Rhode Island, South Carolina, Wyoming |
| Probable Cause and Preponderance of the Evidence | Georgia, North Dakota, South Dakota, Washington |
| Preponderance of the Evidence | Arizona, Arkansas, Hawaii, Idaho, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Mississippi, New Hampshire, New Jersey, Oklahoma, Pennsylvania, Tennessee, Texas, Virginia, West Virginia |
| Preponderance of the Evidence and Clear and Convincing | Kentucky, New York, Oregon |
| Clear and Convincing | Colorado, Connecticut, Florida, Minnesota, Nevada, New Mexico, Ohio, Utah, Vermont |
| Clear and Convincing and Beyond a Reasonable Doubt | California |
| Beyond a Reasonable Doubt | Nebraska, North Carolina\*\*, Wisconsin |

\* Most commonly, in states with two forfeiture standards, the higher one is for the forfeiture of real property.
\*\* State law effectively does not have civil forfeiture.

22

## Burden on Innocent Owners

Not only are most civil forfeitures subject to a standard of proof lower than that required for criminal guilt, but in most states, property owners are effectively guilty until proven innocent.

In 1996, the U.S. Supreme Court held in *Bennis v. Michigan*[54] that property owners do not have a constitutional right to an "innocent owner" defense in civil forfeiture actions. In *Bennis*, a wife's car was used without her knowledge by her husband to secure the services of a prostitute. The husband was arrested and the car seized. Under Michigan law, vehicles used for such purposes were subject to seizure and forfeiture. Furthermore, Michigan law did not provide for a defense based on an owner's lack of knowledge about the use of the vehicle for illegal purposes—in other words, that the owner is innocent, and therefore the property should not be forfeited. The wife appealed the forfeiture of the vehicle, and the U.S. Supreme Court ruled against her.

The critical public and political reaction to this ruling, as well as media reports of questionable forfeiture activities, led to the inclusion of an innocent owner defense in the 2000 Civil Asset Forfeiture Reform Act (CAFRA) that now applies to all federal forfeiture actions. In addition, all remaining states that previously did not have an innocent owner defense, including Michigan, eventually passed legislation barring the forfeiture of property belonging to an innocent owner.

However, in most states and at the federal level, the burden is on the owner to establish her innocence, which would then exempt the property from forfeiture. This is the exact opposite of the dictum "innocent until proven guilty" that applies in criminal cases.

As Table 3 shows, only in six states does the government bear the burden of establishing that an owner is not innocent for forfeiture of all kinds of property. In another six states, the burden depends on the property in question. Typically, in these states, the burden is on the government for real property, especially primary residences, while it is on the owner for other property such as cash. In 38 states, the burden is on the owner to establish his innocence.

### Federal Equitable Sharing

Despite legal environments in most states that favor law enforcement over property owners in forfeiture proceedings, state and local agencies often—and increasingly—turn to a lesser known asset forfeiture practice called "equitable sharing."

The Comprehensive Crime Control Act of 1984 allows state and local law enforcement agencies to transfer assets they seize to federal law enforcement agencies. Federal law enforcement officials can take possession of this property and initiate federal forfeiture actions as long as the "conduct giving rise to the seizure is in violation of federal law and where federal law provides for forfeiture."[55]

Seized assets transferred to the federal

*Table 3 Innocent Owner Burden*

| | |
|---|---|
| Owner must prove innocence | Alaska, Arizona, Arkansas, Connecticut, Delaware, Georgia, Hawaii, Idaho, Illinois, Iowa, Louisiana, Maryland, Massachusetts, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming |
| Depends on property | Alabama, Indiana, Kentucky, Maine, New Mexico, Utah |
| Government must prove guilt | California, Colorado, Florida, Kansas, Michigan, Oregon |

23

# Canine Sniffs Yield Unreliable Evidence for Forfeiture

In forfeiture cases, police officers and prosecutors often rely heavily on the presence of trace amounts of cocaine detected on cash by canines—especially where the only other evidence of wrongdoing is an officer's subjective opinion of "suspicious circumstances."[1]  The value of such evidence for establishing a plausible connection to drug activity is seriously in question, however.

Famously, in 1985, the *Miami Herald* asked 11 prominent citizens to supply a $20 bill for trace analysis.  Ten of the 11 bills tested positive—implicating future-Attorney General Janet Reno, future-Governor Jeb Bush, a Catholic archbishop and a former Miss America winner.[2]

Scientists, in studies stretching back to 1987, have consistently found that a third to 97 percent of all bills in circulation are tainted by cocaine.[3]  The latest study, presented in August 2009 to the American Chemical Society, found cocaine on 90 percent of 234 banknotes from 18 U.S. cities.  The findings, arrived at by means of a new method of gas chromatography, confirm numerous previous studies.[4]

In 1987, a Drug Enforcement Agency scientist found that one-third of all money at the Federal Reserve Building in Chicago had traces of cocaine.  The study recommended "that trace analysis of currency for general enforcement or seizure be stopped."

The law enforcement community has yet to follow that advice.  Judges, however, on occasion demand more than a canine sniff test to establish a drug connection.  For instance, U.S. Supreme Court Justice David Souter has noted "the pervasive contamination of currency by cocaine,"[5] as have many lower courts.[6]  Enough do not, so canines are still widely employed to conduct searches that are practically guaranteed to return a positive result.[7]

---

1    *United States v. $124,700.00*, 458 F.3d.

2    Curriden, M. (1993, August). Courts reject drug-tainted evidence; Studies find cocaine-soiled cash so prevalent that even Janet Reno had some. *American Bar Association Journal, 79*, 22.

3    *United States v. $639,558.00*, 293 U.S. App. D.C. 384, 955 F.2d 712, 714 n.2 (D.C. Cir. 1992); Curriden, 1993.

4    Biello, D. (2009, August 16). Cocaine contaminates majority of U.S. currency; And it's not just the U.S.: Canada, Brazil have a preponderance of the drug powder on their bills, too. *Scientific American*. Retrieved September 16, 2009, from http://www.scientificamerican.com/article.cfm?id=cocaine-contaminates-majority-of-american-currency; Karch, S. (1997). Tainted money supply. *Forensic Drug Abuse Advisor, 9*(3), 20-21; Oyler, J. Darwin, W. D., & Cone, E. J. (1996). Cocaine contamination of United States paper currency, *Journal of Analytical Toxicology 20*, 213-216; Negrusz, A. Perry, J. L., & Moore, C. M. (1998). Detection of cocaine on various denominations of United States currency. *Journal of Forensic Science, 43*(3), 626-629; Jenkins, A. J. (2001). Drug contamination of U.S. paper currency. *Forensic Science International, 121*, 189-193; Curriden, 1993.

5    *Illinois v. Caballes*, 543 U.S. 405, 410-412 (2005) (Souter, J. dissenting).

6    *United States v. $242,484.00*, 351 F.3d 499, 511 (11th Cir. 2003), vacated on other grounds; *United States v. $53,082.00*, 985 F.2d 245, 250 n.5 (6th Cir. 1993); *United States v.$80,760.00*, 781 F. Supp. 462, 475 n.32 (N.D. Tex. 1991); *United States v. $5,000*, 40 F.3d 846, 849 (6th Cir. 1994); *United States v.Carr*, 25 F.3d 1194, 1214-1218 (3d Cir. 1994) (Becker, J. concurring in part and dissenting in part); *United States v. $639,558.00*, 293 U.S. App. D.C. 384, 955 F.2d 712, 714 n.2 (D.C. Cir. 1992).

7    *United States v. $124,700.00*, 458 F.3d. 822 (8th Cir. 2006).

**Plaintiff's Ex. # 1, p. 25**
**Littlepage v. DC, 14-899 (ESH)**

government through equitable sharing agreements may be forfeited regardless of whether an individual is charged, let alone convicted, of a crime in either state or federal courts. If the assets are successfully forfeited to the federal government, the funds are deposited in the appropriate federal asset forfeiture fund, and state and local agencies receive a percentage back.[56]

There are two forms of equitable sharing activities. "Joint investigative" forfeitures are the result of investigative activities involving the cooperation of federal and state or local law enforcement agencies. These are particularly common with drug and gang task forces involving federal, state and local law enforcement agencies. The percentage of funds shared with state and local agencies depends on their role and effort in a particular seizure.

"Adoptive forfeitures" occur when state and local agencies seize assets as the result of their investigation of state crimes. If the original crime is also a federal crime, the property is forfeitable under federal law. State and local agencies may then transfer seized property to federal law enforcement agencies, which can elect to "adopt" this property for federal forfeiture proceedings. State and local agencies receive 80 percent of the assets obtained from adoptive forfeitures, and the federal government retains the remaining 20 percent to offset costs associated with federal fund operations.

The rationale for joint forfeitures is that the federal government can serve as the sole processor of potentially complicated seizure and forfeiture activities. Furthermore, for geographic areas that may involve a multi-state task force, the federal forfeiture laws can avoid conflicts between statutes affecting different state and local agencies, creating a more equitable return on agency participation.

Adoptive forfeitures are more controversial and have been the subject of considerable scholarly criticism.[57] Government officials[58] and proponents of adoptive forfeitures[59] frequently cite improved inter-agency coordination and cooperation, more efficient forfeiture processing and tougher federal criminal penal-ties for many crimes (especially drug crimes).

Critics note that these are rather superficial rationales.[60] The most reasonable explanation is that it is in the financial interests of many state and local agencies to process forfeitures through the federal government rather than to use their own existing state legal framework.

There are several reasons why state and local agencies would elect to use equitable sharing. First, when state and local agencies transfer seized property to the federal government for forfeiture, that property is subject to the federal government standard—preponderance of the evidence—not the state standard, even if state law is more restrictive. Thus, it is easier for the federal government to prevail in forfeiture actions than some states.

Second, in those states where law enforcement does not receive all of the proceeds from civil forfeiture, state law typically mandates that the proceeds be distributed to specific non-law enforcement purposes, such as education or general fund expenditures. However, state and local agencies can enter into agreements with federal agencies to coordinate and enhance forfeiture activities, and the funds obtained are generally exempt from these restrictions.

Furthermore, the federal government *requires* that any funds distributed through equitable sharing arrangements be used solely to fund law enforcement activities, even for agencies in states where law enforcement receives *none* of the proceeds from state forfeitures.[61] The federal government will discontinue equitable sharing agreements with an agency if it is discovered that funds are being used for non-law enforcement purposes—even if state law requires such use.

Moreover, in an effort to encourage the creation of independent task forces designed to target particular crimes such as drug sales and trafficking, equitable sharing payments may be used to pay the salary of officer positions created to replace officers assigned full-time to task forces—even in states that prohibit using forfeiture funds to pay officer salaries.[62]

25

In these ways, the federal government's asset forfeiture program helps state and local agencies avoid restrictions in state law that increase the effort necessary to forfeit funds or diminish the incentives for such activities in the first place.[63]

## The direct payment of forfeiture funds by the federal government to federal, state and local agencies represents **"a virtual cash cow."**

It is difficult to ignore the substantial difference in the return on investment for many law enforcement agencies to engage in equitable sharing activities compared with state forfeiture actions. Vecchi and Sigler claim that the direct payment of forfeiture funds by the federal government to federal, state and local agencies represents "a virtual cash cow" for these agencies.[64]

Even advocates of forfeiture activities acknowledge the circumvention of state forfeiture laws that equitable sharing enables. For example, California prosecutor Dee R. Edgeworth notes that while some states have homestead exemptions that preclude the forfeiture of real property that qualifies as a homestead,

a state homestead exemption is not a defense to a federal real property forfeiture case because the federal supremacy clause preempts the state exemption…. Therefore, in jurisdictions with state homestead exemptions, law enforcement will use the federal forfeiture system for any real property that may be exempted under state law.[65]

Edgeworth cites the U.S. Department of Justice policy manual for asset forfeiture as discouraging adoptive forfeitures simply to avoid more burdensome state laws.[66] The actual language in the policy manual, however, seemingly *encourages* such actions. According

to the "Request for Adoption of State or Local Seizures" form,

As a general rule, if a state or local agency has seized property as part of ongoing state criminal investigation, and if the criminal defendants are being prosecuted in state court, the forfeiture action should also be pursued in state court. However, certain circumstances may make federal forfeiture appropriate. These circumstances include, but are not limited to, the following: (1) *state laws* or procedures *are inadequate* or forfeiture experience is lacking in the state system *with the result that a state forfeiture action may be unfeasible or unsuccessful* (emphasis added).[67]

The emphasized passage indicates that adoptive forfeitures are acceptable in cases in which state and local law enforcement is uncertain they would prevail under state law. The language also suggests that federal adoptive forfeitures could be pursued even if the owner is being prosecuted in state court. Because the state would have to meet a beyond a reasonable doubt standard in criminal court, the only rationales for adoptive forfeiture in such cases would seem to be concerns about insufficient evidence to convict or, in the event the state prevails, the fact that existing state law allocates less than the 80 percent proceeds granted under federal law. It is unclear how this language supposedly reduces attempts to circumvent state laws.[68]

In one of the few empirical analyses of asset forfeiture to date, criminologists John Worrall and Tomislav Kovandzic found that law enforcement agencies in states where at least a portion of forfeiture proceeds must be used for non-law enforcement purposes had significantly higher levels of equitable sharing payments than agencies in states where law enforcement could keep all proceeds.[69] The results suggest that law enforcement agencies in

26

states that require law enforcement to share forfeiture proceeds are more likely to engage in equitable sharing in order to avoid state restrictions.

This is consistent with investigative reports such as the 2008 NPR series[70] and scholarly research[71] that highlight law enforcement efforts to maximize revenue through equitable sharing. For example, following the passage of a Missouri law requiring all forfeiture proceeds to be deposited in the state education fund, law enforcement agencies took specific steps to circumvent this law by increasing the use of equitable sharing.[72] This is also consistent with the findings of our own original analysis of equitable sharing data.

Forfeiture critics argue that the self-funding nature of asset forfeiture, especially equitable sharing proceeds that are not subject to restrictions of state law, poses real danger to the public's ability to oversee government resources, as state legislatures have less power to set law enforcement budgets.[73] Many departments collect more in forfeiture revenues than their yearly operating budget, but they see no accompanying reductions because state laws frequently prohibit reducing law enforcement budgets as a result of new forfeiture revenues.[74]

## The Extent and Nature of Asset Forfeiture in the United States

### Data Sources

To measure the extent of asset forfeiture use, we relied on three sources of data. Alone, none provide a complete picture of asset forfeiture in the United States, but together they paint a clearer portrait. Although they all have limitations, these sources represent the best-available data on asset forfeiture. Part II of this report provides the same data for each state.

All of these data sources include both civil and criminal forfeitures—none report them



separately—though given that 80 percent of federal forfeitures occur absent prosecution, it is likely that the vast majority are civil asset forfeitures.

- **Freedom of Information Requests**–Laws in 29 states clearly required data on asset forfeiture use to be collected. The Institute for Justice spent two years submitting official freedom of information requests to those states. Only 19 states provided reliably useful information, and as shown in Part II, the extent of information and level of detail varies widely. Two states responded with unusable data, and eight simply failed to respond. Thus, in most states, we know very little about the use of asset forfeiture. It is important to note that some states may have included equitable sharing proceeds, as well as proceeds from state-law forfeitures, in their reports. So these data may overlap with reported equitable sharing receipts.

- **LEMAS**–The Law Enforcement Management and Administrative Statistics (LEMAS) survey of law enforcement agencies nationwide is conducted every three to four years by the Census Bureau on behalf of the

27

# Despite State Protections, Nebraska Troopers Seize Cash

Nebraska is one of only three states that holds the government to the highest possible legal standard of proof in civil forfeiture proceedings, requiring law enforcement to prove its case "beyond a reasonable doubt." That did not stop state troopers from seizing and ultimately forfeiting $124,700 in cash from Nevada resident Emiliano Gonzalez without so much as charging, let alone convicting, him of a crime. This was possible through federal equitable sharing, as well as the low federal standards required for a successful forfeiture.

In May 2003, a Nebraska trooper stopped Gonzalez for speeding. After learning from a dispatcher that Gonzalez had a previous arrest for speeding that he did not disclose, troopers asked to search the car and discovered $124,700 in cash in a cooler in the back seat.[1] Gonzalez, who was not fluent in English, told police he pooled cash from friends and their relatives in order to buy a refrigerated truck in Chicago. When he got to Chicago, the truck he intended to buy for a produce business had already been sold. He was driving home when he was stopped.

Troopers seized the cash pursuant to federal forfeiture and controlled substances laws, in essence alleging that the money was involved in a drug crime.

Gonzalez initially told police that he did not have large amounts of cash. He later testified that he was scared carrying so much money was illegal, and he had concealed the money in a cooler to avoid having it stolen. The trial court found that his story was "plausible and consistent" and denied the forfeiture. The 8th U.S. Circuit Court of Appeals later reversed the trial court's decision.

In so doing, the court held that the government established by a "preponderance of the evidence" (the federal civil forfeiture standard of proof) a "substantial connection" between the money and a drug trafficking offense.

The 8th Circuit wrote, "[W]hile an innocent traveler might theoretically carry more than $100,000 in cash across the country and seek to conceal funds from would-be thieves on the highway, we have adopted the common-sense view that bundling and concealment of large amounts of currency, combined with other suspicious circumstances, supports a connection between money and drug trafficking"—even in the absence of any drugs or drug paraphernalia in the car or any prior drug offenses by Gonzalez or his investors.

Indeed, among the "suspicious circumstances" cited, only one had any relation to evidence of a drug crime—a canine alert of drug residue on the money. Canine alerts on cash are notoriously unreliable (see p. 24).

Especially as interpreted by the 8th Circuit, the preponderance of the evidence standard the government had to meet to forfeit Gonzolez's cash is significantly lower than the beyond a reasonable doubt standard required for civil asset forfeiture under Nebraska law.

---

[1]   *United States v. $124,700*, 458 F.3d 822 (8th Cir. 2006).

Bureau of Justice Statistics at the U.S. Department of Justice.[75]  One question on the survey asks agencies to report the total amount of forfeiture proceeds received during the previous calendar year as the result of participation in a drug asset forfeiture program.[76]  Thus, LEMAS forfeiture totals are based exclusively on forfeitures associated with drug offenses and likely only include funds *received* by law enforcement (excluding assets distributed to other non-agency funds), thereby undercounting the total amount of forfeitures.[77]  LEMAS data likely include, at least for some agencies, both proceeds of forfeitures conducted under state law and those conducted via equitable sharing.

- **Federal Asset Forfeiture Fund Reports**–Several federal documents report annual information on the operation of the federal Department of Justice's Assets Forfeiture Fund (AFF) and the Treasury Forfeiture Fund (TFF) of the U.S. Department of the Treasury. Federal forfeiture funds are the depository for all federally forfeited assets—regardless of whether they were initially seized by state and local agents and then accepted for federal equitable sharing or the exclusive result of federal agents. The sums of assets in these funds thus represent a wide-reaching picture of asset forfeiture in the United States.[78]

## Findings

Overall, these data begin to show that state and local agencies, as well as the federal government, use asset forfeiture extensively—often to the tune of tens of millions of dollars each year.  As Table 4 shows, in just nine states, forfeited currency totaled more than $70 million in just a two-year period, from 2001 to 2002.  This is the two-year period for which the most states reported, in response to freedom of information requests, the total amount of currency forfeited by law enforcement.  These do not include the additional proceeds from the sale of property and vehicles, so the extent of forfeiture is underrepresented by this number.

Not surprisingly, the larger states in this list reported the greatest forfeiture totals, but even smaller states and those not commonly identified as having serious crime or drug problems report considerable asset forfeiture activity.  For example, Massachusetts and Texas report similar currency forfeiture totals for 2002, which suggests that forfeiture activity is not correlated with population size or the extent of crime and drug problems in a given state.

Freedom of information data also reveal that states appear to be forfeiting a large number of vehicles, as Table 5 shows.  Between 2001 and 2007, Texas and Virginia together forfeited more than 17,000 vehicles, and the revenues generated are likely substantial.  For example, Virginia reported the value of vehicle forfeitures over a 12-year period as more than $34 million.  While many forfeited vehicles are either put into service or have limited resale value, the sale of only a fraction of forfeited vehicles would still provide considerable proceeds.

29

*Table 4 Forfeited Currency in Nine States, 2001 and 2002*

|  | 2001 | 2002 | Total | Average per Year |
|---|---|---|---|---|
| Arkansas | $3,494,483 | $2,805,948 | $6,300,431 | $3,150,216 |
| Hawaii | $450,945 | $645,537 | $1,096,482 | $548,241 |
| Maine | $338,248 | $487,599 | $825,847 | $412,924 |
| Massachusetts | $5,255,308 | $4,153,936 | $9,409,244 | $4,704,622 |
| Michigan | $8,811,342 | $10,830,841 | $19,642,183 | $9,821,092 |
| Minnesota | $960,081 | $684,454 | $1,644,535 | $822,268 |
| Texas | $17,445,639 | $5,184,519 | $22,630,158 | $11,315,079 |
| Virginia | $3,752,846 | $3,828,463 | $7,581,309 | $3,790,655 |
| Washington | $705,084 | $680,645 | $1,385,729 | $692,865 |
| Total | $41,213,976 | $29,301,942 | $70,515,918 | $35,257,959 |
| Average per State | $4,579,331 | $3,255,771 | $7,835,102 | $3,917,551 |

*Table 5 Number and Value of Vehicles Forfeited in Five State*

|  | Number of Vehicles | Total Vehicles Value |
|---|---|---|
| **Maine** | | |
| 1999 | 4 | $28,004 |
| 2000 | 4 | $17,600 |
| 2001 | 6 | $52,095 |
| 2002 | 7 | $53,905 |
| 2003 | 7 | $40,200 |
| Totals | 28 | $191,804 |
| **Virginia** | | |
| 1996 | 268 | $451,285 |
| 1997 | 391 | $2,141,597 |
| 1998 | 418 | $2,182,659 |
| 1999 | 409 | $1,918,062 |
| 2000 | 463 | $2,107,804 |
| 2001 | 521 | $2,620,232 |
| 2002 | 569 | $2,598,131 |
| 2003 | 617 | $3,323,225 |
| 2004 | 803 | $3,484,799 |
| 2005 | 827 | $4,493,597 |
| 2006 | 745 | $4,294,805 |
| 2007 | 772 | $4,397,787 |
| Totals | 6,803 | $34,013,983 |
| **Texas** | | |
| 2001 | 805 | NA |
| 2002 | 209 | NA |
| 2003 | 1,575 | NA |
| 2004 | 2,171 | NA |
| 2005 | 1,707 | NA |
| 2006 | 1,996 | NA |
| 2007 | 2,069 | NA |
| Totals | 10,532 | NA |
| **Arkansas** | | |
| 2000 | 534 | NA |
| 2001 | 514 | NA |
| 2002 | 522 | NA |
| 2003 | 683 | NA |
| 2004 | 779 | NA |
| 2005 | 771 | NA |
| 2006 | 655 | NA |
| 2007 | 688 | NA |
| 2008 | 585 | NA |
| Totals | 5,731 | NA |
| **Hawaii** | | |
| 2001 | NA | $536,040 |
| 2002 | NA | $487,147 |
| 2003 | NA | $575,675 |
| 2004 | NA | $457,792 |
| 2005 | NA | $332,230 |
| 2006 | NA | $460,855 |
| 2007 | NA | $468,290 |
| Totals | NA | $3,318,029 |

Forfeiture also appears extensive looking at LEMAS data, with more than $1 billion in combined forfeiture proceeds reported for 2000 and 2003, the most recent years available. In 2000, LEMAS surveyed 2,985 agencies and reported a total of $669,703,443 in forfeiture proceeds. In 2003, the 2,859 agencies surveyed reported $536,944,811 in proceeds.[79] However, as noted earlier, it is likely that LEMAS undercounts the true extent of forfeiture use, both because it only addresses drug forfeitures and because it only asks for proceeds returned to law enforcement agencies. It is also not clear, because the survey question does not ask, whether these data cover currency only or other assets seized, such as cars, homes and boats.

Federal reports also indicate widespread—and growing—use of asset forfeiture by federal agents and through equitable sharing. As Table 6 shows, from 2006 to 2008, currency deposits alone to the Department of Justice's Assets Forfeiture Fund (AFF) exceeded $1 billion each year, with tens or even hundreds of millions more in property forfeitures. Annual financial statements indicate that these years had a few exceptionally high-value forfeitures (a single case of $337 million, three fraud cases totaling $842 million, and $443 million from five major cases); however, even after deducting the assets from these exceptional cases, deposits for these years are higher than in previous years.

*Table 6 Deposits to Department of Justice Assets Forfeiture Fund, 2001 to 2008*

|  | Cash and Cash Equivalents | Forfeitures of Property | Totals |
|---|---|---|---|
| FY 2001 | $357,900,000 | $48,900,000 | $406,800,000 |
| FY 2002 | $355,600,000 | $68,000,000 | $423,600,000 |
| FY 2003 | $413,900,000 | $72,100,000 | $486,000,000 |
| FY 2004 | $448,500,000 | $94,600,000 | $543,100,000 |
| FY 2005 | $514,900,000 | $80,600,000 | $595,500,000 |
| FY 2006 | $1,009,200,000 | $115,700,000 | $1,124,900,000 |
| FY 2007 | $1,409,000,000 | $106,700,000 | $1,515,700,000 |
| FY 2008 | $1,222,600,000 | $63,400,000 | $1,286,000,000 |
| Totals | $5,731,600,000 | $650,000,000 | $6,381,600,000 |
| Averages | $716,450,000 | $81,250,000 | $797,700,000 |

Moreover, in 2008, for the first time in its history, the AFF held more than $1 billion in funds available for law enforcement activities. These are net assets (or "net position" in Department of Justice language)[80]—forfeiture proceeds available to law enforcement *after* debts owed by the Fund are paid. These debts include payments to third parties, equitable sharing payments, asset management expenses, special contracts associated with Fund operation and funds supporting joint law enforcement operations. In short, this is money that federal law enforcement can use.

Table 7 reports the growth of net assets in both the AFF and the TFF in fiscal years 2000 to 2008. Although the AFF has considerably more revenues, the TFF has also increased substantially, with more than $400 million in net assets in 2008 alone.

Consider that in 1986, the second year after the AFF was created and amendments to federal forfeiture law allowed law enforcement agencies greater latitude to retain and spend forfeiture proceeds, the Fund received deposits of $93.7 million from forfeited cash and the sale of forfeited property.[81] By 2008, the Fund held more than $1 billion in net assets.

This $1 billion in net assets would cover all or almost all of the total justice system expenditures (including police, judicial and corrections combined) in 2006 for Utah ($1.2 billion), New Mexico ($1.2 billion), Mississippi ($1.1 billion), Kansas ($1.3 billion), Iowa ($1.2 billion) or Arkansas ($1.2 billion).[82]

In addition, both the AFF and TFF may invest a portion of their assets in U.S. Treasury securities and retain the interest income for future operations. During fiscal years 2000 to 2008, the time period covered in Table 7, the range of investment income was $11.5 million to a staggering $111 million in 2007. Thus, considerable sums of money are generated by the investment of forfeiture assets, which are then used to strengthen the Department of Justice's and Treasury Department's ability to forfeit more assets.

31

*Table 7 Departments of Justice and Treasury Forfeiture Funds Net Assets, 2000 to 2008*

|  | AFF Net Assets | TFF Net Assets | Totals |
|---|---|---|---|
| FY 2000 | $536,500,000 | NA | NA |
| FY 2001 | $525,800,000 | $237,300,000 | $763,100,000 |
| FY 2002 | $485,200,000 | $173,000,000 | $658,200,000 |
| FY 2003 | $528,400,000 | $177,200,000 | $705,600,000 |
| FY 2004 | $427,900,000 | $194,100,000 | $622,000,000 |
| FY 2005 | $448,000,000 | $255,300,000 | $703,300,000 |
| FY 2006 | $651,100,000 | $236,800,000 | $887,900,000 |
| FY 2007 | $734,200,000 | $361,400,000 | $1,095,600,000 |
| FY 2008 | $1,000,700,000 | $426,800,000 | $1,427,500,000 |

Just as federal asset forfeiture funds have grown, so too have equitable sharing payments from the AFF to state and local agencies and task forces—essentially doubling from 2000 to 2008, from a little more than $200 million to $400 million, as shown in Figure 1. The nine-year total comes to more than $2.4 billion, and the amount of money that has returned to state and local law enforcement has increased significantly over the past three years. There can be little doubt that a considerable amount of the asset forfeiture that occurs in the United States is the result of equitable sharing.

*Figure 1 Equitable Sharing Payments to States from the Department of Justice Assets Forfeiture Fund, 2000 to 2008*



# Forfeiture as Extortion in Jim Wells County, Texas

In August 2005, Javier Gonzalez borrowed a car from his employer at a used car lot in Austin, Texas, and drove to Brownsville to visit his dying aunt, who had helped raise him, and also to make arrangements for her funeral.  He brought more than $10,000 in cash to provide for a proper burial with a coffin and headstone.  She passed away in December 2005.

Before Gonzolez made it to Brownsville, however, he was pulled over because the borrowed Mazda's front license plate was sitting on the dashboard instead of affixed to the front bumper.  This is a common misunderstanding in Texas—many dealers and motorists think the front plate is optional, and police officers rarely pull them over to tell them otherwise.

When the Jim Wells County Task Force officers found out about the cash, they handcuffed him and took him to a local fire station for more interrogation and a more thorough search of the car.  The search turned up no drugs or other contraband, but officers produced an affidavit saying they were seizing his money and offered him a choice:  Sign away any legal claim to the cash or face money laundering charges and have his boss' car seized as well.  Feeling he had no other choice, Gonzalez signed.

Gonzalez hired an attorney, however, and in April 2008 won his money back, plus attorney's fees and an award.  In the settlement, the county denied all accusations and did not admit wrong-doing.

In March 2008, Joe Garza, the District Attorney for Texas' 79th Judicial District (which includes Jim Wells and neighboring Brooks County) was voted out of office, in large part because of a grow-ing public scandal regarding his use of forfeiture funds.[1]  An audit has revealed that Garza distrib-uted $1.1 million to three favored employees between 2004 and 2008, and many others may have received improper payments for "car allowances, stipends, reimbursements, advances, audits, travel (including to casinos), contract labor and other seemingly illogical purposes."[2]

1    Reid, J. (2008, May 16). Highway robbery. *The Texas Observer*, *10*(10), 16.
2    Cuellar, Jr., M. J. (2009, July 14). State asks for audit of DA's forfeiture fund; Saenz details 'the scheme' to commis-sioners. *Alice Echo-News Journal*, npn; Cuellar, Jr., M. J. (2009, August 5). More details emerge from DA forfeiture fund; 46 others received more than $400,000 from fund. *Alice Echo-News Journal*, npn; Powell, J., & Malan, D. (2009, May 2008). Jim Wells probes drug-fund use; $4.2 million spent by ex-DA Garza. *Corpus Christi Caller-Times*, p. B17.

33

*Table 8 Currency Forfeitures in Four States, 2001 to 2006*

|  | Oklahoma | Texas | Virginia | Washington | Total | Average |
|---|---|---|---|---|---|---|
| 2001 | $3,924,541 | $17,445,639 | $3,752,846 | $705,084 | $25,828,110 | $6,457,028 |
| 2002 | $6,520,748 | $5,184,519 | $3,828,463 | $680,645 | $16,214,375 | $4,053,594 |
| 2003 | $5,887,904 | $40,002,068 | $5,467,848 | $986,400 | $52,344,220 | $13,086,055 |
| 2004 | $5,236,443 | $35,976,382 | $6,754,732 | $824,390 | $48,791,947 | $12,197,987 |
| 2005 | $5,378,123 | $25,308,679 | $6,698,992 | $1,329,935 | $38,715,729 | $9,678,932 |
| 2006 | $5,648,549 | $33,062,289 | $5,180,497 | $866,406 | $44,757,741 | $11,189,435 |
| Total | $32,596,308 | $156,979,576 | $31,683,378 | $5,392,860 | $226,652,122 | $56,663,031 |
| Average | $5,432,718 | $26,163,263 | $5,280,563 | $898,810 | $37,775,354 | $9,443,838 |

State freedom of information data also show an increase in forfeiture use, although there are yearly fluctuations. Table 8 shows the growth of currency forfeitures in four states over the six-year period of 2001 to 2006. (Only four states provided these data for these years.) In particular, Texas experienced tremendous increases after 2002. During this six-year period, law enforcement agencies in these four states alone reported currency forfeitures of more than $226 million.

The growth in forfeitures also holds true for vehicles, as shown in Table 5. The number of vehicles forfeited in the larger states, Virginia and Texas, increased nearly threefold from 1996 to 2007 and from 2001 to 2007, respectively.[83]

In short, the best available data on asset forfeiture in the United States indicates that its use is extensive at all levels of government and suggests that it is growing. Contrast this finding with rates of drug usage and arrest, the most common application of civil forfeiture laws. The percentage of youths and adults who admit to use of various illegal substances sharply declined in the early 1980s and has remained relatively stable since then,[84] while drug arrests have continued to rise.[85] Thus, despite relatively stable rates of drug usage, police have increased arrests—and appear to be profiting considerably from these activities.

Available data also appear to contradict a key argument from forfeiture advocates. Advocates continually highlight how forfeiture is used to pursue high-level targets and major criminal organizations.[86] Table 9 suggests that, at least at the state level, this is not necessarily the case. One-half of all Virginia currency forfeitures were for *less* than $614 to $1,288, depending on the year under examination.

Thus, rather than high-level targets and criminal organizations, state and local law enforcement frequently seize and forfeit relatively small amounts of currency that would more likely be held by low-level offenders or ordinary individuals.

Similarly, as shown in Table 5, the average value of vehicles forfeited appears to be low, typically less than $6,000. And given that this average presumably includes some expensive vehicles, it is likely that the median (which is unavailable) is considerably less than $6,000. Again, this seemingly contradicts proponents' claims[87] that forfeitures target expensive "toys" (such as vehicles) that criminals purchase with the proceeds from their "ill-gotten gains."

## Is Law Enforcement Policing for Profit?

Available data indicate that forfeiture use is widespread and growing—but are law enforcement agencies "policing for profit"? Do laws that make forfeiture more rewarding and easier for law enforcement lead to greater use of forfeiture?

To find out, we tested the hypothesis that stricter state forfeiture laws, coupled with smaller allocations of proceeds to law enforcement, lead to less use of forfeiture under state law by examining federal equitable sharing data. Equitable sharing provides a way for state and local law enforcement agencies to circumvent unfavorable state forfeiture procedures, so we would expect to see greater use of equitable sharing in states where law enforcement keeps less and faces greater procedural burdens.

**Plaintiff's Ex. # 1, p. 35**
**Littlepage v. DC, 14-899 (ESH)**

*Table 9 Frequency of Currency Forfeiture Actions, Maine and Virginia*

|  | Number forfeitures | Average value per forfeiture | Median value |
|---|---|---|---|
| **Maine** | | | |
| 1999 | 80 | $12,782 | $2,630 |
| 2000 | 44 | $8,208 | $2,221 |
| 2001 | 69 | $49,012 | $1,860 |
| 2002 | 68 | $7,171 | $2,470 |
| 2003 | 70 | $9,758 | $2,250 |
| Maine Total | 331 | | |
| **Virginia** | | | |
| 1996 | 1,098 | $2,373 | $707 |
| 1997 | 1,184 | $1,893 | $702 |
| 1998 | 1,332 | $2,253 | $645 |
| 1999 | 1,492 | $2,050 | $628 |
| 2000 | 1,623 | $2,392 | $628 |
| 2001 | 1,693 | $2,217 | $685 |
| 2002 | 1,848 | $2,072 | $631 |
| 2003 | 2,160 | $2,531 | $615 |
| 2004 | 2,456 | $2,750 | $660 |
| 2005 | 1,723 | $3,888 | $700 |
| 2006 | 1,556 | $3,329 | $1,235 |
| 2007 | 1,689 | $4,104 | $1,289 |
| Va. Total | 19,854 | | |

This is, in fact, precisely what we found. The results suggest, albeit indirectly, that when state law makes forfeiture less rewarding and more difficult, state and local law enforcement agencies engage in less of it.

Ideally, we would also test the relationship between state forfeiture laws and proceeds from forfeitures conducted under state law. Unfortunately, because state record-keeping on forfeiture is limited, there is no sufficient source of data on state-law forfeitures for such an analysis.

One possibility is the data received through freedom of information requests. But these data represent less than half of the states, span different years and cover different levels and types of law enforcement agencies from state to state. The result is that the sample is simply too small, and the quality of the data too spotty, to be able to come to any solid conclusions.

Another possibility is LEMAS data, which provide consistent coverage between states and include all states. However, LEMAS does not distinguish between state-level and equitable sharing receipts. Therefore, we cannot be certain whether an analysis would measure the relationship between state forfeiture laws and state forfeiture proceeds, equitable sharing proceeds, or both. The reliability of any relationship we would find would be highly suspect.[88]



**Plaintiff's Ex. # 1, p. 36**
**Littlepage v. DC, 14-899 (ESH)**

# In Lamar County, Ga., "They had guns and badges and they just took it."

In September 2007, Chris Hunt was driving on I-75 through central Georgia on his way to see his mother in his hometown of Dublin.  Lamar County sheriffs stopped Hunt, who owns a car detailing business, for speeding.  Officers say they smelled burnt marijuana and alcohol in the car, discovered marijuana on the floor, and noted that Hunt had bloodshot eyes, all claims that Hunt denies.  Upon finding $5,581, officers confiscated the cash over Hunt's protests.  He said the money was the weekend's profits from his shop.

A canine later detected drug residue on the cash (a notoriously unreliable indicator of drug activity see page 24).  The sheriffs did not find a testable amount of drugs, however, nor alcohol or any other contraband.  Hunt was never charged with a crime.  "It was my hard-earned cash," said Hunt.  "They had guns and badges and they just took it."  National Public Radio examined other federal forfeiture cases from Lamar County and found the same pattern—motorists without previous narcotics arrests stopped and their cash seized because officers claimed they could smell marijuana they could not find, the motorist acted nervous and police dogs alerted on the cash.[1]

Hunt contacted an attorney to help get his money back and filed a claim in November 2007.[2] In July 2009, he received half back as part of a negotiated settlement.[3]

---

1    Burnett, J, (2008, June 16). Cash seizures by police prompt court fights. *National Public Radio*. Retrieved September 15, 2009, from http://www.npr.org/templates/story/story.php?storyId=91555835; Complaint at 1, *United States v. $5,581.00 in United States Funds No. 5:08-tc-05000* (M.D.Ga. filed Feb. 06, 2008).

2    Complaint at 1, *United States v. $5,581.00 in United States Funds No. 5:08-tc-05000* (M.D.Ga. filed Feb. 06, 2008).

3    Settlement at 1, *United States v. $5,581.00 in United States Funds No. 5:08-cv-31* (M.D.Ga. dismissed Jul. 28, 2009).

Plaintiff's Ex. # 1, p. 37
Littlepage v. DC, 14-899 (ESH)

*Analysis*

The analysis of equitable sharing and its relationship to state laws relied on a sample of 563 law enforcement agencies. The measure of equitable sharing reflected payments of cash and sale proceeds returned to state and local law enforcement agencies through the Department of Justice's Asset Forfeiture Program. Because any one year may be atypical and thus skew results, we averaged equitable sharing payments received by agencies for fiscal years 2000 to 2004. Finally, we divided this five-year average by the size of the resident population served by the agency to arrive at a per capita measure of equitable sharing payments.[89] The use of a per capita measure controls for population differences and minimizes concerns that our results are dominated by larger agencies that can be expected to encounter more drug-related activity simply because they serve a larger population.

Differences in equitable sharing payments were then compared to three measures of state forfeiture laws:[90] the standard of proof required; whether the innocent owner burden is on the owner, government, or whether it depends on the property; and the profit motive (the percentage of forfeited assets agencies receive).[91]

We also controlled for various factors that could muddy the relationship between equitable sharing proceeds and state laws: the number of full-time officers assigned to special or multi-agency drug enforcement units, the arrest rate (per 100,000 population) for drug manufacturing and selling, the violent crime rate (per 100,000 population), law enforcement agency type, whether the agency was primarily responsible for enforcing drug laws in their respective jurisdiction, and region of the country. For a more detailed description of our methods, see Appendix A.

*Results*

The findings from the equitable sharing analysis are unequivocal: Agencies in states that limit the ability to profit from forfeiture proceeds receive significantly more equitable sharing proceeds. This suggests that law enforcement agencies are circumventing restrictive state laws.

Results indicate law enforcement agencies in generous forfeiture states receive significantly lower equitable sharing payments from the Department of Justice. For example, each 25 percentage point decrease in the state profit motive (say, from 100 percent to 75 percent) boosts federal equitable sharing by $7,500 per year. This is for a law enforcement agency serving an average-sized population of 300,000. Thus, as Table 10 shows, law enforcement agencies in states with no profit motive will receive, on average, four times that amount—$30,000—compared to agencies in states where 100 percent of proceeds go to law enforcement.

Put another way, 26 states permit law enforcement to use all civil forfeiture proceeds. If these states were to do away with the profit motive, they could expect law enforcement to turn more to equitable sharing, with the average-sized agency taking in $30,000 more in equitable sharing proceeds. The average-sized law enforcement agency receives about $120,000 in equitable sharing payments already, so an additional $30,000 would represent a 25 percent increase, on average.

*Table 10 Boost in Equitable Sharing Payments from Stricter State Laws*

| | Dollar Increase (Average-sized Law Enforcement Agency) | Average Percentage Increase |
|---|---|---|
| Profit Motive (100 percentage point decrease) | $30,000* | 25 percent |
| Innocent Owner Burden (on government) | $27,600* | 23 percent |
| Standard of Proof (stricter by one level) | $16,860** (in presumed innocent states only) | 14 percent |

* significant at .10 level; **significant at .01 level.

Plaintiff's Ex. # 1, p. 38
Littlepage v. DC, 14-899 (ESH)

# Seizing Elderly Woman's Home in Philadelphia

Margaret Davis, a 77-year-old homeowner with multiple serious medical conditions, including end-stage renal disease, was in the habit of leaving her North Philadelphia home unlocked so her neighbors, who routinely checked up on her, could come and go.  She used paratransit to travel to dialysis treatment three times a week.[1]

In August 2001, police chased several alleged drug dealers through Davis' front door.  The suspects escaped out the back.  Davis gave the officers permission to search her home and they found drugs, left in plain view, presumably by the fleeing suspects.[2]  The matter should have ended there, but in September 2001 the Philadelphia District Attorney's office filed a motion to seize the home even though Davis was not a party to any drug dealing.[3]

Unable to afford an attorney, Davis was referred to the Civil Practice Clinic at the University of Pennsylvania Law School, which took on the case in February 2002.  In April, as the case was working its way through court, police chased another suspect into Davis' house and caught him attempting to hide drugs.  Fortunately, Davis' attorney was able to reach an agreement with the District Attorney's office, which withdrew the petition in November of 2003.[4]

---

1    E-mail exchange with Louis S. Rulli, Practice Professor of Law and Director of Clinical Programs, University of Pennsylvania Law School, August 18-20, 2009.
2    Amended Petition for Forfeiture at 10, *Commonwealth of Pennsylvania v. 1365 W. Colwyn Street No. 2903* (Pa. Ct. Common Pleas filed May 16, 2002).
3    Civil Docket Report, *Commonwealth of Pennsylvania v. Davis*, Case ID: 010902903.
4    E-mail exchange with Louis S. Rulli; *Commonwealth of Pennsylvania v. 1365 W. Colwyn Street No. 2903* at 10.

**Plaintiff's Ex. # 1, p. 39**
**Littlepage v. DC, 14-899 (ESH)**

Similarly, results suggest that, in states where innocent owner statutes place a greater burden on the state, agencies skirt this procedural safeguard by engaging in more equitable sharing, which relies on the less burdensome federal standard for the government. Switching the burden of proof in innocent owner defenses from the property owner to the government increases expected equitable sharing payments by $27,600 per year for an average-sized agency, or an increase of about 23 percent in equitable sharing receipts.

By itself, results on the standard of proof alone were not statistically significant. However, the combination of placing the burden on the government to establish a property owner's guilt and raising the standard of proof leads to a statistically significant increase in equitable sharing payments. Specifically, in states where owners are presumed innocent, raising the standard of proof one level boosts equitable sharing receipts by $16,860 per year for an average-sized agency, an increase of about 14 percent. The effect of increasing the standard of proof was not statistically significant in presumed guilty states.

Turning to the combination of innocent owner burden and profit motive, when the innocent owner burden switches from the owner to the government, we find that the effects of changes in the profit motive are even more pronounced.

If the owner is presumed guilty and must prove his innocence, as in 38 states for all property and another six for some property, forfeiture is easier for the government. In those states, as shown in Table 11, a 25 percent increase in the profit motive under state law is associated with a decrease in equitable sharing payments of about $9,750 per year for an average-sized law enforcement agency. This is a larger effect than we found when analyzing profit motive alone (a decrease in equitable sharing payments of $7,500 for each 25 percent increase in the profit motive). Raising the profit motive in state law means that agencies will turn to equitable sharing less, even more so in presumed guilty states where forfeiture is already relatively easy under state law.

However, when the owner is presumed innocent and the state must prove guilt, as in only six states, law enforcement agencies will participate more often in equitable sharing, no matter the percentage they are allowed to keep in state seizures. Thus, it appears that presumed innocent laws make state forfeiture procedures so onerous for law enforcement that they more frequently turn to federal equitable sharing, regardless of the profit motive in state law.

*Table 11 Impact of Profit Motive in Presumed Guilty and Presumed Innocent States*

|  | **Change in Equitable Sharing Payments (Average-sized Law Enforcement Agency)** |
| --- | --- |
| Presumed Guilty States | Decreases $9,750 with each 25 percentage point increase in profit motive** |
| Presumed Innocent States | Increases, regardless of size of profit motive* |

* significant at .10 level; **significant at .01 level.

39

In short, all of these results demonstrate that all three factors of state forfeiture law that we studied—profit motive, innocent owner burden and standard of proof—impact whether law enforcement agencies choose to pursue equitable sharing. More-over, when state laws make forfeiture more difficult and less rewarding, agencies are apt to turn to the federal government's easier and more generous forfeiture procedures.

Importantly, all of these findings held true—and indeed, became stronger—even after controlling for the variables noted above, such as drug arrests and violent crime rates. Put another way, the number of drug arrests or violent crimes in an area or the size or mission (drug-related or not) of a law enforcement agency does not "explain away" the effects of hurdles to forfeiture in state law. Even comparing similar agencies in similar crime-rate areas, the agencies in states with more restrictive and less generous state laws will use equitable sharing more.

In all, these results provide compelling evidence that law enforcement agencies re-spond to incentives in state law—specifically by using equitable sharing more when that method of forfeiture is more likely to turn a profit than state-law procedures. This also suggests, though indirectly, that states that make forfeiture more difficult and less rewarding see less forfeiture under state law. Altogether, the results make clear that forfeiture laws that give law enforcement agencies a share of forfeiture proceeds create a dynamic of "policing for profit."

40

## Part II:  Grading the States

**Part II**

### How to Use Grading the States

This section provides detailed information about asset forfeiture in each state, as well as for the federal government.  For each state, we include a brief explanation of the state's **forfeiture law**, data on the **extent of forfeiture use**, and a **grade**.

*Forfeiture Law*:  This provides a brief description of the forfeiture laws in each state, focusing especially on incentives for abuse:  the percentage of forfeiture proceeds law enforcement agencies may keep and how easy or difficult the law makes it for owners to keep or successfully fight for the return of their property.  Our analysis focuses primarily on the civil forfeiture laws and procedures in drug statutes.

*Extent of Forfeiture Use:*  The tables indicate the level of asset forfeiture use in each state using the three sources of data detailed on pages 27 and 29.  While all fall short of a complete count of assets forfeited, together they provide a more comprehensive picture of the extent of forfeiture use in a state.  Also, recall that none of these sources distinguish between civil and criminal forfeitures, though it is likely that the vast majority are civil forfeitures.  Finally, note that data from LEMAS and freedom-of-information requests may include equitable sharing proceeds, as well as proceeds from state-law forfeitures.

*Grade:*  Each state is graded on the extent to which its asset forfeiture law encourages policing for profit, as well as data indicating how law enforcement officers behave in response to the incentives in the law.  Final grades combine two separate grades, one for the incentives in the law and the other for behavior.

- **Forfeiture Law Grade:**  This grade indicates how rewarding and easy civil forfeiture is in a state.  The table below indicates how we assigned grades to each state for three elements of forfeiture law.  These individual grades were weighted to reflect the relative incentive each element provides law enforcement to engage in civil forfeiture.  Weighted grades were then combined into one grade.[1]



---

1      After states were assigned their respective grades, the standard of proof and innocent owner burden grades were combined into one "burden" grade by creating a weighted average, where standard of proof accounted for 66 percent of the grade and innocent owner burden accounted for 33 percent.  This reflects the relative difficulty each process represents for law enforcement agencies in keeping seized properties.  These burden grades were then combined with profit motive grades into a single weighted grade by assigning a weight of one to the "burden" grades and a weight of three to the percentage grades.  This was done based on the premise that law enforcement agencies are incentivized to pursue asset forfeiture based more on the percentage of the seized assets they can keep than the relative ease of the forfeiture process.

41

**Plaintiff's Ex. # 1, p. 42**

**Littlepage v. DC, 14-899 (ESH)**

*Table 12 Elements of the Forfeiture Law Grades*

| | Standard of Proof | Innocent Owner Burden | Profit Motive (Percentage of Proceeds to Law Enforcement) |
|---|---|---|---|
| A | Beyond a reasonable doubt | Government (owners presumed innocent) | 0% to 5% |
| B | Beyond a reasonable doubt/clear and convincing and Clear and convincing | | 5.1% to 20% |
| C | Clear and convincing/preponderance of the evidence | Depends on property | 20.1% to 80% |
| D | Preponderance of the evidence and Preponderance of the evidence/probable cause | | 80.1% to 95% |
| F | Probable Cause | Owner (owners presumed guilty) | 95.1% to 100% |

- **State Law Evasion Grade:** As the findings of the first section demonstrate, a state law that provides strong protections for property owners is of little use if law enforcement agencies can partner with the federal government to forfeit property and receive a large chunk of the proceeds. Therefore, a critical part of grading the states is the use of equitable sharing as a measure of the extent to which state and local law enforcement agencies attempt to circumvent limits in state law.[2]  Higher grades indicate lower levels of equitable sharing.[3]

- **Final Grade:**  This is a simple average of the Forfeiture Law Grade and the State Law Evasion Grade.

---

[2]     A few states require that equitable sharing assets must go through a state or local court prior to deposit in a federal account.  These are commonly called "turnover orders."

[3]     This grade was created in a multi-step process.  First, a three-year average of equitable sharing was created using data from 2005, 2006 and 2007.  Second, the equitable sharing totals for each state were adjusted, or standardized, by dividing each state's equitable sharing total by its average rate of drug arrests for 2005, 2006 and 2007, taken from the FBI's Uniform Crime Report.  (Drug arrest rate reflects the number of drug arrests per 1,000 people in the population).  Third, because the adjusted equitable sharing distribution was skewed, the data were transformed into natural logs to normalize the distribution.  Fourth, the logged data were transformed into z-scores and grades assigned where z-scores of less than -1.5=A, -1.5 to -.5=B; -.5 to .5=C; .5 to 1.5=D; and greater than 1.5=F.

**Plaintiff's Ex. # 1, p. 43**
**Littlepage v. DC, 14-899 (ESH)**

**State Grades, Alphabetically by State**

|  | Law Grade | Evasion Grade | Final Grade |
|---|---|---|---|
| Alabama | D- | C | D |
| Alaska | F | B | D+ |
| Arizona | D- | C | D |
| Arkansas | D- | C | D |
| California | C+ | F | D |
| Colorado | C+ | C | C |
| Connecticut | C+ | B | C+ |
| Delaware | F | A | C |
| Florida | D+ | D | D |
| Georgia | D- | F | D- |
| Hawaii | D- | C | D |
| Idaho | D- | A | C |
| Illinois | D | D | D |
| Indiana | B+ | C | C+ |
| Iowa | D- | C | D |
| Kansas | D- | C | D |
| Kentucky | D- | C | D |
| Louisiana | D | B | C- |
| Maine | B+ | A | A- |
| Maryland | B | C | C+ |
| Massachusetts | F | C | D |
| Michigan | D- | D | D- |
| Minnesota | D | B | C |
| Mississippi | D | C | D+ |
| Missouri | B | C | C+ |
| Montana | F | B | D+ |
| Nebraska | C | C | C |
| Nevada | D- | C | D+ |
| New Hampshire | D | C | D+ |
| New Jersey | D- | C | D |
| New Mexico | D- | C | D+ |
| New York | C- | F | D |
| North Carolina | A- | D | C+ |
| North Dakota | B | A | B+ |
| Ohio | B+ | F | C- |
| Oklahoma | D- | C | D |
| Oregon | C | B | C+ |
| Pennsylvania | D- | C | D |
| Rhode Island | D | B | C- |
| South Carolina | F | B | D+ |
| South Dakota | D- | A | C |
| Tennessee | D- | C | D |
| Texas | D | F | D- |
| Utah | D- | B | C- |
| Vermont | B+ | B | B |
| Virginia | D- | D | D- |
| Washington | D- | C | D |
| West Virginia | D- | D | D- |
| Wisconsin | C | C | C |
| Wyoming | F | A | C |

43

**State Grades, Ranked Highest to Lowest**

|  | Law Grade | Evasion Grade | Final Grade |
|---|---|---|---|
| Maine | B+ | A | A- |
| North Dakota | B | A | B+ |
| Vermont | B+ | B | B |
| Connecticut | C+ | B | C+ |
| Indiana | B+ | C | C+ |
| Maryland | B | C | C+ |
| Missouri | B | C | C+ |
| North Carolina | A- | D | C+ |
| Oregon | C | B | C+ |
| Colorado | C+ | C | C |
| Delaware | F | A | C |
| Idaho | D- | A | C |
| Minnesota | D | B | C |
| Nebraska | C | C | C |
| South Dakota | D- | A | C |
| Wisconsin | C | C | C |
| Wyoming | F | A | C |
| Louisiana | D | B | C- |
| Ohio | B+ | F | C- |
| Rhode Island | D | B | C- |
| Utah | D- | B | C- |
| Alaska | F | B | D+ |
| Mississippi | D | C | D+ |
| Montana | F | B | D+ |
| Nevada | D- | C | D+ |
| New Hampshire | D | C | D+ |
| New Mexico | D- | C | D+ |
| South Carolina | F | B | D+ |
| Alabama | D- | C | D |
| Arizona | D- | C | D |
| Arkansas | D- | C | D |
| California | C+ | F | D |
| Florida | D+ | D | D |
| Hawaii | D- | C | D |
| Illinois | D | D | D |
| Iowa | D- | C | D |
| Kansas | D- | C | D |
| Kentucky | D- | C | D |
| Massachusetts | F | C | D |
| New Jersey | D- | C | D |
| New York | C- | F | D |
| Oklahoma | D- | C | D |
| Pennsylvania | D- | C | D |
| Tennessee | D- | C | D |
| Washington | D- | C | D |
| Georgia | D- | F | D- |
| Michigan | D- | D | D- |
| Texas | D | F | D- |
| Virginia | D- | D | D- |
| West Virginia | D- | D | D- |

**Plaintiff's Ex. # 1, p. 45**
**Littlepage v. DC, 14-899 (ESH)**

# ALABAMA



| D- |
|---|
| Forfeiture Law Grade |



**FINAL GRADE**



| C |
|---|
| State Law Evasion Grade |

## FORFEITURE LAW

Alabama ranks toward the bottom of civil forfeiture laws in the country. In Alabama, to forfeit property, the government only needs to present a prima facie case the property is related to criminal activity and thus subject to forfeiture. Thereafter, the burden is usually on the property owner to prove that he is innocent—that the underlying offense was committed without his knowledge or consent—and therefore the property cannot be taken. However, if the property at issue is real property, like a home, the burden is on the state to prove that the owner is not innocent, providing more protection to owners.

In Alabama, law enforcement keeps 100 percent of the proceeds for any sales of seized property, which creates a strong incentive for law enforcement to seize property, even in situations where it may not be warranted. Compounding the problem, there is no requirement in Alabama that state and local law enforcement agencies account for their forfeitures. In addition, Alabama received more than $40 million in equitable sharing proceeds from 2000 to 2008.

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND (AFF)

|  | Proceeds Returned to State |
|---|---|
| **FY 2000** | $1,898,205 |
| **FY 2001** | $2,602,074 |
| **FY 2002** | $1,968,319 |
| **FY 2003** | $4,216,595 |
| **FY 2004** | $6,628,648 |
| **FY 2005** | $4,866,686 |
| **FY 2006** | $5,314,799 |
| **FY 2007** | $8,563,174 |
| **FY 2008** | $6,500,693 |
| **Total** | $42,559,193 |
| **Average per Year** | $4,728,799 |

### FORFEITURES *as* REPORTED *to* LEMAS (Drug-related only)

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| **1993** | $7,641,801 | $47,075 |
| **1997** | $13,220,110 | $31,422 |
| **2000** | $3,842,602 | $10,032 |
| **2003** | $6,105,514 | $19,791 |

### FREEDOM *of* INFORMATION DATA

No Data Available; Not Required to Collect

45

# ALASKA



Forfeiture
Law Grade



**D+**

**FINAL GRADE**



State Law
Evasion Grade

## FORFEITURE LAW

Alaska has terrible civil forfeiture laws. Not only does the government merely need to show probable cause to forfeit property, but an innocent owner bears the burden of trying to reclaim his property and prove his innocence. Once a property owner is given notice that his property has been seized, he has thirty days to respond. If he fails to claim the property within that time frame, it is automatically forfeited. These problems are compounded by the fact that law enforcement in Alaska keeps 100 percent of the revenues generated by civil forfeitures, creating a perverse incentive to seize as much property as possible. Moreover, there is no legal requirement that Alaska authorities collect or report data on their forfeitures.

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND (AFF)

|  | Proceeds Returned to State |
|---|---|
| **FY 2000** | $497,162 |
| **FY 2001** | $291,732 |
| **FY 2002** | $656,799 |
| **FY 2003** | $781,954 |
| **FY 2004** | $419,726 |
| **FY 2005** | $704,298 |
| **FY 2006** | $1,096,715 |
| **FY 2007** | $2,238,822 |
| **FY 2008** | $562,221 |
| **Total** | $7,249,429 |
| **Average per Year** | $805,492 |

### FORFEITURES *as* REPORTED *to* LEMAS (Drug-related only)

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| **1993** | $951,002 | $88,125 |
| **1997** | $373,114 | $6,497 |
| **2000** | $555,683 | $11,376 |
| **2003** | $1,479,741 | $30,651 |

### FREEDOM *of* INFORMATION DATA

No Data Available; Not Required to Collect

46

# ARIZONA



Forfeiture
Law Grade



**FINAL GRADE**



State Law
Evasion Grade

## FORFEITURE LAW

Arizona's civil asset forfeiture laws are in need of serious reform.  In Arizona, the government may forfeit your property by showing by a preponderance of the evidence that the property is subject to forfeiture.  Unfortunately, a property owner claiming an innocent owner exemption to the forfeiture laws—because, for example, he did not know his property was being used illegally—bears the burden of proving his innocence.

In Arizona, law enforcement personnel have a strong incentive to seize as much property as they can since they receive 100 percent of the funds raised through civil forfeitures.  Even more troublesome, Arizona law enforcement can use forfeiture revenue to pay the direct salaries of personnel.[1]  Arizona took advantage of its broad forfeiture statutes by collecting more than $64 million in forfeiture revenue in a mere four-year period (2000-2003).  Arizona also received over $35 million in equitable sharing revenue from 2000 to 2008, although these numbers may overlap to some extent, as it is not clear whether equitable sharing revenue was included in responses to freedom of information requests.

---

1    Keller, T., & Wright, J. (2004). Policing and prosecuting for profit: Arizona's civil asset forfeiture laws violate basic due process protections (No. 198). Phoenix, AZ: Goldwater Institute.

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND **(AFF)**

|  | Proceeds Returned to State |
|---|---|
| **FY 2000** | $1,943,015 |
| **FY 2001** | $3,639,423 |
| **FY 2002** | $2,226,222 |
| **FY 2003** | $2,223,797 |
| **FY 2004** | $2,161,873 |
| **FY 2005** | $2,021,896 |
| **FY 2006** | $8,930,498 |
| **FY 2007** | $6,763,897 |
| **FY 2008** | $6,001,689 |
| **Total** | $35,912,310 |
| **Average per Year** | $3,990,257 |

### FORFEITURES *as* REPORTED *to* LEMAS **(Drug-related only)**

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| **1993** | $9,085,629 | $247,399 |
| **1997** | $21,045,288 | $140,611 |
| **2000** | $11,768,481 | $101,529 |
| **2003** | $17,333,065 | $145,703 |

### FREEDOM *of* INFORMATION DATA

**Reports of forfeitures by county; types and number of law enforcement agencies unclear**

|  | State | Counties | Total |
|---|---|---|---|
| **2000** | $1,583,751 | $12,388,602 | $13,972,353 |
| **2001** | $3,154,593 | $12,083,186 | $15,237,779 |
| **2002** | $4,183,462 | $12,445,228 | $16,628,690 |
| **2003** | $4,359,795 | $14,319,403 | $18,679,198 |
| **Total** | $13,281,601 | $51,236,419 | $64,518,020 |
| **Average per Year** | $3,320,400 | $12,809,105 | $16,129,505 |

**Plaintiff's Ex. # 1, p. 48**
**Littlepage v. DC, 14-899 (ESH)**

# ARKANSAS


Forfeiture
Law Grade




State Law
Evasion Grade

**FINAL GRADE**

## FORFEITURE LAW

Arkansas civil forfeiture laws put the property of ordinary citizens at risk. To forfeit your property, the state only needs to show that it is more likely than not that your property is related to criminal activity and thus subject to forfeiture—a legal standard known as preponderance of the evidence. To recover seized property, an innocent owner bears the burden of proving his innocence. Moreover, law enforcement in Arkansas reaps all of the rewards of civil forfeiture. It keeps 100 percent of all funds generated through forfeiture.

### FORFEITURES as REPORTED to LEMAS (Drug-related only)

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| 1993 | $4,015,853 | $63,989 |
| 1997 | $4,838,972 | $14,689 |
| 2000 | $7,670,474 | $23,293 |
| 2003 | $2,279,525 | $8,752 |

### FREEDOM of INFORMATION DATA

**Reports of forfeitures by districts, which include all law enforcement agencies**

|  | Currency | Number of cars | Number of weapons | Number of other properties |
|---|---|---|---|---|
| 2000 | $5,544,742 | 534 | 249 | 201 |
| 2001 | $3,494,483 | 514 | 241 | 165 |
| 2002 | $2,805,948 | 522 | 232 | 141 |
| 2003 | $3,816,823 | 683 | 282 | 208 |
| 2004 | $4,299,354 | 779 | 245 | 180 |
| 2005 | $7,003,838 | 771 | 223 | 172 |
| 2006 | $5,556,583 | 655 | 162 | 141 |
| 2007 | $4,301,003 | 688 | 187 | 132 |
| 2008 | $5,160,593 | 585 | 147 | 130 |
| Average per Year | $4,664,819 | 637 | 219 | 163 |
| Total | $41,983,367 | 5,731 | 1,968 | 1,470 |

### EQUITABLE SHARING PROCEEDS from the ASSETS FORFEITURE FUND (AFF)

|  | Proceeds Returned to State |
|---|---|
| FY 2000 | $540,568 |
| FY 2001 | $911,267 |
| FY 2002 | $773,525 |
| FY 2003 | $477,238 |
| FY 2004 | $2,377,787 |
| FY 2005 | $957,776 |
| FY 2006 | $4,406,266 |
| FY 2007 | $1,792,272 |
| FY 2008 | $2,581,575 |
| Total | $14,818,274 |
| Average per Year | $1,646,475 |

48

# CALIFORNIA



Forfeiture
Law Grade





State Law
Evasion Grade

**FINAL GRADE**

## FORFEITURE LAW

Compared to most other states, California's forfeiture laws provide better protections to property owners and do not provide as strong of a profit incentive to law enforcement to take property. For the government to forfeit property in California, it must have, at a minimum, clear and convincing evidence for cash associated with criminal activity and requires a beyond a reasonable doubt standard for forfeiting real property. Furthermore, when an innocent person with an interest in the property seeks to protect that interest, the burden is on the government to show that the owner knew about the property's illegal use. Law enforcement in California keeps 65 percent of all revenues generated through civil forfeiture.

However, the behavior of law enforcement officials tells a different tale. Given that California places greater limits on state and local governments in forfeiting property, it should not be surprising that it aggressively participates in equitable sharing with the federal government, collecting an astonishing $305 million in an eight-year period from 2000 to 2008. In 2000, California legislators voted to forbid state and local agencies from using the federal equitable sharing loophole except in limited circumstances, but then-Governor Gray Davis vetoed the measure.

### FORFEITURES *as* REPORTED *to* LEMAS **(Drug-related only)**

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| 1993 | $115,223,229 | $309,383 |
| 1997 | $93,636,748 | $178,040 |
| 2000 | $61,450,257 | $153,793 |
| 2003 | $42,460,049 | $109,029 |

### FREEDOM *of* INFORMATION DATA

Reports of forfeitures by county; types and number of law enforcement agencies unclear

|  | Total amount of assets | Total number of assets |
|---|---|---|
| 2002 | $25,565,686.24 | 3,029 |
| 2003 | $26,589,893.34 | 3,345 |
| 2004 | $22,459,345.80 | 3,512 |
| 2005 | $19,866,809.89 | 3,685 |
| 2006 | $25,582,483.48 | 3,877 |
| 2007 | $27,603,821.74 | 4,062 |
| 2008 | $25,548,227.54 | 4,490 |
| Total | $173,236,268.03 | 26,000 |
| Average per Year | $24,748,038.29 | 3,714 |

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND **(AFF)**

|  | Proceeds Returned to State |
|---|---|
| FY 2000 | $29,532,158 |
| FY 2001 | $32,530,454 |
| FY 2002 | $26,435,779 |
| FY 2003 | $24,259,920 |
| FY 2004 | $30,972,798 |
| FY 2005 | $26,389,562 |
| FY 2006 | $41,901,452 |
| FY 2007 | $42,226,537 |
| FY 2008 | $51,699,292 |
| Total | $305,947,952 |
| Average per Year | $33,994,217 |

49

**Plaintiff's Ex. # 1, p. 50**
**Littlepage v. DC, 14-899 (ESH)**

# COLORADO


Forfeiture
Law Grade




State Law
Evasion Grade

**FINAL GRADE**

## FORFEITURE LAW

Colorado reformed its civil asset forfeiture laws in 2005, but room for improvement remains. For the government to forfeit your property now, it must have clear and convincing evidence that the property is related to criminal activity and thus subject to forfeiture. Thankfully, innocent owners are not required to prove their innocence in Colorado. Instead, the government bears the burden of showing that the owner participated in the alleged criminal activity. Law enforcement keeps 50 percent of all funds generated through civil forfeiture.

Prior to the reforms passed in 2005, Colorado law enforcement could take property when it was merely more likely than not that it had been used in criminal activity, innocent owners had to prove their own innocence and law enforcement reaped 100 percent of the forfeiture windfall. While there remains work to be done, the reforms have clearly improved the forfeiture landscape in Colorado.

### FORFEITURES *as* REPORTED *to* LEMAS **(Drug-related only)**

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| 1993 | $2,577,295 | $35,938 |
| 1997 | $4,127,549 | $15,989 |
| 2000 | $2,408,996 | $10,326 |
| 2003 | $2,555,456 | $9,975 |

### FREEDOM *of* INFORMATION DATA

**Reports of forfeitures from some judicial districts, some police departments, and some sheriff's departments**

| 2000 | All Law Enforcement Agencies | Task Forces | Total |
|---|---|---|---|
| Forfeitures | $11,678,627 | $277,920 | $11,956,547 |

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND **(AFF)**

|  | Proceeds Returned to State |
|---|---|
| FY 2000 | $639,942 |
| FY 2001 | $5,013,103 |
| FY 2002 | $1,348,887 |
| FY 2003 | $1,288,769 |
| FY 2004 | $1,712,673 |
| FY 2005 | $2,944,760 |
| FY 2006 | $5,159,744 |
| FY 2007 | $4,799,505 |
| FY 2008 | $4,211,955 |
| Total | $27,119,338 |
| Average per Year | $3,013,260 |

**Plaintiff's Ex. # 1, p. 51**
**Littlepage v. DC, 14-899 (ESH)**

# CONNECTICUT


**C+**
Forfeiture
Law Grade


**C+**
FINAL GRADE


**B**
State Law
Evasion Grade

## FORFEITURE LAW

Connecticut's civil forfeiture laws are not as bad as the laws in many states. For the government to forfeit your property, it must have clear and convincing evidence that the property in question is related to criminal activity and thus subject to forfeiture. However, once property has been seized, innocent owners have the burden of proving that they did not know the property was being used in connection with criminal activity. Connecticut law enforcement keeps 60 percent of the proceeds from civil forfeiture. There is no requirement that the state collect data on forfeitures or proceeds from them.

These laws, however, can still lead to abuse. For instance, in 2001, Debbie Kerpen had $2.76 million, her cars, horse trailers, boat and tractor seized because of her alleged role as head of a call girl service—all without a single charge being filed against her. Unfortunately for Debbie, as ACLU President Nadine Strossen put it, "She's facing a greater penalty than she would under any applicable criminal law, without any of the constitutional protections."[1]

1    Pagnozzi, A. (2001, July 24). 'Legal' excuse to steal. *Hartford Courant*, p. A3.

### FORFEITURES *as* REPORTED *to* LEMAS **(Drug-related only)**

|        | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|--------|------------------------|---------------------------------------------|
| 1993   | $2,696,489             | $27,452                                     |
| 1997   | $2,797,387             | $21,096                                     |
| 2000   | $2,971,449             | $27,094                                     |
| 2003   | $2,564,780             | $27,208                                     |

### FREEDOM *of* INFORMATION DATA

No Data Available; Not Required to Collect

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND **(AFF)**

|                    | Proceeds Returned to State |
|--------------------|----------------------------|
| **FY 2000**        | $704,026                   |
| **FY 2001**        | $1,441,489                 |
| **FY 2002**        | $352,271                   |
| **FY 2003**        | $1,261,087                 |
| **FY 2004**        | $1,350,653                 |
| **FY 2005**        | $2,786,594                 |
| **FY 2006**        | $1,365,596                 |
| **FY 2007**        | $2,014,681                 |
| **FY 2008**        | $1,890,925                 |
| **Total**          | $13,167,322                |
| **Average per Year** | $1,463,036               |

**Plaintiff's Ex. # 1, p. 52**
**Littlepage v. DC, 14-899 (ESH)**

# DELAWARE

| | | |
|---|---|---|
|  Forfeiture Law Grade |  **FINAL GRADE** |  State Law Evasion Grade |

## FORFEITURE LAW

Delaware has terrible civil forfeiture law, scoring an F on the law grade. The state's final grade is pulled up to a C only by limited use of equitable sharing (an evasion grade of A) to date. In Delaware, the government only needs to show probable cause to forfeit property. If an innocent owner objects, the owner has the burden of showing that the property was wrongly seized or not subject to forfeiture. These problems are compounded by the fact that law enforcement in Delaware keeps 100 percent of the revenues generated by civil forfeitures, creating a perverse incentive to seize as much property as possible. Fortunately for Delaware citizens, law enforcement in the state does not seem to have used forfeiture as aggressively as the law permits. It is hard to know the extent of forfeiture in Delaware, though, because there is no provision under state law that requires data to be collected or reported.

### FORFEITURES *as* REPORTED *to* LEMAS **(Drug-related only)**

| | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| 1993 | $1,514,806 | $73,837 |
| 1997 | $1,277,969 | $37,118 |
| 2000 | $1,114,772 | $39,792 |
| 2003 | $1,938,634 | $60,347 |

### FREEDOM *of* INFORMATION DATA

No Data Available; Not Required to Collect

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND **(AFF)**

| | Proceeds Returned to State |
|---|---|
| **FY 2000** | $449,374 |
| **FY 2001** | $461,175 |
| **FY 2002** | $422,941 |
| **FY 2003** | $173,222 |
| **FY 2004** | $606,678 |
| **FY 2005** | $791,700 |
| **FY 2006** | $130,302 |
| **FY 2007** | $478,764 |
| **FY 2008** | $813,464 |
| **Total** | $4,327,620 |
| **Average per Year** | $480,847 |

52

# FLORIDA



Forfeiture Law Grade



**FINAL GRADE**



State Law Evasion Grade

## FORFEITURE LAW

Florida's civil forfeiture laws provide some protections for property owners but also give law enforcement a large incentive to use forfeiture—and agencies appear to do just that. The government must prove by clear and convincing evidence that the property was related to criminal activity and thus can be forfeited, a higher standard than most states but still less than the beyond a reasonable doubt standard required for a criminal conviction. Also, in Florida owners are not presumed guilty; instead, the government bears the burden in an innocent owner defense.

Unfortunately, though, law enforcement in Florida still receives 85 percent of the funds generated from civil forfeiture. As a result, Florida law enforcement makes substantial use of civil forfeiture at the state level, just as it does through equitable sharing. In a mere three-year period (2001-2003), the state took in more than $100 million in forfeiture, and Florida law enforcement received anywhere from $16 million to $48 million per year in the 2000s through equitable sharing. (These counts may overlap, as it is not clear whether Florida included equitable sharing revenue in its response to information requests.)

This expansive use of civil forfeiture has not only benefitted law enforcement institutionally, it has also led to personal gain. In 2003, for instance, it was reported that top Tampa Bay police brass were keeping seized cars for their own use. The seized fleet consisted of some 42 cars, including a Lincoln Navigator, a Ford Expedition, and, Police Chief Bennie Holder's favorite, a $38,000 Chevy Tahoe.[1]

---

1    Blumner, R. E. (2003, August 17). Police too addicted to lure of easy money. *St. Petersburg Times*, p. 7D.

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND **(AFF)**

|  | Proceeds Returned to State |
|---|---|
| **FY 2000** | $16,004,502 |
| **FY 2001** | $48,910,328 |
| **FY 2002** | $15,271,472 |
| **FY 2003** | $21,911,302 |
| **FY 2004** | $15,632,236 |
| **FY 2005** | $18,309,636 |
| **FY 2006** | $16,006,014 |
| **FY 2007** | $29,578,608 |
| **FY 2008** | $34,198,199 |
| **Total** | $215,822,297 |
| **Average per Year** | $23,980,255 |

### FORFEITURES *as* REPORTED *to* LEMAS **(Drug-related only)**

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| **1993** | $59,720,558 | $264,940 |
| **1997** | $64,546,249 | $203,174 |
| **2000** | $102,430,563 | $370,343 |
| **2003** | $82,355,593 | $262,612 |

### FREEDOM *of* INFORMATION DATA

Reports of forfeitures from all law enforcement agencies

| Year | Forfeitures |
|---|---|
| **FY 2001** | $42,203,824 |
| **FY 2002** | $32,903,944 |
| **FY 2003** | $29,090,576 |
| **Total** | $104,198,344 |

53

**Plaintiff's Ex. # 1, p. 54**
**Littlepage v. DC, 14-899 (ESH)**

# GEORGIA



Forfeiture
Law Grade



**FINAL GRADE**



State Law
Evasion Grade

## FORFEITURE LAW

Georgia has terrible civil forfeiture laws and uses equitable sharing extensively. Under state law, depending on the property, the government need only establish probable cause or a preponderance of the evidence that the property was connected to illegal activity to forfeit it. You bear the burden of showing that the property is not derived from illegal activity or that you are an innocent owner. Even worse, law enforcement keeps 100 percent of the proceeds from any sales of seized property, which creates a strong incentive for law enforcement to seize property even in situations where it may not be warranted. And public oversight is limited: In response to requests, Georgia provided only one year of forfeiture data, for 2001.

These broad laws have led officials to abuse forfeiture—including for personal gain. One sheriff in Georgia, for instance, used the funds raised through forfeiture to purchase a $90,000 sports car, supposedly to advertise an anti-drug program. In 2008, a grand jury was tasked with trying to figure out if that expenditure was "appropriate."[1]

---

1    The Sheriff's Stash. (2008, July 12). *The Economist, 388*(8588), p. 42.

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND **(AFF)**

|  | **Proceeds Returned to State** |
|---|---|
| **FY 2000** | $13,997,177 |
| **FY 2001** | $11,476,049 |
| **FY 2002** | $10,578,412 |
| **FY 2003** | $10,113,910 |
| **FY 2004** | $10,544,040 |
| **FY 2005** | $13,852,774 |
| **FY 2006** | $20,266,682 |
| **FY 2007** | $23,866,060 |
| **FY 2008** | $15,878,429 |
| **Total** | $130,573,533 |
| **Average per Year** | $14,508,170 |

### FORFEITURES *as* REPORTED *to* LEMAS **(Drug-related only)**

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| **1993** | $7,856,684 | $48,937 |
| **1997** | $26,022,402 | $43,966 |
| **2000** | $20,767,039 | $37,996 |
| **2003** | $38,330,861 | $91,459 |

### FREEDOM *of* INFORMATION DATA

**Reports of forfeitures from judicial circuits**

| 2001 | Currency | Property | Total |
|---|---|---|---|
| **Forfeitures** | $7,216,687 | $888,732 | $8,105,419 |

**Plaintiff's Ex. # 1, p. 55**
**Littlepage v. DC, 14-899 (ESH)**

# HAWAII



**Forfeiture Law Grade**

D-



D

**FINAL GRADE**



**State Law Evasion Grade**

C

## FORFEITURE LAW

Hawaii's civil asset forfeiture laws are in need of serious reform. The state may forfeit your property by showing by a preponderance of the evidence that the property was used in a crime. Unfortunately, if you are an innocent owner and believe your property was wrongly seized, you bear the burden of proof. Law enforcement has a strong incentive to seize property, as they receive 100 percent of the funds raised through civil forfeiture.

### FORFEITURES *as* REPORTED *to* LEMAS (Drug-related only)

|      | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|------|------------------------|---------------------------------------------|
| 1993 | $4,091,284             | $1,007,199                                  |
| 1997 | $1,616,491             | $236,675                                    |
| 2000 | $2,067,879             | $515,824                                    |
| 2003 | $2,557,282             | $618,159                                    |

### FREEDOM *of* INFORMATION DATA

**Reports on forfeitures by seizing agency**

|                     | Currency    | Vehicles    | Other       | Total        |
|---------------------|-------------|-------------|-------------|--------------|
| 2001                | $450,945    | $536,040    | $207,033    | $1,194,018   |
| 2002                | $645,537    | $487,147    | $876,188    | $2,008,872   |
| 2003                | $1,044,944  | $575,675    | $286,000    | $1,906,619   |
| 2004                | $737,668    | $457,792    | $461,625    | $1,657,085   |
| 2005                | $414,395    | $332,230    | $316,627    | $1,063,252   |
| 2006                | $698,035    | $460,855    | $334,709    | $1,493,599   |
| 2007                | $636,598    | $468,290    | $300,396    | $1,405,284   |
| Total               | $4,628,122  | $3,318,029  | $2,252,578  | $10,728,729  |
| Average per Year    | $661,160    | $474,004    | $397,511    | $1,532,676   |

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND (AFF)

|                    | Proceeds Returned to State |
|--------------------|----------------------------|
| FY 2000            | $1,207,271                 |
| FY 2001            | $607,098                   |
| FY 2002            | $2,052,050                 |
| FY 2003            | $2,038,594                 |
| FY 2004            | $1,802,294                 |
| FY 2005            | $1,657,680                 |
| FY 2006            | $3,345,770                 |
| FY 2007            | $2,808,610                 |
| FY 2008            | $1,626,211                 |
| Total              | $17,145,578                |
| Average per Year   | $1,905,064                 |

55

**Plaintiff's Ex. # 1, p. 56**
**Littlepage v. DC, 14-899 (ESH)**

# IDAHO



Forfeiture
Law Grade



**FINAL GRADE**



State Law
Evasion Grade

## FORFEITURE LAW

Based on limited data, while Idaho appears to only modestly pursue forfeitures against property owners, its civil forfeiture laws still put the property of ordinary citizens at risk. To forfeit your property, the state only needs to show that it was more likely than not that your property was used in some criminal activity—the legal standard of preponderance of the evidence. To recover seized property, an innocent owner bears the burden of proving his innocence. Moreover, law enforcement in Idaho reaps all of the rewards of civil forfeitures—they keep 100 percent of all funds and face no requirement to collect or report data on forfeiture use and proceeds.

### FORFEITURES *as* REPORTED *to* LEMAS **(Drug-related only)**

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| **1993** | $194,288 | $13,503 |
| **1997** | $543,143 | $4,178 |
| **2000** | $485,323 | $4,291 |
| **2003** | $2,209,870 | $10,634 |

### FREEDOM *of* INFORMATION DATA

No Data Available; Not Required to Collect

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND **(AFF)**

|  | Proceeds Returned to State |
|---|---|
| **FY 2000** | $25,770 |
| **FY 2001** | $60,688 |
| **FY 2002** | $481,322 |
| **FY 2003** | $193,361 |
| **FY 2004** | $1,568,537 |
| **FY 2005** | $299,441 |
| **FY 2006** | $228,848 |
| **FY 2007** | $343,308 |
| **FY 2008** | $175,352 |
| **Total** | $3,376,627 |
| **Average per Year** | $375,181 |

**Plaintiff's Ex. # 1, p. 57**
**Littlepage v. DC, 14-899 (ESH)**

# ILLINOIS



Forfeiture
Law Grade



**FINAL GRADE**



State Law
Evasion Grade

## FORFEITURE LAW

Illinois has burdensome civil forfeiture laws for property owners, and these laws provide the bulk of forfeiture proceeds to law enforcement.  The state need only show probable cause to forfeit your property.  If you believe your property has been wrongly seized, you bear the burden of proving your innocence.

Moreover, law enforcement keeps 90 percent the proceeds for any sales of seized property, which creates a strong incentive for law enforcement to police for profit.  Despite these broad laws, there is no requirement in Illinois that law enforcement account for forfeited currency and property, so we know little about its use under state law.  We do know law enforcement in Illinois takes great advantage of federal equitable sharing, receiving back nearly $88 million from 2000 to 2008.

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND (AFF)

|  | Proceeds Returned to State |
|---|---|
| FY 2000 | $9,754,782 |
| FY 2001 | $8,386,258 |
| FY 2002 | $6,618,603 |
| FY 2003 | $7,284,801 |
| FY 2004 | $8,529,033 |
| FY 2005 | $8,004,118 |
| FY 2006 | $12,102,313 |
| FY 2007 | $13,460,269 |
| FY 2008 | $13,761,071 |
| Total | $87,901,248 |
| Average per Year | $9,766,805 |

### FORFEITURES *as* REPORTED *to* LEMAS (Drug-related only)

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| 1993 | $6,904,161 | $24,117 |
| 1997 | $33,010,838 | $31,912 |
| 2000 | $22,185,455 | $24,644 |
| 2003 | $28,153,269 | $30,574 |

### FREEDOM *of* INFORMATION DATA

No Data Available; Not Required to Collect

57

# INDIANA



B+
Forfeiture
Law Grade



C+

**FINAL GRADE**

C
State Law
Evasion Grade

## FORFEITURE LAW

Indiana has some of the better civil forfeiture laws in the country, at least with regard to the profit incentive. Unfortunately, to forfeit your property, the government only needs to show that it was more likely than not that your property was related to a crime and thus is forfeitable—the legal standard of preponderance of the evidence, lower than the beyond a reasonable doubt standard required for a criminal conviction. But law enforcement in Indiana does not receive any of the funds gained through civil forfeiture, which keeps the focus of law enforcement on preventing crime rather than raising funds. After deducting law enforcement costs for the prosecution of civil forfeitures, all forfeiture revenue is sent either to the general fund of the state or the state's education fund. Indiana does participate in equitable sharing with the federal government, averaging more than $2.6 million per year in the 2000s.

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND **(AFF)**

|  | Proceeds Returned to State |
|---|---|
| **FY 2000** | $2,640,559 |
| **FY 2001** | $2,102,094 |
| **FY 2002** | $2,224,005 |
| **FY 2003** | $2,140,236 |
| **FY 2004** | $2,249,053 |
| **FY 2005** | $2,563,570 |
| **FY 2006** | $2,781,017 |
| **FY 2007** | $2,736,058 |
| **FY 2008** | $4,322,001 |
| **Total** | $23,758,593 |
| **Average per Year** | $2,639,844 |

### FORFEITURES *as* REPORTED *to* LEMAS **(Drug-related only)**

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| **1993** | $5,136,967 | $45,934 |
| **1997** | $41,009,686 | $69,382 |
| **2000** | $3,629,890 | $7,629 |
| **2003** | $3,287,229 | $7,716 |

### FREEDOM *of* INFORMATION DATA

**No Data Available; Not Required to Collect**

**Plaintiff's Ex. # 1, p. 59**
**Littlepage v. DC, 14-899 (ESH)**

# IOWA



**D-**
Forfeiture
Law Grade



**D**

**FINAL GRADE**



**C**
State Law
Evasion Grade

## FORFEITURE LAW

Iowa's civil forfeiture laws place a heavy burden on property owners. Under state law, the prosecutor must only show that the property is related to criminal activity and can be forfeited by a preponderance of the evidence. Once the prosecutor meets that burden, the burden is on the property owner to show his innocence, or in other words, that he did not know and could not have reasonably known of the conduct or that he acted reasonably to prevent the conduct giving rise to the forfeiture. Moreover, law enforcement receives 100 percent of the value of any property seized under Iowa forfeiture law, and law enforcement agencies are not required to collect or report their forfeiture proceeds.

### FORFEITURES *as* REPORTED *to* LEMAS (Drug-related only)

|      | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|------|------------------------|---------------------------------------------|
| 1993 | $4,328,098 | $20,830 |
| 1997 | $3,068,909 | $6,574 |
| 2000 | $3,136,596 | $6,862 |
| 2003 | $2,463,424 | $5,206 |

### FREEDOM *of* INFORMATION DATA

No Data Available; Not Required to Collect

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND (AFF)

|         | Proceeds Returned to State |
|---------|----------------------------|
| FY 2000 | $725,201 |
| FY 2001 | $385,477 |
| FY 2002 | $454,855 |
| FY 2003 | $3,606,690 |
| FY 2004 | $3,429,906 |
| FY 2005 | $1,497,974 |
| FY 2006 | $2,261,349 |
| FY 2007 | $1,770,877 |
| FY 2008 | $1,577,120 |
| Total   | $15,709,449 |
| Average per Year | $1,745,494 |

59

**Plaintiff's Ex. # 1, p. 60**
**Littlepage v. DC, 14-899 (ESH)**

# KANSAS



Forfeiture
Law Grade



**FINAL GRADE**



State Law
Evasion Grade

## FORFEITURE LAW

Kansas civil forfeiture laws place an excessive burden on property owners while also providing a strong profit incentive for law enforcement agencies. The government need only show by a preponderance of the evidence that the property meets the forfeiture definition. Once that burden is met, a property owner bears the burden of showing that his interest in the property is not forfeitable. Moreover, Kansas law enforcement keeps 100 percent of the proceeds from the sale of forfeited property after paying reasonable attorney's fees. Finally, even though Kansas does require that forfeiture data be collected, the government did not respond to requests for the information for this report.

### FORFEITURES *as* REPORTED *to* LEMAS (Drug-related only)

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| 1993 | $2,182,590 | $30,117 |
| 1997 | $7,676,368 | $21,999 |
| 2000 | $3,274,621 | $10,187 |
| 2003 | $4,873,528 | $16,356 |

### FREEDOM *of* INFORMATION DATA

No Data Available; Required to Collect, But Did Not Respond to Request

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND (AFF)

|  | Proceeds Returned to State |
|---|---|
| **FY 2000** | $1,690,336 |
| **FY 2001** | $3,137,162 |
| **FY 2002** | $1,442,719 |
| **FY 2003** | $1,992,796 |
| **FY 2004** | $5,039,777 |
| **FY 2005** | $3,279,147 |
| **FY 2006** | $1,805,375 |
| **FY 2007** | $2,091,681 |
| **FY 2008** | $2,874,235 |
| **Total** | $23,353,228 |
| **Average per Year** | $2,594,803 |

60

# KENTUCKY


**Forfeiture Law Grade**


**D**
**FINAL GRADE**


**State Law Evasion Grade**

## FORFEITURE LAW

Kentucky civil forfeiture law affords inadequate protection to property owners. The state must only show that the property is related to criminal activity and can be forfeited by a preponderance of the evidence, a standard significantly lower than that required for criminal guilt. And property owners have the burden of proof in an innocent owner claim unless it is real property, such as a home or land. Moreover, law enforcement agencies receive 100 percent of the value of any forfeited assets, creating an incentive for law enforcement to focus on forfeiture rather than crime prevention.

The perverse incentives of profit-oriented civil forfeiture law are exemplified in the 1996 scandal in Paducah, Ky., where $66,000 was discovered at the headquarters of the Western Area Narcotics Task Force (WANT). Investigators found that "the task force had seized large amounts of money and then dispensed it freely, unconstrained by audits, reporting requirements, or the task force's mission."[1] With such a large profit motive, "WANT made asset seizures a priority, mandating expected forfeiture growth rates. But WANT met its quotas with much more zeal than care. The police chief estimated that 60 percent of the money found in WANT headquarters will be returned to the owners because it was not properly seized."[2] As this report found, law enforcement officials are now required to collect forfeiture data in Kentucky, but the information provided was unreliable.

---

1    Blumenson, E., & Nilsen, E. (1998). Policing for profit: The drug war's hidden economic agenda. *University of Chicago Law Review, 65(*1), 35-114.
2    Id.

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND **(AFF)**

|  | Proceeds Returned to State |
|---|---|
| FY 2000 | $2,497,441 |
| FY 2001 | $4,938,459 |
| FY 2002 | $2,691,400 |
| FY 2003 | $2,233,489 |
| FY 2004 | $3,886,825 |
| FY 2005 | $3,441,424 |
| FY 2006 | $5,621,490 |
| FY 2007 | $7,562,868 |
| FY 2008 | $5,865,895 |
| Total | $38,739,291 |
| Average per Year | $4,304,366 |

### FORFEITURES *as* REPORTED *to* LEMAS **(Drug-related only)**

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| 1993 | $4,504,971 | $53,098 |
| 1997 | $3,110,106 | $9,858 |
| 2000 | $3,861,882 | $12,338 |
| 2003 | $3,334,152 | $12,388 |

### FREEDOM *of* INFORMATION DATA

No Data Available; Required to Collect, But Data Provided Were Unclear and Unreliable

61

# LOUISIANA



D
Forfeiture
Law Grade



C-

**FINAL GRADE**



B
State Law
Evasion Grade

## FORFEITURE LAW

In Louisiana, protection against wrongful forfeiture of assets by police is inadequate. The state may forfeit your property by showing by a preponderance of evidence that the property is related to a crime and thus forfeitable. A property owner must then show that he is innocent—that he did not know and could not have reasonably known of the conduct or that he acted reasonably to prevent the conduct giving rise to the forfeiture.

Law enforcement is entitled to 80 percent of the value of property they seize in civil forfeiture actions. Incredibly, the remaining 20 percent flows to the criminal court fund. This would seem to blatantly violate the due process clause of the U.S. Constitution. In *Tumey v. Ohio*,[1] the U.S. Supreme Court struck down a statutory scheme where a mayor, also sitting as a judge, received a share of the proceeds collected in court.

Moreover, Louisiana officials are required to collect data on the use of forfeiture but did not respond to a request for that information.

---

1    *Tumey v. Ohio*, 273 U.S. 510 (1927).

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND **(AFF)**

|  | **Proceeds Returned to State** |
|---|---|
| **FY 2000** | $1,993,010 |
| **FY 2001** | $1,415,443 |
| **FY 2002** | $930,075 |
| **FY 2003** | $2,158,907 |
| **FY 2004** | $1,501,057 |
| **FY 2005** | $1,670,434 |
| **FY 2006** | $2,149,234 |
| **FY 2007** | $2,796,426 |
| **FY 2008** | $2,772,516 |
| **Total** | $17,387,102 |
| **Average per Year** | $1,931,900 |

### FORFEITURES *as* REPORTED *to* LEMAS **(Drug-related only)**

|  | **Total Assets Forfeited** | **Assets Forfeited per Law Enforcement Agency** |
|---|---|---|
| **1993** | $8,657,777 | $68,334 |
| **1997** | $8,601,094 | $25,080 |
| **2000** | $6,866,313 | $21,237 |
| **2003** | $12,212,862 | $50,264 |

### FREEDOM *of* INFORMATION DATA

No Data Available; Required to Collect, But Did Not Respond to Request

62

# MAINE



Forfeiture
Law Grade

**B+**



**A-**

**FINAL GRADE**



State Law
Evasion Grade

**A**

## FORFEITURE LAW

Maine affords property owners some of the better protections against wrongful civil forfeiture in the country. The government must show by a preponderance of evidence that the property is related to a crime and thus can be forfeited. This standard, however, is still less than the beyond a reasonable doubt standard required for a criminal conviction. Unfortunately, the property owner bears the burden in an innocent owner claim, unless the property is real property such as a home. Most importantly, though, Maine forfeiture law avoids the most troubling aspect of many state forfeiture regimes: a monetary incentive to police and prosecute for profit. In Maine, all forfeiture funds go directly to the state's general fund.

### FORFEITURES *as* REPORTED *to* LEMAS **(Drug-related only)**

|      | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|------|------------------------|---------------------------------------------|
| 1993 | $347,051               | $13,917                                     |
| 1997 | $209,856               | $1,972                                      |
| 2000 | $237,047               | $1,772                                      |
| 2003 | $685,057               | $4,572                                      |

### FREEDOM *of* INFORMATION DATA

Reports of forfeitures based on case numbers; types and number of law enforcement agencies unclear

|      | Currency   | Firearms | Real Estate | Vehicles | Total       |
|------|------------|----------|-------------|----------|-------------|
| 1999 | $1,022,587 | $900     | $329,143    | $28,003  | $1,380,633  |
| 2000 | $361,135   | $150     | $671,534    | $17,600  | $1,050,419  |
| 2001 | $338,247   | $1,190   | $145,043    | $52,095  | $536,575    |
| 2002 | $487,599   | $0       | $0          | $53,905  | $541,504    |
| 2003 | $683,057   | $0       | $14,000     | $40,200  | $737,257    |
| Total | $2,892,625 | $2,240  | $1,159,720  | $191,803 | $4,246,388  |
| Average per Year | $578,525 | $448 | $231,944 | $38,361 | $849,278 |

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND **(AFF)**

|          | Proceeds Returned to State |
|----------|----------------------------|
| FY 2000  | $289,012                   |
| FY 2001  | $249,073                   |
| FY 2002  | $204,420                   |
| FY 2003  | $396,817                   |
| FY 2004  | $220,415                   |
| FY 2005  | $521,857                   |
| FY 2006  | $350,624                   |
| FY 2007  | $1,025,788                 |
| FY 2008  | $345,699                   |
| Total    | $3,603,705                 |
| Average per Year | $400,412           |

63

**Plaintiff's Ex. # 1, p. 64**
**Littlepage v. DC, 14-899 (ESH)**

# MARYLAND



| B |
|---|
| Forfeiture Law Grade |



| C+ |
|---|
| **FINAL GRADE** |



| C |
|---|
| State Law Evasion Grade |

## FORFEITURE LAW

Procedurally, Maryland does not afford strong protections to property owners swept up in civil forfeiture, but it does eliminate the profit incentive. Property can be forfeited under a preponderance of the evidence standard; the government must merely prove it is more likely than not that the property was involved in a crime, a far lower standard than beyond a reasonable doubt. Property owners are effectively "guilty until proven innocent": To contest a seizure, the property owner must prove that the property was wrongfully seized or that the owner did not have actual knowledge of the conduct. But Maryland civil forfeiture law, unlike most other states, avoids creating a profit incentive for local law enforcement. All proceeds from civil forfeiture flow to the state general fund or the local governing body.

With the profit incentive eliminated under state law, Maryland law enforcement can and does still obtain forfeited property by working with federal authorities through adoption and equitable sharing. Despite the mandate that forfeiture proceeds go the general fund, state law enforcement, working with their federal partners, received more than $50 million in forfeiture revenue from 2000 to 2008. This end-run around state forfeiture law was challenged in court, but the Maryland Court of Appeals ratified the practice of equitable sharing even when law enforcement failed to obtain a court order permitting the use of the loophole.[1]

---

[1]   *DeSantis v. State*, 866 A.2d 143 (Md. 2005).

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND (AFF)

|  | Proceeds Returned to State |
|---|---|
| **FY 2000** | $3,955,415 |
| **FY 2001** | $3,063,429 |
| **FY 2002** | $4,626,498 |
| **FY 2003** | $7,424,604 |
| **FY 2004** | $6,159,725 |
| **FY 2005** | $5,635,733 |
| **FY 2006** | $6,384,843 |
| **FY 2007** | $8,216,398 |
| **FY 2008** | $8,052,287 |
| **Total** | $53,518,932 |
| **Average per Year** | $5,946,548 |

### FORFEITURES *as* REPORTED *to* LEMAS (Drug-related only)

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| **1993** | $5,418,380 | $68,048 |
| **1997** | $11,342,965 | $103,778 |
| **2000** | $8,541,208 | $141,878 |
| **2003** | $8,792,725 | $58,660 |

### FREEDOM *of* INFORMATION DATA

No Data Available; Not Required to Collect

64

# MASSACHUSETTS



**Forfeiture Law Grade**



**FINAL GRADE**



**State Law Evasion Grade**

## FORFEITURE LAW

Massachusetts has a terrible civil forfeiture regime. Under Massachusetts civil forfeiture law, law enforcement need only show probable cause that your property was related to a crime to forfeit it. You are then in effect guilty until proven innocent, as you must shoulder the burden of proving that the property was not forfeitable or that you did not know and should not have known about the conduct giving rise to the forfeiture. Further, law enforcement keeps 100 percent of all forfeited property. The receipts are split: half to the prosecutor's office and half to the local or state police. Massachusetts is required to collect forfeiture data, but in response to requests, the state provided data only for 2000 to 2003.

### FORFEITURES *as* REPORTED *to* LEMAS (Drug-related only)

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| 1993 | $7,037,778 | $51,909 |
| 1997 | $30,557,661 | $100,927 |
| 2000 | $3,846,418 | $12,722 |
| 2003 | $5,018,063 | $18,293 |

### FREEDOM *of* INFORMATION DATA

**Reports of forfeitures by district attorneys offices**

| Year | Forfeitures |
|---|---|
| 2000 | $3,337,462 |
| 2001 | $5,255,308 |
| 2002 | $4,153,936 |
| 2003 | $4,048,912 |
| Total | $16,795,619 |

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND (AFF)

|  | Proceeds Returned to State |
|---|---|
| FY 2000 | $2,849,444 |
| FY 2001 | $2,416,212 |
| FY 2002 | $2,614,071 |
| FY 2003 | $2,012,439 |
| FY 2004 | $4,354,656 |
| FY 2005 | $4,563,453 |
| FY 2006 | $2,527,410 |
| FY 2007 | $3,921,974 |
| FY 2008 | $5,249,599 |
| Total | $30,509,258 |
| Average per Year | $3,389,918 |

65

**Plaintiff's Ex. # 1, p. 66**
**Littlepage v. DC, 14-899 (ESH)**

# MICHIGAN



**D-**
Forfeiture
Law Grade



**D-**

**FINAL GRADE**



**D**
State Law
Evasion Grade

## FORFEITURE LAW

Michigan has bad civil forfeiture laws—and law enforcement there uses equitable sharing extensively.  Michigan requires prosecuting attorneys to prove by a preponderance of the evidence that the property is related to a crime and thus subject to forfeiture.  This standard is significantly lower than the beyond a reasonable doubt standard required to actually convict someone of criminal activity.  However, owners in Michigan are presumed innocent; unlike in most states, the government bears the burden of establishing that the criminal activity was done with an owner's knowledge or consent, implied or expressed.

On the other hand, law enforcement receives all proceeds of civil forfeiture to enhance law enforcement efforts, creating an incentive to pursue forfeiture more vigorously than combating other criminal activity.  As the numbers below indicate, multi-jurisdictional task forces work extensively with district attorneys and police departments to forfeit property, resulting in more than $149 million in total forfeiture revenue from 2001 to 2008.

### FORFEITURES *as* REPORTED *to* LEMAS **(Drug-related only)**

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| 1993 | $12,567,115 | $59,539 |
| 1997 | $14,535,079 | $23,065 |
| 2000 | $22,398,134 | $39,112 |
| 2003 | $18,995,124 | $38,059 |

### FREEDOM *of* INFORMATION DATA

*On Next Page*

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND **(AFF)**

|  | Proceeds Returned to State |
|---|---|
| FY 2000 | $4,514,721 |
| FY 2001 | $7,536,367 |
| FY 2002 | $4,792,256 |
| FY 2003 | $5,414,143 |
| FY 2004 | $4,616,839 |
| FY 2005 | $13,494,514 |
| FY 2006 | $9,645,997 |
| FY 2007 | $8,551,255 |
| FY 2008 | $13,272,447 |
| Total | $71,838,539 |
| Average per Year | $7,982,060 |

66

**Plaintiff's Ex. # 1, p. 67**
**Littlepage v. DC, 14-899 (ESH)**

## MICHIGAN FREEDOM *of* INFORMATION DATA

Reports of forfeitures from law enforcement agencies, task forces and district attorneys

| | Police and Sheriff | Task Forces | District Attorneys | Total |
|---|---|---|---|---|
| **2001** | | | | |
| Currency | $5,750,076 | $2,521,717 | $539,549 | $8,811,342 |
| Personal Property | $1,632,330 | $177,885 | $53,559 | $1,863,774 |
| Real Property | $890,644 | $294,585 | $0 | $1,185,229 |
| Conveyances | $559,649 | $590,953 | $92,550 | $1,243,152 |
| Total | $8,832,699 | $3,585,140 | $685,658 | $13,103,497 |
| **2002** | | | | |
| Currency | $7,007,821 | $3,497,601 | $325,419 | $10,830,841 |
| Personal Property | $1,249,053 | $239,467 | $475 | $1,488,995 |
| Real Property | $686,396 | $400,740 | $54,000 | $1,141,136 |
| Conveyances | $1,058,946 | $539,575 | $18,050 | $1,616,571 |
| Total | $10,002,216 | $4,677,383 | $397,944 | $15,077,543 |
| **2003** | | | | |
| Currency | $11,572,489 | $3,800,983 | $179,160 | $15,552,632 |
| Personal Property | $1,224,164 | $185,111 | $38,185 | $1,447,460 |
| Real Property | $722,227 | $876,196 | $65,000 | $1,663,423 |
| Conveyances | $1,071,210 | $694,159 | $58,605 | $1,823,974 |
| Total | $14,590,090 | $5,556,449 | $340,950 | $20,487,489 |
| **2004** | | | | |
| Currency | $10,450,632 | $2,522,419 | $479,154 | $13,452,205 |
| Personal Property | $343,933 | $366,302 | $99,495 | $809,730 |
| Real Property | $1,041,665 | $303,684 | $127,027 | $1,472,376 |
| Conveyances | $1,250,040 | $736,539 | $52,255 | $2,038,834 |
| Total | $13,086,270 | $3,928,944 | $757,931 | $17,773,145 |
| **2005** | | | | |
| Currency | $12,564,861 | $3,632,905 | $272,902 | $16,470,668 |
| Personal Property | $241,687 | $296,456 | $46,033 | $584,176 |
| Real Property | $274,018 | $409,389 | $40,000 | $723,407 |
| Conveyances | $4,951,493 | $768,396 | $272,902 | $5,992,791 |
| Total | $18,032,059 | $5,107,146 | $631,837 | $23,771,042 |
| **2006** | | | | |
| Currency | $9,814,586 | $3,228,727 | $264,364 | $13,307,677 |
| Personal Property | $272,864 | $620,179 | $117,501 | $1,010,544 |
| Real Property | $307,465 | $559,298 | $45,126 | $911,889 |
| Conveyances | $1,975,297 | $806,535 | $26,580 | $2,808,412 |
| Total | $12,370,212 | $5,214,739 | $453,571 | $18,038,522 |
| **2007** | | | | |
| Currency | $13,594,846 | $3,703,000 | $228,346 | $17,526,192 |
| Personal Property | $256,096 | $671,016 | $86,969 | $1,023,081 |
| Real Property | $246,535 | $531,298 | $0 | $777,833 |
| Conveyances | $1,852,968 | $835,730 | $29,040 | $2,717,738 |
| Total | $15,959,445 | $5,741,044 | $344,355 | $22,044,844 |
| **2008** | | | | |
| Currency | $9,798,402 | $4,793,565 | $907 | $14,592,874 |
| Personal Property | $311,675 | $555,436 | $0 | $867,111 |
| Real Property | $150,500 | $406,109 | $95,394 | $652,003 |
| Conveyances | $2,176,200 | $749,216 | $2,000 | $2,927,416 |
| Total | $12,436,777 | $6,504,326 | $98,301 | $19,039,404 |
| **Grand Total** | $105,309,768 | $40,315,171 | $3,710,547 | $149,335,486 |
| **Grand Average per Year** | $13,163,721 | $5,039,396 | $463,818 | $18,686,936 |

Plaintiff's Ex. # 1, p. 68
Littlepage v. DC, 14-899 (ESH)

# MINNESOTA



| D |
|---|
| Forfeiture Law Grade |



**C**

**FINAL GRADE**



| B |
|---|
| State Law Evasion Grade |

## FORFEITURE LAW

Minnesota law provides only slight protection for property owners against wrongful forfeitures, as its poor law grade of D shows. The state's somewhat higher final grade reflects limited use of equitable sharing to date (an evasion grade of B). Although state statutes require that the government must show by clear and convincing evidence that the property is connected to drug trafficking and thus forfeitable, this burden is often easily met. This is because, in practice, few cases are tried. When they are, the owner is presumed guilty, bearing the burden of showing that he is an innocent owner.[1] Law enforcement also receives as much as 90 percent of the value of forfeited property,[2] thus providing a profit incentive to law enforcement to focus on civil forfeitures instead of other law enforcement duties. Nevertheless, as the numbers below indicate, Minnesota law enforcement has used forfeiture relatively modestly in recent years.

However, this changed in 2009. Then, the consequences of Minnesota's lax forfeiture laws were on full display with a scandal involving the state's Metro Gang Strike Force, accused of using its forfeiture power to improperly seize property. In some instances, officers have been alleged to keep the property for their own personal use.[3]

---

1   The statute does not refer to an innocent owner defense. But in *Blanche v. 1995 Pontiac Grand Prix*, 599 N.W.2d 191 (1999), the court permits an innocent owner defense to be raised without establishing a burden of proof.
2   Specifically, 70 percent of the proceeds from common forfeitures go to the law enforcement agency, 20 percent go to the office of the prosecutor, and 10 percent go to the general governmental fund. Minn. Stat. § 609.5315.
3   Lore, M. (2009, September 18). Criminal defense attorneys seek more protections in forfeiture cases. Retrieved September 25, 2009, from http://www.minnlawyer.com/article.cfm/2009/09/21/Criminal-defense-attorneys-seek-more-protections-in-forfeiture-cases.

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND **(AFF)**

|  | Proceeds Returned to State |
|---|---|
| **FY 2000** | $1,046,751 |
| **FY 2001** | $1,348,423 |
| **FY 2002** | $1,810,187 |
| **FY 2003** | $1,133,648 |
| **FY 2004** | $1,369,123 |
| **FY 2005** | $1,930,861 |
| **FY 2006** | $1,498,393 |
| **FY 2007** | $1,960,561 |
| **FY 2008** | $2,436,864 |
| **Total** | $14,534,811 |
| **Average per Year** | $1,614,979 |

### FORFEITURES *as* REPORTED *to* LEMAS **(Drug-related only)**

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| **1993** | $3,313,487 | $20,000 |
| **1997** | $13,088,560 | $27,291 |
| **2000** | $2,039,003 | $4,500 |
| **2003** | $4,564,594 | $8,665 |

### FREEDOM *of* INFORMATION DATA

*On Next Page*

**68**

MINNESOTA FREEDOM *of* INFORMATION DATA

**Reports of forfeitures from law enforcement agencies and task forces**

|  | All Law Enforcement Agencies |
|---|---|
| **1996** | $1,948,424 |
| **1997** | $1,913,906 |
| **1998** | $1,208,821 |
| **1999** | $1,488,157 |
| **2000** | $501,115 |
| **2001** | $960,081 |
| **2002** | $684,454 |
| **2003** | $1,030,966 |
| **2004** | $1,312,165 |
| **2005** | $1,443,026 |
| **2006** | $3,942,930 |
| **2007** | $4,318,651 |
| **2008** | $3,500,434 |
| **Total** | $24,253,130 |
| **Average per Year** | $1,865,625 |

**Plaintiff's Ex. # 1, p. 70**
**Littlepage v. DC, 14-899 (ESH)**

# MISSISSIPPI



| Forfeiture Law Grade |
|---|
| D |



**D+**

**FINAL GRADE**



| State Law Evasion Grade |
|---|
| C |

## FORFEITURE LAW

Mississippi provides minimal protections for property owners from civil forfeiture abuse. The state only needs to prove by a preponderance of the evidence that the property is related to a crime and thus forfeitable, a standard lower than the beyond a reasonable doubt required for a criminal conviction. Moreover, the burden is on the property owner to prove his innocence, effectively making him guilty until proven innocent. Law enforcement collects 80 percent of the proceeds from any seizures, thus ensuring a profit motive for law enforcement to pursue forfeitures. There is no legal requirement that law enforcement collect or report data on forfeiture use or proceeds.

Some law enforcement agencies in Mississippi seem to have become reliant on such funds to operate. The Hattiesburg Police Department, for example, took in around $1.4 million over the past six years.[1] Hattiesburg City Council President Kim Bradley admits that "forfeiture funds are a tremendous help, especially with the recent state budget cuts." In the current recession, law enforcement could feel increased pressure to bring in forfeiture proceeds to make up for declining state revenue.

---

1    Butler, E. (2009, January 11). HPD gets $1.4M in forfeiture revenue. *Hattiesburg American*, npn.

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND **(AFF)**

|  | Proceeds Returned to State |
|---|---|
| **FY 2000** | $1,310,763 |
| **FY 2001** | $1,227,097 |
| **FY 2002** | $1,026,045 |
| **FY 2003** | $1,546,593 |
| **FY 2004** | $4,278,744 |
| **FY 2005** | $3,242,740 |
| **FY 2006** | $5,526,173 |
| **FY 2007** | $3,254,022 |
| **FY 2008** | $2,696,655 |
| **Total** | $24,108,832 |
| **Average per Year** | $2,678,759 |

### FORFEITURES *as* REPORTED *to* LEMAS **(Drug-related only)**

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| **1993** | $2,983,591 | $36,175 |
| **1997** | $13,872,939 | $41,579 |
| **2000** | $4,801,456 | $16,360 |
| **2003** | $6,699,229 | $39,677 |

### FREEDOM *of* INFORMATION DATA

No Data Available; Not Required to Collect

70

**Plaintiff's Ex. # 1, p. 71**
**Littlepage v. DC, 14-899 (ESH)**

# MISSOURI



**Forfeiture Law Grade** — B



**C+**

**FINAL GRADE**



**State Law Evasion Grade** — C

## FORFEITURE LAW

Missouri law makes it very easy for law enforcement to forfeit property, but it strictly limits agencies' ability to profit from forfeitures under state law. The weakest part of Missouri's law is requiring the government to show only reasonable cause to believe property is related to a crime to forfeit it. That is the lowest legal standard, akin to the probable cause required for a search warrant, and much lower than beyond a reasonable doubt, the standard the government must meet for a criminal conviction. Moreover, owners are presumed guilty: When property is seized and an innocent owner has an interest in the property, the owner must intervene in the forfeiture proceedings and show he did not have actual knowledge of the criminal activity. However, Missouri is one of only eight states where law enforcement receives none of the funds from forfeiture; all accrue to the local education system. This is a significant protection for owners, but the data from Missouri suggests that law enforcement still engages in forfeiture, seizing more than $34 million from 2001 to 2008.

A key incentive to continued use of forfeiture in Missouri may be federal equitable sharing. After an investigative report in the *Kansas City Star*, Missouri lawmakers were awakened to a major problem that plagues other states that limit the ability of law enforcement to profit from forfeiture: federal adoption of forfeiture proceedings and equitable sharing arrangements. By 1999, more than 85 percent of forfeited property was funneled through this loophole.

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND (AFF)

|  | Proceeds Returned to State |
|---|---|
| FY 2000 | $8,179,698 |
| FY 2001 | $4,979,750 |
| FY 2002 | $4,079,649 |
| FY 2003 | $4,781,175 |
| FY 2004 | $6,024,911 |
| FY 2005 | $8,546,529 |
| FY 2006 | $9,479,687 |
| FY 2007 | $10,667,509 |
| FY 2008 | $10,461,755 |
| Total | $67,200,663 |
| Average per Year | $7,466,740 |

### FORFEITURES *as* REPORTED *to* LEMAS (Drug-related only)

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| 1993 | $6,756,915 | $69,839 |
| 1997 | $10,131,477 | $15,070 |
| 2000 | $7,852,960 | $14,894 |
| 2003 | $4,565,135 | $6,973 |

### FREEDOM *of* INFORMATION DATA

*On Next Page*

71

**Plaintiff's Ex. # 1, p. 72**
**Littlepage v. DC, 14-899 (ESH)**

MISSOURI FREEDOM *of* INFORMATION DATA

**Reports of forfeitures from prosecuting attorneys and attorney general**

| | Pending | Returned | Transferred to Federal Agency | Transferred to State | Disposition not Reported | Other | Total |
|---|---|---|---|---|---|---|---|
| **2001** | $1,559,080 | $1,100,845 | $498,373 | $225,921 | $268,754 | $300 | $3,653,273 |
| **2002** | $2,171,488 | $1,038,313 | $1,372,961 | $232,848 | $349,143 | $1,802 | $5,166,555 |
| **2003** | $1,897,115 | $720,269 | $342,880 | $210,340 | $71,233 | $23,089 | $3,264,926 |
| **2004** | $1,212 | $893,546 | $669,331 | $45,273 | $12,953 | $112,467 | $1,734,782 |
| **2005** | $2,307,302 | $386,285 | $1,272,420 | $71,225 | $0 | $1,653 | $4,038,885 |
| **2006** | $1,591,228 | $664,158 | $2,810,763 | $83,038 | $51,942 | $14,446 | $5,215,575 |
| **2007** | $1,464,990 | $674,253 | $2,028,673 | $74,461 | $248,730 | $13,914 | $4,505,021 |
| **2008** | $1,377,108 | $179,582 | $5,183,935 | $58,532 | $83,979 | $0 | $6,883,136 |
| **Total** | $12,369,523 | $5,657,251 | $14,179,336 | $1,001,638 | $1,086,734 | $167,671 | $34,462,153 |
| **Average per Year** | $1,546,190 | $707,156 | $1,772,417 | $125,205 | $135,842 | $20,959 | $4,307,769 |

**Plaintiff's Ex. # 1, p. 73**
**Littlepage v. DC, 14-899 (ESH)**

# MONTANA



| | | |
|---|---|---|
| F | D+ | B |
| Forfeiture Law Grade | FINAL GRADE | State Law Evasion Grade |

## FORFEITURE LAW

Montana has terrible civil forfeiture laws. The state only requires probable cause to forfeit property. This is the lowest standard of proof the government must meet to prove your property is related to a crime. It is the same standard required for a search warrant and far lower than the beyond a reasonable doubt standard required for a criminal conviction. Moreover, once Montana seizes your property, you are presumed guilty, and you bear the burden of proving that either the property was not forfeitable or that the conduct giving rise to the seizure was without your knowledge or consent. Moreover, law enforcement receives 100 percent of the proceeds from forfeiture.

News accounts reveal that almost half of some county prosecutors' salaries are paid by funds from forfeiture accounts. The Montana State Bar issued an ethics opinion that found no conflict of interest despite an acknowledgement that the funds are often used to hire deputy prosecutors that assist the county prosecutor.[1] The exact amounts and how these funds are used are difficult to determine, however, because there is no requirement that forfeiture data be reported.

In 2007, the Montana legislature considered reforming its civil forfeiture laws but rejected a bill that would have eliminated the profit incentive that law enforcement currently has. It would have also plugged the federal equitable sharing loophole that allows states to avoid state laws protecting property owners from wrongful forfeiture.

---

1   State Bar of Montana. (n. d.). Ethics opinion 960827. Retrieved September 25, 2009, from http://www.montanabar.org/displaycommon.cfm?an=1&subarticlenbr=131.

## FORFEITURES *as* REPORTED *to* LEMAS (Drug-related only)

| | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| 1993 | $893,729 | $23,200 |
| 1997 | $7,550,011 | $34,879 |
| 2000 | $1,373,458 | $8,079 |
| 2003 | $965,189 | $7,349 |

## FREEDOM *of* INFORMATION DATA

No Data Available; Not Required to Collect

## EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND (AFF)

| | Proceeds Returned to State |
|---|---|
| FY 2000 | $251,243 |
| FY 2001 | $576,378 |
| FY 2002 | $205,696 |
| FY 2003 | $182,607 |
| FY 2004 | $201,458 |
| FY 2005 | $422,760 |
| FY 2006 | $487,171 |
| FY 2007 | $1,134,024 |
| FY 2008 | $387,501 |
| Total | $3,848,838 |
| Average per Year | $427,649 |

73

# NEBRASKA



Forfeiture
Law Grade



**FINAL GRADE**



State Law
Evasion Grade

## FORFEITURE LAW

Nebraska has a very high standard—beyond a reasonable doubt—to forfeit property. However, once the state establishes that the property is subject to forfeiture, the burden shifts to the property owner to establish that he is an innocent owner. In Nebraska, law enforcement receives 75 percent of forfeiture proceeds.

Given these limitations, Nebraska law enforcement only took in about $600,000 in total forfeitures from 2001 to 2002. But Nebraska agencies take advantage of equitable sharing arrangements. For example, an out-of-state driver crossing Nebraska was stopped by law enforcement, and police found a small amount of marijuana but later dropped the drug charges. The police took a suitcase with more than $40,000 in it and turned it over to a federal agent. The Nebraska Supreme Court found the state courts had no jurisdiction over the money after the federal agents took possession, even though the initial seizure was conducted by state agents and any eventual receipts would be equitably shared with local law enforcement.[1]

---

1   *Obad v. State*, 766 N.W.2d 89 (Neb. 2009).

### FORFEITURES *as* REPORTED *to* LEMAS **(Drug-related only)**

|      | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|------|-----------------------|--------------------------------------------|
| 1993 | $2,367,871            | $81,561                                    |
| 1997 | $11,725,158           | $47,819                                    |
| 2000 | $9,296,488            | $41,309                                    |
| 2003 | $1,362,393            | $7,834                                     |

### FREEDOM *of* INFORMATION DATA

Reports of forfeitures by counties; types and number of law enforcement agencies unclear

Total amount of assets, 2001-2002: $604,722

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND **(AFF)**

|                  | Proceeds Returned to State |
|------------------|---------------------------|
| **FY 2000**      | $2,089,356                |
| **FY 2001**      | $1,536,488                |
| **FY 2002**      | $826,487                  |
| **FY 2003**      | $3,949,404                |
| **FY 2004**      | $3,358,978                |
| **FY 2005**      | $2,284,353                |
| **FY 2006**      | $5,348,456                |
| **FY 2007**      | $4,087,991                |
| **FY 2008**      | $4,929,203                |
| **Total**        | $28,410,716               |
| **Average per Year** | $3,156,746            |

Plaintiff's Ex. # 1, p. 75
Littlepage v. DC, 14-899 (ESH)

# NEVADA



**D-**
Forfeiture
Law Grade



**D+**

**FINAL GRADE**



**C**
State Law
Evasion Grade

## FORFEITURE LAW

Nevada forfeiture law provides paltry protection for property owners from wrongful forfeitures. The government may seize your property and keep it upon a showing of clear and convincing evidence, a higher standard than many states but still lower than the criminal standard of beyond a reasonable doubt. But the burden falls on you to prove that you are an innocent owner by showing that the act giving rise to the forfeiture was done without your knowledge, consent or willful blindness. Further, law enforcement keeps 100 percent of the revenue raised from the sale of forfeited property. Additionally, the revenue must be spent within the year, because any excess more than $100,000 in a forfeiture account is given to local schools. This provision creates an incentive to rely on new forfeitures each year.[1] Nevada law enforcement officials are supposed to report on forfeiture, but they did not respond to requests for information.

---

1    Skolnik, S. (2006, September 26). Their loss is our gain as police claim the tools of the criminal trade. *Las Vegas Sun*, p. 1.

### FORFEITURES *as* REPORTED *to* LEMAS **(Drug-related only)**

|      | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|------|------------------------|---------------------------------------------|
| 1993 | $1,395,369             | $60,479                                     |
| 1997 | $2,568,835             | $54,081                                     |
| 2000 | $2,494,879             | $63,710                                     |
| 2003 | $1,592,706             | $45,025                                     |

### FREEDOM *of* INFORMATION DATA

No Data Available; Required to Collect, But Did Not Respond to Request

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND **(AFF)**

|                    | Proceeds Returned to State |
|--------------------|----------------------------|
| FY 2000            | $717,857                   |
| FY 2001            | $1,208,744                 |
| FY 2002            | $2,327,734                 |
| FY 2003            | $1,414,098                 |
| FY 2004            | $3,057,339                 |
| FY 2005            | $958,577                   |
| FY 2006            | $4,811,808                 |
| FY 2007            | $3,171,097                 |
| FY 2008            | $3,976,608                 |
| Total              | $21,643,862                |
| Average per Year   | $2,404,874                 |

**Plaintiff's Ex. # 1, p. 76**
**Littlepage v. DC, 14-899 (ESH)**

# NEW HAMPSHIRE



D
Forfeiture
Law Grade



D+

**FINAL GRADE**



C
State Law
Evasion Grade

## FORFEITURE LAW

New Hampshire civil forfeiture laws do not adequately protect the rights of property owners. Prosecutors must prove only by a mere preponderance of the evidence that your property is related to a crime and thus subject to forfeiture. Once established, the burden rests on you to raise an innocent owner defense, effectively making you guilty until proven innocent. Law enforcement has a profit motive to pursue forfeitures because they directly keep 45 percent of the proceeds. Another 45 percent of the proceeds go to a state forfeiture fund, while the remaining 10 percent accrues to the state health and human services department. New Hampshire officials are supposed to track the amount of forfeiture activity, but they failed to respond to requests for information about the state forfeiture program.

### FORFEITURES *as* REPORTED *to* LEMAS **(Drug-related only)**

|      | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|------|------------------------|---------------------------------------------|
| 1993 | $1,437,084             | $21,141                                     |
| 1997 | $24,712,305            | $105,361                                    |
| 2000 | $334,170               | $1,647                                      |
| 2003 | $678,210               | $3,075                                      |

### FREEDOM *of* INFORMATION DATA

No Data Available; Required to Collect, But Did Not Respond to Request

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND **(AFF)**

|                    | Proceeds Returned to State |
|--------------------|----------------------------|
| **FY 2000**        | $346,243                   |
| **FY 2001**        | $455,552                   |
| **FY 2002**        | $728,182                   |
| **FY 2003**        | $882,749                   |
| **FY 2004**        | $806,361                   |
| **FY 2005**        | $1,271,291                 |
| **FY 2006**        | $1,301,766                 |
| **FY 2007**        | $1,334,732                 |
| **FY 2008**        | $1,072,645                 |
| **Total**          | $8,199,521                 |
| **Average per Year** | $911,058                 |

**Plaintiff's Ex. # 1, p. 77**
**Littlepage v. DC, 14-899 (ESH)**

# NEW JERSEY



D-
Forfeiture
Law Grade



D
**FINAL GRADE**



C
State Law
Evasion Grade

## FORFEITURE LAW

New Jersey civil forfeiture laws offer scant protection to property owners. The government only needs to show by a preponderance of the evidence that the seized property is related to criminal activity. Once shown, the owner bears the burden of proving that the property was not forfeitable, making him guilty until proven innocent. The property owner must show that he was not aware of the criminal activity, was not involved with the criminal activity and took all reasonable steps to prevent the criminal activity. Law enforcement keeps 100 percent of the funds forfeited, creating an incentive to pursue forfeiture over other law enforcement efforts. Moreover, New Jersey officials are not required to track and report forfeitures and proceeds.

A New Jersey Superior Court judge ruled that the forfeiture regime violated constitutional due process because of the profit incentive imbedded in it.[1] Unfortunately, the appellate division overruled the district judge and reinstated the incentive provision.[2]

---

1    See: Bullock, S. (2003). Court seizes the day: New Jersey civil forfeiture laws declared unconstitutional. Retrieved September 25, 2009, from http://www.ij.org/index.php?option=com_content&task=view&id=1425&Itemid=194.

2    *State v. One 1990 Ford Thunderbird*, 852 A.2d 1114 (2004).

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND (AFF)

|  | Proceeds Returned to State |
|---|---|
| **FY 2000** | $4,809,223 |
| **FY 2001** | $3,211,799 |
| **FY 2002** | $755,923 |
| **FY 2003** | $1,158,130 |
| **FY 2004** | $2,818,466 |
| **FY 2005** | $3,422,390 |
| **FY 2006** | $2,548,731 |
| **FY 2007** | $5,699,340 |
| **FY 2008** | $5,969,112 |
| **Total** | $30,393,114 |
| **Average per Year** | $3,377,013 |

### FORFEITURES *as* REPORTED *to* LEMAS (Drug-related only)

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| **1993** | $39,332,843 | $105,045 |
| **1997** | $50,604,691 | $81,444 |
| **2000** | $10,574,698 | $18,622 |
| **2003** | $8,271,790 | $16,335 |

### FREEDOM *of* INFORMATION DATA

No Data Available; Not Required to Collect

**Plaintiff's Ex. # 1, p. 78**
**Littlepage v. DC, 14-899 (ESH)**

# NEW MEXICO



D-
Forfeiture
Law Grade



D+
**FINAL GRADE**



C
State Law
Evasion Grade

## FORFEITURE LAW

Even after a reform effort in 2002, New Mexico's civil forfeiture laws still do not offer adequate protections for property owners. To secure a civil forfeiture, the government must prove, by clear and convincing evidence, that property is related to criminal activity and thus subject to forfeiture. This is a higher standard than most states but still lower than proof beyond a reasonable required to establish criminal guilt. Moreover, in most instances, property owners have the burden of proof for innocent owner claims. And law enforcement may still receive 100 percent of the proceeds from any forfeiture.

### FORFEITURES *as* REPORTED *to* LEMAS **(Drug-related only)**

| | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| 1993 | $2,265,510 | $45,455 |
| 1997 | $3,680,178 | $23,592 |
| 2000 | $2,556,181 | $20,274 |
| 2003 | $3,623,358 | $48,112 |

### FREEDOM *of* INFORMATION DATA

No Data Available; Not Required to Collect

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND **(AFF)**

| | Proceeds Returned to State |
|---|---|
| **FY 2000** | $541,659 |
| **FY 2001** | $1,157,905 |
| **FY 2002** | $2,272,066 |
| **FY 2003** | $2,319,114 |
| **FY 2004** | $2,829,601 |
| **FY 2005** | $3,017,396 |
| **FY 2006** | $2,616,795 |
| **FY 2007** | $3,759,580 |
| **FY 2008** | $3,282,329 |
| **Total** | $21,796,445 |
| **Average per Year** | $2,421,827 |

**Plaintiff's Ex. # 1, p. 79**
**Littlepage v. DC, 14-899 (ESH)**

# NEW YORK



C-
Forfeiture
Law Grade



D

**FINAL GRADE**



F

State Law
Evasion Grade

## FORFEITURE LAW

New York law provides some protection for property owners caught up in civil forfeiture, but the state's law enforcement agencies are among the nation's most aggressive in pursuing equitable sharing with the federal government. Under New York civil forfeiture law, the government's standard of proof to conduct a forfeiture depends on the property being pursued. For real property that was used as an instrumentality of the crime, the government must prove by clear and convincing evidence that the property is related to the crime and can be forfeited. For other property, the government only needs to show by a preponderance of the evidence that the assets were the instrumentality or proceeds of the crime. Moreover, the property owner bears the burden in innocent owner claims. Law enforcement may keep up to 60 percent of the proceeds seized. The state received more than $237 million through equitable sharing between 2000 and 2008.

Although New York "reformed" its asset forfeiture regime in 1990, it actually further encroached on the property rights of its citizens as a result of the reform. For example, money located near controlled substances is now presumptively forfeitable—in effect, presumed guilty. The property owner has a significant burden placed on him to overcome this presumption.

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND (AFF)

|  | Proceeds Returned to State |
|---|---|
| **FY 2000** | $31,690,678 |
| **FY 2001** | $19,256,431 |
| **FY 2002** | $26,982,890 |
| **FY 2003** | $19,423,843 |
| **FY 2004** | $21,847,333 |
| **FY 2005** | $27,704,134 |
| **FY 2006** | $16,613,808 |
| **FY 2007** | $34,612,069 |
| **FY 2008** | $39,370,757 |
| **Total** | $237,501,943 |
| **Average per Year** | $26,389,105 |

### FORFEITURES *as* REPORTED *to* LEMAS (Drug-related only)

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| **1993** | $36,474,284 | $169,517 |
| **1997** | $36,670,306 | $59,784 |
| **2000** | $45,574,079 | $93,750 |
| **2003** | $34,480,660 | $79,647 |

### FREEDOM *of* INFORMATION DATA

**1990-2002: Reports of forfeitures from district attorneys and task forces;
2008: Reports of forfeitures by county**

| 1990-2002 | District Attorneys | Task Forces | Total |
|---|---|---|---|
| **Currency** | $45,060,601 | $44,304,289 | $89,364,890 |
| **Vehicles** | $3,424,657 | $552,000 | $3,976,657 |
| **Total** | $48,485,258 | $44,856,289 | $93,341,547 |
|  | **Money** | **Other Property** | **Total** |
| **2008** | $69,858,632 | $402,890 | $70,261,522 |

79

**Plaintiff's Ex. # 1, p. 80
Littlepage v. DC, 14-899 (ESH)**

# NORTH CAROLINA



**A-**
Forfeiture
Law Grade



**C+**

**FINAL GRADE**



**D**
State Law
Evasion Grade

## FORFEITURE LAW

Civil forfeiture essentially does not exist under North Carolina law.  Property can only be forfeited if the property owner is actually convicted of a crime.  If he is convicted, the burden is on him to show why the property cannot be forfeited.  Moreover, law enforcement does not receive any percentage of forfeiture proceeds.

Perhaps it should come as no surprise, then, that North Carolina participates extensively in equitable sharing, receiving more than $96 million from 2000 to 2008.

### FORFEITURES *as* REPORTED *to* LEMAS **(Drug-related only)**

|      | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|------|------------------------|---------------------------------------------|
| 1993 | $9,213,280             | $69,634                                     |
| 1997 | $28,063,380            | $49,920                                     |
| 2000 | $19,284,039            | $39,180                                     |
| 2003 | $34,007,124            | $68,065                                     |

### FREEDOM *of* INFORMATION DATA

No Data Available; Not Required to Collect

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND **(AFF)**

|                    | Proceeds Returned to State |
|--------------------|----------------------------|
| **FY 2000**        | $7,125,291                 |
| **FY 2001**        | $6,808,539                 |
| **FY 2002**        | $4,581,800                 |
| **FY 2003**        | $9,480,431                 |
| **FY 2004**        | $8,536,628                 |
| **FY 2005**        | $10,121,517                |
| **FY 2006**        | $10,817,405                |
| **FY 2007**        | $20,920,094                |
| **FY 2008**        | $17,964,512                |
| **Total**          | $96,356,217                |
| **Average per Year** | $10,706,246              |

80

# NORTH DAKOTA



B
Forfeiture
Law Grade



B+

**FINAL GRADE**



A
State Law
Evasion Grade

## FORFEITURE LAW

North Dakota provides better protections for property owners against civil forfeiture abuse than many states.  To forfeit property, the government only needs to demonstrate that there is probable cause to bring the forfeiture action and establish, by a preponderance of the evidence, that the property is related to criminal activity.  The burden is on the property owner to prove his innocence and establish that the property is not subject to forfeiture, effectively making owners guilty until proven innocent.  But the state does offer some important protections.  Under North Dakota law, residences and other real estate are not subject to forfeiture if they are co-owned by someone who has not been convicted of the underlying criminal offense.[1]  Additionally, none of the proceeds from civil forfeiture flow to law enforcement in North Dakota.

1    N.D. Cent. Code § 29-31.1-01; see also CCIM Institute. (2006, July 6). Civil asset forfeiture. Retrieved September 25, 2009, from http://www.ccim.com/system/files/Civil_Asset_Forfeiture_0.pdf.

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND (AFF)

|  | Proceeds Returned to State |
|---|---|
| FY 2000 | $26,767 |
| FY 2001 | $47,097 |
| FY 2002 | $33,974 |
| FY 2003 | $10,796 |
| FY 2004 | $14,890 |
| FY 2005 | $41,168 |
| FY 2006 | $35,959 |
| FY 2007 | $69,903 |
| FY 2008 | $81,172 |
| Total | $361,726 |
| Average per Year | $40,192 |

### FORFEITURES *as* REPORTED *to* LEMAS (Drug-related only)

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| 1993 | $124,929 | $3,726 |
| 1997 | $45,667 | $280 |
| 2000 | $162,983 | $1,193 |
| 2003 | $76,954 | $844 |

### FREEDOM *of* INFORMATION DATA

No Data Available; Not Required to Collect

81

# OHIO



| | | |
|---|---|---|
| B+ | C- | F |
| Forfeiture Law Grade | | State Law Evasion Grade |
| | **FINAL GRADE** | |




## FORFEITURE LAW

Ohio's protections against civil forfeiture abuse are mixed. In forfeiture proceedings, the government must prove the property is related to a crime and thus subject to forfeiture by clear and convincing evidence, a higher standard than most states but still less than the beyond a reasonable doubt standard required for a criminal conviction.[1] A property owner who wishes to argue his innocence has the burden of doing so.[2] But most importantly, none of the proceeds from civil forfeiture go to law enforcement. Unfortunately for Ohio property owners, though, even though state law is rather protective, law enforcement officials participate extensively in equitable sharing, receiving more than $80 million from 2000 to 2008.

1    O. R. C. § 2981.05(D).
2    O. R.C. § 2981.09(A).

### FORFEITURES *as* REPORTED *to* LEMAS **(Drug-related only)**

| | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| **1993** | $9,496,783 | $25,791 |
| **1997** | $31,912,267 | $40,872 |
| **2000** | $11,093,755 | $15,106 |
| **2003** | $10,540,139 | $12,981 |

### FREEDOM *of* INFORMATION DATA

No Data Available; Required to Collect, But Did Not Respond to Request

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND **(AFF)**

| | Proceeds Returned to State |
|---|---|
| **FY 2000** | $4,075,942 |
| **FY 2001** | $6,064,363 |
| **FY 2002** | $9,015,890 |
| **FY 2003** | $9,579,065 |
| **FY 2004** | $8,475,627 |
| **FY 2005** | $6,782,028 |
| **FY 2006** | $12,798,625 |
| **FY 2007** | $13,907,440 |
| **FY 2008** | $12,405,013 |
| **Total** | $83,103,993 |
| **Average per Year** | $9,233,777 |

82

# OKLAHOMA



**D-**
Forfeiture
Law Grade



**D**

FINAL GRADE



**C**
State Law
Evasion Grade

## FORFEITURE LAW

Oklahoma has terrible civil forfeiture laws, and its statutes give law enforcement significant financial incentives to seize property. To forfeit property in civil proceedings, the government typically must show that property is related to a crime and subject to forfeiture by a preponderance of the evidence. In all civil forfeitures in Oklahoma, owners are presumed guilty and must contest forfeiture by proving they did not know property was being used illegally. Worse, law enforcement receives 100 percent of the proceeds from civil forfeiture.

When assets are seized by the Oklahoma Bureau of Narcotics and Dangerous Drugs Control, the Bureau can agree to share the proceeds with other law enforcement agencies. There are some limits on the amount of forfeited funds the Bureau can spend, but the cap was raised substantially in 2007. Previously, the Bureau needed to seek permission of the legislature to spend more than $900,000 of forfeited funds. Since 2007, that cap is $2,000,000.[1] Oklahoma law enforcement officials have used civil forfeiture laws aggressively, averaging more than $5.5 million per year in forfeiture proceeds between 2000 and 2007.

---

1    63 Ok. St. 2-503(F)(2).

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND **(AFF)**

|  | Proceeds Returned to State |
|---|---|
| **FY 2000** | $1,384,903 |
| **FY 2001** | $729,415 |
| **FY 2002** | $5,754,965 |
| **FY 2003** | $6,418,639 |
| **FY 2004** | $5,630,156 |
| **FY 2005** | $7,158,850 |
| **FY 2006** | $6,569,517 |
| **FY 2007** | $6,189,501 |
| **FY 2008** | $2,579,483 |
| **Total** | $42,415,429 |
| **Average per Year** | $4,712,825 |

### FORFEITURES *as* REPORTED *to* LEMAS **(Drug-related only)**

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| **1993** | $3,321,841 | $22,833 |
| **1997** | $13,403,508 | $26,122 |
| **2000** | $3,495,123 | $8,388 |
| **2003** | $11,154,378 | $27,525 |

### FREEDOM *of* INFORMATION DATA

*On Next Page*

83

**Reports of forfeitures by district; types and number of law enforcement agencies unclear**

|  | Currency | Non-currency | Total |
|---|---|---|---|
| **FY 2000** | $3,428,322 | $50,820 | $3,479,142 |
| **FY 2001** | $3,807,605 | $846,641 | $4,654,246 |
| **FY 2002** | $3,924,541 | $649,651 | $4,574,192 |
| **FY 2003** | $6,520,748 | $778,361 | $7,299,109 |
| **FY 2004** | $5,887,904 | $890,421 | $6,778,325 |
| **FY 2005** | $5,236,443 | $686,191 | $5,922,634 |
| **FY 2006** | $5,378,123 | $704,801 | $6,082,924 |
| **FY 2007** | $5,648,549 | $693,629 | $6,342,178 |
| **Total** | $39,832,234 | $5,300,516 | $45,132,750 |
| **Average per Year** | $4,979,029 | $662,564 | $5,641,594 |

84

**Plaintiff's Ex. # 1, p. 85**
**Littlepage v. DC, 14-899 (ESH)**

# OREGON



Forfeiture
Law Grade



**FINAL GRADE**



State Law
Evasion Grade

## FORFEITURE LAW

Oregon civil forfeiture laws have been the subject of much controversy and litigation over the past decade. In 2000, the voters passed a strong initiative that eliminated both the profit incentive and placed a high standard of proof on the government in civil forfeiture proceedings. Unfortunately, that initiative was put on hold while its constitutionality was challenged in court by law enforcement, where it was eventually upheld in 2006. By that time, however, law enforcement successfully advocated for both additional changes in the legislature and also for another initiative, which narrowly passed in 2008 and curtailed several of the strong reforms passed in the 2000 initiative.

Thankfully for property owners, the burden has remained on the government for innocent owner claims regardless of which law or amendment was in effect. Before statutory changes were made in 2005, the government needed to show only probable cause to forfeit property in the first instance. Today, to secure forfeiture of personal property, the government has to prove, only by a preponderance of the evidence, that the property is proceeds or an instrumentality of a crime committed by another person. If the property is real property, the standard of proof is clear and convincing evidence. Before 2005, law enforcement was able to keep 92 percent of proceeds for its own use. After 2005, the formula was changed so that law enforcement now keeps 63 percent. That formula remains in place after the 2008 initiative.

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND **(AFF)**

|  | Proceeds Returned to State |
| --- | --- |
| **FY 2000** | $830,027 |
| **FY 2001** | $655,252 |
| **FY 2002** | $3,557 |
| **FY 2003** | $644,153 |
| **FY 2004** | $477,160 |
| **FY 2005** | $668,926 |
| **FY 2006** | $564,374 |
| **FY 2007** | $1,881,774 |
| **FY 2008** | $1,024,763 |
| **Total** | $6,749,986 |
| **Average per Year** | $749,998 |

### FORFEITURES *as* REPORTED *to* LEMAS **(Drug-related only)**

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
| --- | --- | --- |
| **1993** | $3,267,269 | $36,278 |
| **1997** | $4,781,832 | $24,765 |
| **2000** | $3,142,414 | $18,859 |
| **2003** | $3,236,650 | $22,035 |

### FREEDOM *of* INFORMATION DATA

No Data Available; Required to Collect, Data Provided Was Unusable

85

# PENNSYLVANIA



Forfeiture
Law Grade



**FINAL GRADE**



State Law
Evasion Grade

## FORFEITURE LAW

Pennsylvania has terrible civil forfeiture laws. The government can civilly forfeit property by a preponderance of the evidence showing that the property is related to a crime and subject to forfeiture, a standard significantly lower than the beyond a reasonable doubt standard required for a criminal conviction. And property owners, not the government, bear the burden of proof in innocent owner claims, making property owners effectively guilty until proven innocent. Worse still, all of the money seized by law enforcement agencies and forfeited ultimately makes its way back into their hands. The money is first distributed to the district attorney and state Attorney General, and, under the law, they must use it for enforcement of drug laws. Pennsylvania law enforcement officials take advantage of the commonwealth's broad forfeiture laws. In just a three-year period (2000-2002), more than $20.2 million in currency, vehicles, real estate and other property was forfeited.

A 1992 case illustrates the lengths to which Pennsylvania law enforcement is willing to go to seize and forfeit citizens' property. Mattia and Marjorie Lonardo owned Shorty's Café in a "drug infested area" of Allentown, Pa.[1] Aware that their café was being used for drug sales, they took significant steps to fight back. According to the appellate court:

> Mr. Lonardo made it known to his patrons that he would notify the police if he saw or suspected the possession of drugs[.] On his own initiative, Mr. Lonardo reported illegal activities to the police at least seven times, and police offers admitted at hearing that at least two raids were initiated by Mr. Londardo's reports. At times Mr. Lonardo called the police anonymously in fear of his life, instructed his employees to call the police whenever they saw patrons with drugs and ordered patrons to leave the bar when they were observed with drugs. Also, he identified a suspect and cooperated with police searches at the raids, discussed drugs and loitering problems with the police captain and followed his instruction by posting signs on all the windows. Mr. Lonardo received threats against himself and family and was injured when glass was thrown at him because he refused to acquiesce in drug activities at the cage. He also sustained damages to the property due to this policy toward patrons dealing or possessing drugs.[2]

The police seized Mr. Lonardo's café, and a trial court ordered it forfeited.[3] The Lonardos were not themselves charged with any violation of the Pennsylvania Controlled Substances Act. Nonetheless, the trial court concluded—after the testimony of 24 police officers— that the property was used in drug-related activity and the Lonardos did not "reasonably disclaim . . . ["lack of knowledge of the drug related activity"]."[4] On appeal, the state defended the holding—arguing that property could be seized if the owner had knowledge of drug activity, even if the owner did not consent to it.[5] Fortunately, the appellate court overturned the trial court, concluding that the Lonardos "did all that could reasonably be expected of them to prevent the illegal use of their property[.]"[6]

EQUITABLE SHARING
PROCEEDS *from the* ASSETS
FORFEITURE FUND **(AFF)**

|  | Proceeds Returned to State |
|---|---|
| **FY 2000** | $4,400,314 |
| **FY 2001** | $3,407,745 |
| **FY 2002** | $4,573,607 |
| **FY 2003** | $4,232,797 |
| **FY 2004** | $5,839,157 |
| **FY 2005** | $6,251,089 |
| **FY 2006** | $6,168,214 |
| **FY 2007** | $10,381,304 |
| **FY 2008** | $8,173,837 |
| **Total** | $53,428,064 |
| **Average per Year** | $5,936,452 |

---

1   *Commonwealth of Pennsylvania v. Gordon Street*, 607 A.2d 839, 840-841 (Pa. Commw. Ct. 1992).
2   *Id.* at 846.
3   *Id.* at 841.
4   *Ibid.*
5   *Id.* at 843.
6   *Id.* at 846.

**86**

## FORFEITURES *as* REPORTED *to* LEMAS **(Drug-related only)**

|      | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|------|------------------------|---------------------------------------------|
| 1993 | $9,550,623             | $44,080                                     |
| 1997 | $22,778,083            | $17,691                                     |
| 2000 | $6,940,283             | $6,677                                      |
| 2003 | $4,962,874             | $4,844                                      |

## FREEDOM *of* INFORMATION DATA

**Reports of forfeitures by law enforcement agencies**

|                   | Currency    | Vehicles   | Real Estate | Other     | Total       |
|-------------------|-------------|------------|-------------|-----------|-------------|
| **FY 2000**       | $5,521,524  | $656,273   | $362,518    | $103,134  | $6,643,448  |
| **FY 2001**       | $5,052,475  | $440,521   | $460,349    | $44,958   | $5,998,303  |
| **FY 2002**       | $6,353,097  | $818,455   | $350,433    | $93,250   | $7,615,235  |
| **Total**         | $16,927,095 | $1,915,249 | $1,173,300  | $241,342  | $20,256,986 |
| **Average per Year** | $5,642,365 | $638,416 | $391,100    | $80,447   | $6,752,329  |

87

**Plaintiff's Ex. # 1, p. 88**
**Littlepage v. DC, 14-899 (ESH)**

# RHODE ISLAND



Forfeiture
Law Grade



**FINAL GRADE**



State Law
Evasion Grade

## FORFEITURE LAW

Rhode Island civil forfeiture laws fail to protect property owners.  The government only needs to show probable cause to believe a property is related to a crime to forfeit it.  And property owners are effectively guilty until proven innocent, as the burden is on the property owner to prove he was not aware of or did not participate in the underlying crime.  Ninety percent of forfeited property makes its way to law enforcement, while only 10 percent is allocated to the Department of Health for drug abuse treatment programs.  The state is supposed to collect information on forfeiture but failed to respond to requests for information.

### FORFEITURES *as* REPORTED *to* LEMAS (Drug-related only)

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| 1993 | $1,940,640 | $47,778 |
| 1997 | $1,049,485 | $15,527 |
| 2000 | $591,461 | $8,206 |
| 2003 | $1,287,895 | $32,560 |

### FREEDOM *of* INFORMATION DATA

No Data Available; Required to Collect, But Did Not Respond to Request

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND (AFF)

|  | Proceeds Returned to State |
|---|---|
| FY 2000 | $673,840 |
| FY 2001 | $321,372 |
| FY 2002 | $549,664 |
| FY 2003 | $755,538 |
| FY 2004 | $1,527,027 |
| FY 2005 | $683,856 |
| FY 2006 | $1,015,913 |
| FY 2007 | $1,935,590 |
| FY 2008 | $1,583,601 |
| Total | $9,046,401 |
| Average per Year | $1,005,156 |

88

# SOUTH CAROLINA



**Forfeiture Law Grade**



**FINAL GRADE**



**State Law Evasion Grade**

## FORFEITURE LAW

South Carolina has dreadful civil forfeiture laws. The government can forfeit property by demonstrating mere probable cause that the property is related to a crime and subject to forfeiture. This is the lowest standard, the same one required for a search warrant, and far lower than the beyond a reasonable doubt standard required for a criminal conviction. South Carolina law also considers property owners to be guilty until proven innocent, placing the burden on owners to prove they had no connection to an underlying crime to get their property back. And law enforcement keeps 95 percent of the proceeds—75 percent goes directly to the law enforcement agency and 20 percent to prosecutors. The remaining five percent goes to the state's general fund. Law enforcement and prosecutors are required to use the money to fight drug offenses. Moreover, there is no requirement that the state collect data on forfeitures, so citizens do not know how the state's powerful civil forfeitures laws are being used.

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND (AFF)

|  | Proceeds Returned to State |
|---|---|
| **FY 2000** | $1,298,766 |
| **FY 2001** | $1,199,110 |
| **FY 2002** | $3,641,683 |
| **FY 2003** | $3,560,979 |
| **FY 2004** | $4,893,591 |
| **FY 2005** | $3,005,058 |
| **FY 2006** | $4,414,456 |
| **FY 2007** | $2,877,220 |
| **FY 2008** | $4,761,356 |
| **Total** | $29,652,219 |
| **Average per Year** | $3,294,691 |

### FORFEITURES *as* REPORTED *to* LEMAS (Drug-related only)

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| **1993** | $10,233,388 | $132,644 |
| **1997** | $6,626,501 | $28,927 |
| **2000** | $5,263,571 | $26,038 |
| **2003** | $4,042,927 | $23,292 |

### FREEDOM *of* INFORMATION DATA

No Data Available; Not Required to Collect

89

# SOUTH DAKOTA


Forfeiture
Law Grade



**FINAL GRADE**


State Law
Evasion Grade

## FORFEITURE LAW

South Dakota does little to protect its citizens from civil forfeiture abuse, as its poor law grade of D- shows. The state's final grade of C reflects limited use of equitable sharing to date. To forfeit real property, the government must prove its case by a pre-ponderance of the evidence, but for all other property, the government only needs to show probable cause. These are low standards, far below what is needed to establish criminal guilt. For an innocent owner claim, the property owner is forced to bear the burden of proof, effectively presuming owners are guilty. And law enforcement has access to 100 percent of the money it brings in from civil forfeiture. Initially, the assets are distributed to a "drug control fund" managed by the Attorney General, but law enforcement can then request that money for its own use. There is no require-ment that law enforcement collect or report information on the use of forfeiture or its proceeds.

### FORFEITURES *as* REPORTED *to* LEMAS (Drug-related only)

|      | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|------|------------------------|---------------------------------------------|
| 1993 | $163,568               | $8,616                                      |
| 1997 | $2,563,089             | $12,087                                     |
| 2000 | $307,682               | $1,802                                      |
| 2003 | $1,114,539             | $5,476                                      |

### FREEDOM *of* INFORMATION DATA

No Data Available; Not Required to Collect

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND (AFF)

|                    | Proceeds Returned to State |
|--------------------|----------------------------|
| FY 2000            | $9,583                     |
| FY 2001            | $105,550                   |
| FY 2002            | $53,130                    |
| FY 2003            | $122,365                   |
| FY 2004            | $22,928                    |
| FY 2005            | $48,750                    |
| FY 2006            | $36,143                    |
| FY 2007            | $42,765                    |
| FY 2008            | $6,784                     |
| Total              | $447,998                   |
| Average per Year   | $49,778                    |

**Plaintiff's Ex. # 1, p. 91**
**Littlepage v. DC, 14-899 (ESH)**

# TENNESSEE



Forfeiture
Law Grade



**FINAL GRADE**



State Law
Evasion Grade

## FORFEITURE LAW

Tennessee has broad civil forfeiture laws that fail to protect the rights of property owners.  There, the government must establish by only a preponderance of the evidence that property is related to a crime and subject to forfeiture.  Tennessee also effectively presumes owners are guilty, as the property owner bears the burden of proof for innocent owner claims.  And, while it cannot be used to supplement salaries, local drug enforcement nonetheless keeps 100 percent of property forfeited, and there is no requirement to collect or report data on the use of forfeiture or its proceeds in Tennessee.

### FORFEITURES *as* REPORTED *to* LEMAS (Drug-related only)

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| 1993 | $10,582,931 | $47,349 |
| 1997 | $19,894,405 | $47,255 |
| 2000 | $18,441,459 | $46,945 |
| 2003 | $15,675,257 | $49,327 |

### FREEDOM *of* INFORMATION DATA

No Data Available; Not Required to Collect

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND (AFF)

|  | Proceeds Returned to State |
|---|---|
| FY 2000 | $4,339,691 |
| FY 2001 | $5,081,198 |
| FY 2002 | $4,838,211 |
| FY 2003 | $3,470,935 |
| FY 2004 | $3,416,186 |
| FY 2005 | $5,642,415 |
| FY 2006 | $4,153,200 |
| FY 2007 | $6,938,343 |
| FY 2008 | $6,221,133 |
| Total | $44,101,312 |
| Average per Year | $4,900,146 |

91

# TEXAS



Forfeiture Law Grade **D**



**D-**

**FINAL GRADE**



State Law Evasion Grade **F**

## FORFEITURE LAW

Texas has broad civil forfeiture laws that offer little protection for property owners—and it uses them, as well as federal equitable sharing, aggressively.  In civil forfeiture proceedings, the state must show that property is related to a crime and subject to forfeiture by a preponderance of the evidence.  This standard is significantly lower than the beyond a reasonable doubt finding required for a criminal conviction.  And property owners bear the burden for innocent owner claims, making owners, in effect, guilty until proven innocent.  Moreover, law enforcement retains up to 90 percent of proceeds from civil forfeiture.

Between 2001 and 2007, Texas law enforcement received more than $225 million in civil forfeiture proceeds under state law and $200 million in equitable sharing with the federal government from 2000 to 2008, although these numbers may overlap to some extent, as it is unclear whether freedom of information data includes equitable sharing revenue.

### FORFEITURES *as* REPORTED *to* LEMAS **(Drug-related only)**

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| **1993** | $52,627,133 | $137,845 |
| **1997** | $39,234,793 | $21,645 |
| **2000** | $50,216,412 | $51,452 |
| **2003** | $62,011,133 | $63,005 |

### FREEDOM *of* INFORMATION DATA

*On Next Page*

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND **(AFF)**

|  | Proceeds Returned to State |
|---|---|
| **FY 2000** | $22,576,969 |
| **FY 2001** | $19,668,285 |
| **FY 2002** | $14,419,530 |
| **FY 2003** | $13,659,504 |
| **FY 2004** | $19,386,146 |
| **FY 2005** | $17,123,807 |
| **FY 2006** | $28,859,716 |
| **FY 2007** | $36,200,059 |
| **FY 2008** | $29,552,435 |
| Total | $201,446,451 |
| **Average per Year** | $22,382,939 |

**Plaintiff's Ex. # 1, p. 93**
**Littlepage v. DC, 14-899 (ESH)**

TEXAS FREEDOM *of* INFORMATION DATA

**Reports of forfeitures from law enforcement, task forces and district attorneys**

| | All Local Law Enforcement | Task Forces | District Attorneys | Total |
|---|---|---|---|---|
| **2001** | | | | |
| **Currency** | $7,224,912.58 | $1,377,400.42 | $8,843,326.37 | $17,445,639 |
| **Real Property** | $1,164,551.72 | $193,292.00 | $179,790.70 | $1,537,634 |
| **Total** | $8,389,464 | $1,570,692 | $9,023,117 | $18,983,274 |
| **2002** | | | | |
| **Currency** | $207,103.10 | $977,923.43 | $3,999,492.89 | $5,184,519 |
| **Real Property** | $1,563,336.41 | $40,108.01 | $214,775.65 | $1,818,220 |
| **Total** | $1,770,440 | $1,018,031 | $4,214,269 | $7,002,739 |
| **2003** | | | | |
| **Currency** | $23,159,305.55 | $5,791,442.53 | $11,051,320.35 | $40,002,068 |
| **Real Property** | $2,031,843.18 | $75,696.70 | $622,984.37 | $2,730,524 |
| **Total** | $25,191,149 | $5,867,139 | $11,674,305 | $42,732,593 |
| **2004** | | | | |
| **Currency** | $23,043,183.50 | $6,146,440.65 | $6,786,757.93 | $35,976,382 |
| **Real Property** | $2,608,395.63 | $1,051,902.37 | $982,751.30 | $4,643,049 |
| **Total** | $25,651,579 | $7,198,343 | $7,769,509 | $40,619,431 |
| **2005** | | | | |
| **Currency** | $11,985,617.55 | $3,955,042.09 | $9,368,019.38 | $25,308,679 |
| **Real Property** | $3,192,233.50 | $460,740.50 | $529,784.50 | $4,182,759 |
| **Total** | $15,177,851 | $4,415,783 | $9,897,804 | $29,491,438 |
| **2006** | | | | |
| **Currency** | $23,882,370.27 | $1,413,368.61 | $7,766,550.47 | $33,062,289 |
| **Real Property** | $3,483,398.02 | $432,935.00 | $605,523.81 | $4,521,857 |
| **Total** | $27,365,768 | $1,846,304 | $8,372,074 | $37,584,146 |
| **2007** | | | | |
| **Currency** | $32,796,988.95 | $1,513,726.00 | $9,642,951.58 | $43,953,667 |
| **Real Property** | $3,855,765.91 | $330,917.00 | $1,038,902.28 | $5,225,585 |
| **Total** | $36,652,755 | $1,844,643 | $10,681,854 | $49,179,252 |
| **Grand Total** | $140,199,006 | $23,760,935 | $61,632,932 | $225,592,873 |
| **Grand Average per Year** | $20,028,429 | $3,394,419 | $8,804,705 | $32,227,553 |

# UTAH



| | | |
|---|---|---|
| **D-**<br>Forfeiture<br>Law Grade | **C-**<br>**FINAL GRADE** | **B**<br>State Law<br>Evasion Grade |

## FORFEITURE LAW

From 2000 to 2004, Utah law was relatively protective of property owners, but no longer. Today, while the government must prove property is related to a crime subject to forfeiture by clear and convincing evidence, a relatively high standard, and the government bears the burden in innocent owner contests for most forfeitures, 100 percent of property seized and forfeited in connection to alleged controlled substance offenses is allocated to law enforcement through the Crime Reduction Assistance Program.

These laws are partly the product of a sustained effort by law enforcement to reverse a voter initiative protecting property rights. In 2000, nearly 70 percent of Utah voters passed a measure that eliminated allocation of forfeited money to law enforcement.[1] But law enforcement was determined. Rather than obey the new law, some county prosecutors persisted in diverting some of the forfeited money into their own accounts. Pressure from a group of citizens helped end this practice. No longer able to use the proceeds from forfeiture, police signaled that they no longer had as much interest in the practice. One remarked that "[d]oing forfeiture [was now] way down the line in [his] priorities."[2] But in 2004, the police succeeded in having the initiative overturned by the state legislature, so now 100 percent of proceeds once again go to police and prosecutors.[3]

Despite a requirement that information on the use of forfeiture be collected, Utah officials did not respond to requests for data.

1    Institute for Justice. (n. d.). Ending prosecution for profit in Utah: Citizens demand prosecutors follow state's civil forfeiture law. Retrieved September 25, 2009, from http://www.ij.org/index.php?option=com_content&task=view&id=1063&Itemid=165.
2    Bullock, S. (2003, October). IJ helps end Utah's prosecution for profit. Retrieved September 25, 2009, from http://www.ij.org/index.php?option=com_content&task=view&id=1435&Itemid=194.
3    Dobner, J. (2004, March 3). Lawmakers overturn 2000 forfeiture law. Retrieved September 25, 2009, from http://www.deseretnews.com/article/595046371/Lawmakers-overturn-2000-forfeiture-law.html.

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND **(AFF)**

| | Proceeds Returned to State |
|---|---|
| **FY 2000** | $226,524 |
| **FY 2001** | $199,037 |
| **FY 2002** | $3,357 |
| **FY 2003** | $0 |
| **FY 2004** | $619,006 |
| **FY 2005** | $245,948 |
| **FY 2006** | $1,001,545 |
| **FY 2007** | $1,229,094 |
| **FY 2008** | $1,524,820 |
| **Total** | $5,049,331 |
| **Average per Year** | $561,037 |

### FORFEITURES *as* REPORTED *to* LEMAS **(Drug-related only)**

| | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| **1993** | $1,740,560 | $56,292 |
| **1997** | $1,587,495 | $12,130 |
| **2000** | $1,298,007 | $10,384 |
| **2003** | $275,165 | $2,892 |

### FREEDOM *of* INFORMATION DATA

No Data Available; Required to Collect , But Did Not Respond to Request

94

# VERMONT

| | | |
|---|---|---|
|  **B+** Forfeiture Law Grade | **B** FINAL GRADE |  **B** State Law Evasion Grade |

## FORFEITURE LAW

Vermont has one of the better civil forfeiture laws in the country. In civil forfeiture proceedings, the state must show by clear and convincing evidence that the property is related to a crime and may be forfeited, a higher standard than most states. Unfortunately, Vermont presumes owners are guilty, as the burden in innocent owner claims is on the owner. But importantly, none of the property seized through civil forfeiture is allocated to law enforcement. The money goes to the state treasury.

### FORFEITURES *as* REPORTED *to* LEMAS (Drug-related only)

| | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| 1993 | $990,599 | $28,475 |
| 1997 | $152,306 | $1,646 |
| 2000 | $244,161 | $2,736 |
| 2003 | $1,217,532 | $16,386 |

### FREEDOM *of* INFORMATION DATA

No Data Available; Possible Requirement to Collect for Review by State Treasurer

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND (AFF)

| | Proceeds Returned to State |
|---|---|
| FY 2000 | $488,454 |
| FY 2001 | $824,938 |
| FY 2002 | $701,553 |
| FY 2003 | $956,841 |
| FY 2004 | $919,259 |
| FY 2005 | $1,023,538 |
| FY 2006 | $978,247 |
| FY 2007 | $842,834 |
| FY 2008 | $995,851 |
| Total | $7,731,515 |
| Average per Year | $859,057 |

95

# VIRGINIA



**D-**
Forfeiture
Law Grade



**D-**

**FINAL GRADE**



**D**
State Law
Evasion Grade

## FORFEITURE LAW

Virginia's civil forfeiture laws utterly fail to protect property owners. The government must prove, only by a preponderance of the evidence, that property is related to a crime and subject to forfeiture. In turn, property owners bear the burden of proof for innocent owner claims, effectively making them guilty until proven innocent. Moreover, law enforcement enjoys 100 percent of the proceeds from civil forfeiture. Initially, 90 percent of the receipts go directly to law enforcement agencies that participated in a forfeiture. Thereafter, 10 percent goes to the Department of Criminal Justice Services to be used to promote law enforcement activities. Virginia's broad laws have enabled the commonwealth to receive, on average, more than $7.2 million per year in forfeiture revenue between 1996 and 2007.

### FORFEITURES *as* REPORTED *to* LEMAS **(Drug-related only)**

|      | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|------|------------------------|---------------------------------------------|
| 1993 | $6,833,973             | $59,178                                     |
| 1997 | $5,945,240             | $17,296                                     |
| 2000 | $155,453,132           | $510,969                                    |
| 2003 | $9,213,476             | $30,954                                     |

### FREEDOM *of* INFORMATION DATA

*On Next Page*

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND **(AFF)**

|                    | Proceeds Returned to State |
|--------------------|----------------------------|
| **FY 2000**        | $4,147,130                 |
| **FY 2001**        | $2,639,465                 |
| **FY 2002**        | $2,638,756                 |
| **FY 2003**        | $2,928,349                 |
| **FY 2004**        | $4,268,111                 |
| **FY 2005**        | $4,069,024                 |
| **FY 2006**        | $4,948,114                 |
| **FY 2007**        | $29,647,752                |
| **FY 2008**        | $26,673,908                |
| **Total**          | $81,960,609                |
| **Average per Year** | $9,106,734               |

**Plaintiff's Ex. # 1, p. 97**
**Littlepage v. DC, 14-899 (ESH)**

## VIRGINIA FREEDOM *of* INFORMATION DATA

**Local law enforcement agencies only (district attorney and task force data not reliable)**

| | Value of Assets Forfeited | | | Number of Forfeitures | | |
|---|---|---|---|---|---|---|
| | **Currency** | **Vehicles** | **Total** | **Currency** | **Vehicles** | **Total** |
| **1996** | $2,606,021 | $451,285 | $3,057,305 | 1,098 | 268 | 1,366 |
| **1997** | $2,241,737 | $2,141,597 | $4,383,334 | 1,184 | 391 | 1,575 |
| **1998** | $3,000,466 | $2,182,659 | $5,183,125 | 1,332 | 418 | 1,750 |
| **1999** | $3,057,957 | $1,918,062 | $4,976,019 | 1,492 | 409 | 1,901 |
| **2000** | $3,882,837 | $2,107,804 | $5,990,641 | 1,623 | 463 | 2,086 |
| **2001** | $3,752,846 | $2,620,232 | $6,373,078 | 1,693 | 521 | 2,214 |
| **2002** | $3,828,463 | $2,598,131 | $6,426,594 | 1,848 | 569 | 2,417 |
| **2003** | $5,467,848 | $3,323,225 | $8,791,073 | 2,160 | 617 | 2,777 |
| **2004** | $6,754,732 | $3,484,799 | $10,239,531 | 2,456 | 803 | 3,259 |
| **2005** | $6,698,992 | $4,493,597 | $11,192,589 | 1,723 | 827 | 2,550 |
| **2006** | $5,180,497 | $4,294,805 | $9,475,302 | 1,556 | 745 | 2,301 |
| **2007** | $6,931,959 | $4,397,787 | $11,329,746 | 1,689 | 772 | 2,461 |
| **Total** | $53,404,354 | $34,013,983 | $87,418,337 | 19,854 | 6,803 | 26,657 |
| **Average per Year** | $4,450,363 | $2,834,499 | $7,284,861 | 1,655 | 567 | 2,221 |

97

**Plaintiff's Ex. # 1, p. 98**
**Littlepage v. DC, 14-899 (ESH)**

# WASHINGTON



**Forfeiture Law Grade**



**D**

**FINAL GRADE**



**State Law Evasion Grade**

## FORFEITURE LAW

Washington's civil forfeiture laws do not adequately protect property owners. Once the government seizes property, it must give notice to the owner of the seizure. If the owner fails to respond, the property, unless it is real property, is automatically forfeited based only on the government's allegation of probable cause to seize the property for forfeiture. If the owner does respond and contests the forfeiture, the government then must establish that the property is related to a crime and thus subject to forfeiture by a mere showing of preponderance of the evidence, a standard lower than the beyond a reasonable doubt standard required for a criminal conviction. And property owners in forfeiture proceedings are effectively guilty until proven innocent, bearing the burden of proof for innocent owner claims. Ultimately, all of the money collected through civil forfeiture flows to law enforcement: Ninety percent is retained by the seizing agency to improve drug enforcement activity while the remainder goes to a "violence reduction and drug enforcement account."

Disturbingly, a 2001 article in the *Seattle Post-Intelligencer* reported that "one out of five people whose assets were seized [in one county in the state] were never charged with a crime."[1] Major reform efforts in Washington have had mixed success. The legislature did adopt one measure to shift the burden of proof to the government in innocent owner proceedings.[2] But in 2002, an initiative that would have placed stronger limits on forfeiture failed to garner the necessary signatures to earn consideration by the state legislature.[3] It would have eliminated forfeiture without a criminal conviction, as well as law enforcement's financial incentives to engage in the practice.[4] Naturally, the initiative "drew heated opposition from law enforcement," who insisted it would "choke off millions of dollars raised annually."[5]

1    Skolnik, S. (2001, December 13). Critics target drug raid seizures. *Seattle Post-Intelligencer*, p. A1.
2    Skolnik, S. (2002, January 3). Initiative to limit police seizure power falls short. *Seattle Post-Intelligencer*, p. B2.
3    *Ibid.*
4    *Ibid.*
5    *Ibid.*

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND **(AFF)**

|  | Proceeds Returned to State |
|---|---|
| **FY 2000** | $867,260 |
| **FY 2001** | $1,607,481 |
| **FY 2002** | $1,106,521 |
| **FY 2003** | $908,482 |
| **FY 2004** | $2,984,942 |
| **FY 2005** | $2,725,294 |
| **FY 2006** | $1,888,965 |
| **FY 2007** | $2,945,689 |
| **FY 2008** | $2,499,827 |
| **Total** | $17,534,461 |
| **Average per Year** | $1,948,273 |

### FORFEITURES *as* REPORTED *to* LEMAS **(Drug-related only)**

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| **1993** | $5,499,939 | $58,598 |
| **1997** | $4,303,441 | $16,255 |
| **2000** | $5,546,859 | $20,544 |
| **2003** | $16,120,891 | $96,321 |

### FREEDOM *of* INFORMATION DATA

*On Next Page*

**Plaintiff's Ex. # 1, p. 99**
**Littlepage v. DC, 14-899 (ESH)**

WASHINGTON FREEDOM *of* INFORMATION DATA

**Reports of forfeitures from law enforcement agencies and task forces**

|  | Law Enforcement | Task Forces | Total |
|---|---|---|---|
| **2001** | $335,453 | $369,631 | $705,084 |
| **2002** | $350,150 | $330,495 | $680,645 |
| **2003** | $387,260 | $599,140 | $986,400 |
| **2004** | $305,721 | $518,669 | $824,390 |
| **2005** | $298,612 | $1,031,323 | $1,329,935 |
| **2006** | $338,580 | $527,826 | $866,406 |
| **Total** | $2,015,776 | $3,377,084 | $5,392,860 |
| **Average per Year** | $335,963 | $562,847 | $898,810 |

**Plaintiff's Ex. # 1, p. 100**
**Littlepage v. DC, 14-899 (ESH)**

# WEST VIRGINIA



D-
Forfeiture
Law Grade



D-
FINAL GRADE



D
State Law
Evasion Grade

## FORFEITURE LAW

West Virginia has poor civil forfeiture laws. The government must demonstrate that property is related to a crime and subject to forfeiture by a mere preponderance of the evidence, a standard much easier for law enforcement than proving criminal guilt beyond a reasonable doubt. And the burden is on owners for innocent owner claims, making owners effectively guilty until proven innocent.

When money is seized and forfeited, all of the proceeds go to law enforcement: 10 percent goes to the prosecuting attorney, and 90 percent goes to a law enforcement investigation fund. Although there is no requirement in West Virginia that law enforcement officials collect information on forfeiture, a January 2009 article in the *Register Herald* offered some insight into the way police in Beckley, W.V., used forfeiture proceeds. In 2008, the article reported, police brought in $65,000 and six vehicles through forfeiture. Forfeiture revenue provided some of the funding to buy a $10,000 K-9 police dog for the department.[1]

---

1    Pridemore, A. A. (2009, January 31). Drug war strategy: Hit 'em in their wallets. Retrieved September 25, 2009, from http://www.register-herald.com/homepage/local_story_031223004.html.

### FORFEITURES *as* REPORTED *to* LEMAS **(Drug-related only)**

|      | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|------|------------------------|---------------------------------------------|
| 1993 | $828,828               | $23,209                                     |
| 1997 | $1,500,220             | $7,627                                      |
| 2000 | $1,204,723             | $7,420                                      |
| 2003 | $567,410               | $3,360                                      |

### FREEDOM *of* INFORMATION DATA

No Data Available; Not Required to Collect

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND **(AFF)**

|                    | Proceeds Returned to State |
|--------------------|----------------------------|
| **FY 2000**        | $1,044,905                 |
| **FY 2001**        | $386,402                   |
| **FY 2002**        | $571,932                   |
| **FY 2003**        | $733,707                   |
| **FY 2004**        | $485,771                   |
| **FY 2005**        | $444,318                   |
| **FY 2006**        | $485,430                   |
| **FY 2007**        | $24,636,120                |
| **FY 2008**        | $20,764,145                |
| **Total**          | $49,552,730                |
| **Average per Year** | $5,505,859               |



100

**Plaintiff's Ex. # 1, p. 101**
**Littlepage v. DC, 14-899 (ESH)**

# WISCONSIN



Forfeiture
Law Grade



**FINAL GRADE**



State Law
Evasion Grade

## FORFEITURE LAW

Wisconsin's civil forfeiture laws are not as bad as other states. In civil forfeiture proceedings, the government must establish beyond a reasonable doubt that property is related to a crime. That is the highest standard and equivalent to what is needed for a criminal conviction. Property owners do, however, bear the burden of proof for innocent owner claims.

The financial incentives to seek forfeiture are not as strong in Wisconsin as in other states. Up to 50 percent of the proceeds from the sale of forfeited property goes to law enforcement. When the forfeited property is money, the amount flowing to police depends on the amount forfeited. If the amount forfeited does not exceed $2,000, 70 percent of the money goes to law enforcement to pay forfeiture expenses. If more than $2,000 is forfeited, law enforcement receives 50 percent. Perhaps to circumvent these restrictions, Wisconsin actively participates in equitable sharing agreements, receiving more than $50 million in proceeds from 2000 to 2008.

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND (AFF)

| | Proceeds Returned to State |
|---|---|
| FY 2000 | $2,147,686 |
| FY 2001 | $23,904,245 |
| FY 2002 | $1,659,109 |
| FY 2003 | $2,230,539 |
| FY 2004 | $3,937,459 |
| FY 2005 | $3,577,032 |
| FY 2006 | $3,846,503 |
| FY 2007 | $5,347,813 |
| FY 2008 | $3,741,468 |
| Total | $50,391,854 |
| Average per Year | $5,599,095 |

### FORFEITURES *as* REPORTED *to* LEMAS (Drug-related only)

| | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| 1993 | $2,960,576 | $20,012 |
| 1997 | $25,291,380 | $41,516 |
| 2000 | $3,282,532 | $6,596 |
| 2003 | $2,527,846 | $4,527 |

### FREEDOM *of* INFORMATION DATA

No Data Available; Not Required to Collect

101

**Plaintiff's Ex. # 1, p. 102**
**Littlepage v. DC, 14-899 (ESH)**

# WYOMING



Forfeiture
Law Grade



**C**

**FINAL GRADE**



State Law
Evasion Grade

## FORFEITURE LAW

Wyoming has horrible civil forfeiture laws, with an F law grade. The state's final grade is pulled up to a C only by limited use of equitable sharing (an evasion grade of A) to date. The government can seize and subsequently forfeit property with just probable cause that it is subject to forfeiture. This is the lowest standard, far easier for the government than proving criminal guilt beyond a reasonable doubt. A property owner who wishes to claim an innocent owner defense bears the burden of proof, effectively making owners guilty until proven innocent. All of the proceeds from civil forfeiture are distributed to the state Attorney General's asset fund. In turn, those funds are used as matching funds for federal drug enforcement grants.[1] Finally, although officials are required to collect information on the use of forfeiture, they did not respond to requests.

---

1    Wyoming Division of Criminal Investigation. (2002, February 28). Drug asset seizure and forfeiture. Retrieved September 25, 2009, from http://attorneygeneral.state.wy.us/dci/text_das.html.

### EQUITABLE SHARING PROCEEDS *from the* ASSETS FORFEITURE FUND (AFF)

|  | Proceeds Returned to State |
|---|---|
| **FY 2000** | $0 |
| **FY 2001** | $38,604 |
| **FY 2002** | $715 |
| **FY 2003** | $10,881 |
| **FY 2004** | $18,250 |
| **FY 2005** | $119,916 |
| **FY 2006** | $260,660 |
| **FY 2007** | $66,348 |
| **FY 2008** | $113,176 |
| **Total** | $628,550 |
| **Average per Year** | $69,839 |

### FORFEITURES *as* REPORTED *to* LEMAS (Drug-related only)

|  | Total Assets Forfeited | Assets Forfeited per Law Enforcement Agency |
|---|---|---|
| **1993** | $1,369,335 | $34,030 |
| **1997** | $7,028 | $130 |
| **2000** | $281,988 | $5,392 |
| **2003** | $1,364,135 | $16,056 |

### FREEDOM *of* INFORMATION DATA

No Data Available; Required to Collect , But Did Not Respond to Request



102

# FEDERAL GOVERNMENT



**D-**

FORFEITURE
LAW  GRADE

## FORFEITURE LAW

As the numbers below indicate, the federal government has a very aggressive civil forfeiture program.  Federal law enforcement forfeits a substantial amount of property for its own use while also teaming up with local and state governments to prosecute forfeiture actions, whereby all of the agencies share in the bounty at the end of the day.

Outrage over abuse of civil forfeiture laws led to the passage of the Civil Asset Forfeiture Reform Act (CAFRA) in 2000.  Under these changes, the government now must show by a preponderance of the evidence why the property should be forfeited.  The Act also created an innocent owner defense that lets individuals keep their property if they can show either that they did not know that it was being used illegally or that they took reasonable steps to stop it.

But while CAFRA heightened some procedural protections, it failed to address the largest problem in the federal civil forfeiture system:  the strong pecuniary interest that federal law enforcement agencies have in the outcome of the forfeiture proceeding.  For the past 25 years, federal agencies have been able to keep all of the property that they seize and forfeit.  And that has led to explosive growth in the amount of forfeiture activity at the federal level.

### U.S. DEPARTMENT *of* JUSTICE ASSETS FORFEITURE FUND (AFF)[1]

| | Net Assets in Fund | Deposits to Fund | | |
| --- | --- | --- | --- | --- |
| | | Cash and Cash Equivalents | Property | Total Deposits |
| **FY 2000** | $536,500,000 | NA | NA | NA |
| **FY 2001** | $525,800,000 | $357,900,000 | $48,900,000 | $406,800,000 |
| **FY 2002** | $485,200,000 | $355,600,000 | $68,000,000 | $423,600,000 |
| **FY 2003** | $528,400,000 | $413,900,000 | $72,100,000 | $486,000,000 |
| **FY 2004** | $427,900,000 | $448,500,000 | $94,600,000 | $543,100,000 |
| **FY 2005** | $448,000,000 | $514,900,000 | $80,600,000 | $595,500,000 |
| **FY 2006** | $651,100,000 | $1,009,200,000 | $115,700,000 | $1,124,900,000 |
| **FY 2007** | $734,200,000 | $1,409,000,000 | $106,700,000 | $1,515,700,000 |
| **FY 2008** | $1,000,700,000 | $1,222,600,000 | $63,400,000 | $1,286,000,000 |
| **Total** | $5,337,800,000 | $5,731,600,000 | $650,000,000 | $6,381,600,000 |
| **Average per Year** | NA | $716,450,000 | $81,250,000 | $797,700,000 |

**103**

---

1       Data retrieved from AFF Annual Financial Statements:  http://www.usdoj.gov/jmd/afp/01programaudit/index.htm.

**Plaintiff's Ex. # 1, p. 104**
**Littlepage v. DC, 14-899 (ESH)**

## U.S. DEPARTMENT *of* TREASURY FORFEITURE FUND[2]

| | Net Assets in Fund | Deposits to Fund | | Equitable Sharing Payments to States |
| --- | --- | --- | --- | --- |
| | | Currency and Equivalent | Property | |
| **FY 2001** | $237,300,000 | $65,700,000 | $25,800,000 | NA |
| **FY 2002** | $173,000,000 | $113,100,000 | $33,000,000 | $48,500,000 |
| **FY 2003** | $177,200,000 | $163,800,000 | $31,000,000 | $78,500,000 |
| **FY 2004** | $194,100,000 | $228,900,000 | $42,600,000 | $98,700,000 |
| **FY 2005** | $255,300,000 | $209,100,000 | $49,500,000 | $75,700,000 |
| **FY 2006** | $236,800,000 | $167,900,000 | $46,700,000 | $81,300,000 |
| **FY 2007** | $361,400,000 | $208,000,000 | $52,600,000 | $32,700,000 |
| **FY 2008** | $426,800,000 | $412,200,000 | $44,200,000 | $78,500,000 |
| **Total** | $2,061,900,000 | $1,568,700,000 | $325,400,000 | $493,900,000 |
| **Average per Year** | $257,737,500 | $196,087,500 | $40,675,000 | $70,557,143 |

2    Data retrieved from Treasury Forfeiture Fund Annual Accountability Reports: http://www.treas.gov/offices/enforcement/teoaf/annual-reports.shtml.

**Plaintiff's Ex. # 1, p. 105**
**Littlepage v. DC, 14-899 (ESH)**

## Appendix A

### Methods

This appendix provides further detailed information about the methods used in the statistical analysis of equitable sharing data. Some parts of this discussion assume a working knowledge of quantitative research methods.

*Explanatory Variables—Forfeiture Laws*

Each of the state forfeiture laws can be distinguished by the degree of difficulty, or measure of burden, to forfeit property and the financial incentives for law enforcement to engage in forfeitures.[92] Degree of difficulty is measured by two factors—standard of proof and innocent owner. The first reflects the standard of proof the government is required to meet to determine property is subject to forfeiture. This was coded as follows, where lower numbers equal less burden on the state:

1=prima facie/probable cause;

2=probable cause and preponderance of the evidence;

3=preponderance of the evidence;

4=preponderance and clear and convincing;

5=clear and convincing;

6=clear and convincing and beyond a reasonable doubt and

7=beyond a reasonable doubt.

As noted above, some states have two standards depending on the property. We considered these potentially meaningful distinctions and coded them as falling between the different standards found in the law.

The innocent owner burden variable represents who has the burden (the state or the property owner) to establish whether the property owner qualifies as an innocent owner under state law. This was coded as follows, where lower numbers equal less burden on the state:

1=the burden to establish innocence rests exclusively with the property owner/claimant;

2=the burden varies depending on the type of property being forfeited and

3=the burden rests exclusively with the government to establish that the claimant is *not* innocent.

Finally, the percent of proceeds to law enforcement variable was coded based upon the actual number (i.e., percent) reported within the state statute. The forfeiture distribution language within some statutes was imprecise in terms of the actual percentage guaranteed to law enforcement. In states with some vagueness, we coded the data based upon our reading of the statute and compared this coding with information reported in other sources[93] and with that conducted by the legal research staff at the Institute for Justice. While we are confident that these procedures produced the most accurate assessment of proceeds to law enforcement, for any statutes with some remaining vagueness, our guiding principle was to code the percentages conservatively and in a manner that, if inaccurate, would bias results *contrary* to finding a significant relationship between the percentages and forfeiture revenue collected by agencies.

Since the outcome variable was based on multi-year averages, it was necessary to review all state statutes to determine if any statutory changes occurred to the primary variables of interest during this time. A few states did change their forfeiture laws, and these changes were entered into the dataset where appropriate to reflect the changes in law affecting law enforcement agencies in those states.

*Control Variables*

The control variables included in the analyses included the number of full-time officers assigned to special or multi-agency drug enforcement units, the arrest rate (per 100,000 population) for drug manufacturing and selling, the violent crime rate (per 100,000 population), law enforcement agency type, whether the agency was primarily responsible for enforcing drug laws in their respective jurisdiction and region of the country. Table A1 lists and provides a brief description of each variable used along with their means and standard deviations.

We controlled for the number of full-time officers assigned to special or multi-agency drug enforcement units to examine whether such units mediate the link between state asset forfeiture laws and forfeiture activity. One might hypothesize, for example, that law enforcement agencies in less restrictive asset forfeiture states may be more inclined to assign a larger number of full-time officers to specialized drug units because doing so is likely to lead to more drug-related asset forfeiture activity and, eventually, additional revenue for the agency. Data on the number of full-time officers assigned to specialized or multi-agency drug units were obtained from the LEMAS dataset.

105

Plaintiff's Ex. # 1, p. 106
Littlepage v. DC, 14-899 (ESH)

We also included the arrest rate (per 100,000 population) for drug manufacturing and selling and the violent crime rate (per 100,000 population) in the analysis because both of these variables may be causally antecedent to both the type of civil asset forfeiture statutes in place by state policy makers and the amount of drug asset forfeiture activity a jurisdiction can reasonably be expected to engage in based on the sheer number of drug-related transaction opportunities alone (i.e., more drug activity, more asset forfeiture). If this were true, failing to control for these potentially causally antecedent variables would lead to spurious (or partly spurious) associations for the state asset forfeiture law variables. Data on the number of persons arrested for selling and manufacturing drugs were obtained from the Federal Bureau of Investigation's (FBI) Uniform Crime Reports (UCR). Similar to the outcome variables, we used a multi-year average (2001 to 2003) to solve the problem that drug activity fluctuates widely from year-to-year. Data on the number of violent crimes (i.e., homicide, forcible rape, robbery, aggravated assault) reported and recorded by law enforcement agencies for 2003 for each jurisdiction were also obtained from the FBI's UCR.

Two of the controls were binary variables denoting law enforcement agency type (1=municipal agency, 0=sheriff's department) and whether the agency was primarily responsible for enforcing drug laws in their respective jurisdiction (1=yes, 0=no). Data for both variables were obtained from the 2003 LEMAS dataset.

The last set of control variables are binary dummy variables for each of the nine U.S. Census regions. These variables are used to control for any well-established and unobserved (or unmeasured characteristics) of the jurisdictions served by law enforcement agencies that vary at the regional level and that could be expected to influence both state asset forfeiture laws and drug-related asset forfeiture activity. Examples of such potential confounders would be regions of the United States where drug trafficking is more commonplace and regions in close proximity to a major port of entry for drugs.

*Table A1 Variables in the Analysis*

| Variable and Brief Description | Mean | SD |
|---|---|---|
| **Outcome Variables** | | |
| Per Capita Equitable Sharing Payments from Department of Justice, five-year average, Fiscal Years 2000 to 2004 | 0.40 | 0.75 |
| Asset Forfeiture Law Variables | | |
| Standard of Proof (Seven-point scale) | 3.74 | 1.73 |
| Innocent Owner Burden | 1.55 | 0.86 |
| Percent of Asset Proceeds to Law Enforcement | 73.27 | 33.94 |
| Departmental-level Control Variables | | |
| Law Enforcement Agency Responsible for Drug Enforcement, (1=Yes) | 0.97 | 0.16 |
| Law Enforcement Agency Serves Municipality (1=Yes) | 0.69 | 0.46 |
| Full-time Law Enforcement Officers per 100,000 Population, Special Drug Enforcement Unit | 5.68 | 6.36 |
| Full-time Law Enforcement Officers per 100,000 Population, Multi-Agency Drug Task Force | 2.21 | 3.13 |
| Community-level Control Variables | | |
| Drug Arrests for Manufacturing and Selling per 100,000 Population, Average 2001 to 2003 | 104.40 | 173.99 |
| Violent Crime Rate per 100,000 Population | 487.38 | 464.03 |

Notes: Descriptive statistics are for all cases with valid data on a given variable. Unless otherwise noted, each variable refers to the year 2003. The mean and standard deviation for the forfeiture law variables are based on their original values (i.e., not centered).

### Analytic Procedures

We used a censored regression model to determine the impact of three key components of state asset forfeiture laws on the per capita dollar value of forfeiture proceeds returned to law enforcement agencies through equitable sharing payments received from the DOJ's AFF. Censored regression models take into account potential biases that may be present when some observations on the dependent variable are not observable, as is the case here. In the present study, both forfeiture proceeds variables (i.e., the dependent variables) are concentrated at the lower limit value of zero (denoting zero dollars received through asset forfeiture activity). The appropriate censored regression model in this case is the Tobit model.[94] Tobit regression estimates a linear regression model for a left-censored dependent variable, where the dependent variable is censored from below.

More specifically, slightly more than 11 percent (63 out of 563) of the agencies in the study sample received no equitable sharing payments from the DOJ between fiscal years 2000 and 2004. If the probability of zero dollars related to drug-related forfeitures were the only phenomenon to explain, probit regression would provide a suitable model. Of course, this would result in throwing away information on the value of proceeds returned when it is available. That is the case here because if a law enforcement agency received forfeiture proceeds related to drug offenses, we have an estimate of the dollar value they received.

If there were no concentrations at a lower limit, and we only cared to explain the dollar amount of assets forfeited, multiple regression would be the appropriate statistical technique. But, since there is a piling up of values of the dependent variable at a limit (in this case $0), ordinary least squares (OLS) estimates are biased because the dependent variables are not continuous and unbounded. The solution to this problem is a hybrid of the two regression methods (probit and OLS) which economists refer to as Tobit models. Similar to standard OLS regression, the Tobit regression model assumes the error terms are normally distributed, independent between observations and uncorrelated with the independent variables. Model parameters are estimated via maximum likelihood.

Although it is useful to examine ordinary Tobit coefficients for sign and significance, they are not readily interpretable as effect sizes like their OLS counterparts.[95] The reason inter-pretation of Tobit coefficients is more problematic than traditional regression coefficients is because the former must account for two distinct types of observations on the dependent variable. The first set contains the observations, for which the dollar value of assets seized is zero. For these observations, we know only the values of the independent variables and the fact that the dependent variable is less than or equal to zero. The second set consists of all observations for which the value of both the independent and dependent variables are known. Thus, two types of effects are modeled simultaneously in a Tobit regression model: (1) the effect on the per capita dollar value of assets seized for cases with a nonzero value (uncensored) and (2) the effect on the probability of having a nonzero value for cases with the limit value of zero dollars (censored). A problem arises, however, because only a single coefficient is provided in the output of a Tobit analysis for each of the two state asset forfeiture law variables. Clearly, however, it is not possible for a single coefficient to capture both effects—one for cases at the lower limit value (zero dollars) and another for cases above the limit value (nonzero dollars).

Fortunately, a decomposition procedure[96] can be used to disentangle Tobit coefficients in such a way that both different effects are quantified: (1) the effect of state asset forfeiture laws on the per capita dollar value of forfeiture proceeds returned to law enforcement agencies and (2) the effect of the laws on the probability of a law enforcement agency receiving forfeiture proceeds for those agencies failing to receive forfeiture proceeds associated to drug-related activity. Decomposing the Tobit coefficients provides for a more complete understanding of the two separate effects state asset forfeiture laws can have on drug asset forfeiture activity. The Tobit regression models were estimated using the Tobit command in Stata Release 9.0.[97]

Finally, one potential pitfall with using local law enforcement data in a study examining the effects of state laws is that the law variables do not vary across jurisdictions within a particular state. As a result, errors in predicting asset forfeiture are likely to be correlated within clusters (i.e., states) and conventional estimates of standard errors for the state asset forfeiture law variables may be understated due to violations of the independence assumption.[98] To address this problem, we used cluster-adjusted standard errors that adjust for the fact that observations within states may not be independent.[99]

107

| | |
|---|---|
| **Appendix B** | **Appendix B** |
| | *Detailed Statistical Results* |
| | This appendix provides greater detail about the equitable sharing results. The discussion assumes a working knowledge of quantitative research methods. |

Table B1 reports estimates for equitable sharing payments received per person from the DOJ. The coefficient on the share of forfeiture proceeds variable in Table B1 indicates that law enforcement agencies residing in generous forfeiture states receive significantly lower equitable sharing payments from the DOJ. Although this standard interpretation is informative, the decomposition provides additional substantive information regarding the effects of the percent of forfeiture proceeds returned to law enforcement on proceeds received through equitable sharing payments (per person). These results were discussed in the text above; the precise findings are presented in Table B1.

*Table B1 Effect of State Asset Forfeiture Laws on Per Capita Equitable Sharing Payments, Five-Year Average, FY 2000 to FY 2004*

| | (1) Coefficient [Cluster Robust Standard Error] | (2) Effect of Change in State Asset Forfeiture Laws on Average Per Capita Equitable Sharing Payments, Among Those Receiving Equitable Sharing Payments | (3) Effect of Change in State Asset Forfeiture Laws on Probability of Receiving Equitable Sharing Payments |
|---|---|---|---|
| Independent Variable | | | |
| Percent of Asset Proceeds Returned to Law Enforcement Agency | -.002* [.001] | -.001* | -.001* |
| State Standard of Proof | .022 [.020] | .010 | .010 |
| Innocent Owner Burden | .099* [.060] | .046* | .045* |
| Standard Error of Estimate | 0.80 | | |
| Log-Likelihood Value | -650.54 | | |
| Chi-squared | 66.56 | | |
| Sample Size | 563 | | |

Notes: Robust standard errors clustered at the state level are reported. * significant at .10 level.

108

With respect to the legal hurdles faced by agencies in forfeiting drug-related assets, the coefficient on the state standard of proof variable is in the expected positive direction. It should be pointed out, however, that the coefficient is not statistically significant at conventional significance levels. On the other hand, the coefficient for the innocent owner variable is statistically significant in the expected positive direction.

Next, we explored the possibility of two-way interactions between the three forfeiture law variables. We believe there is a strong theoretical basis to expect that the effects of any one forfeiture law variable on equitable sharing payments may be moderated by values for one of the other forfeiture law variables. For example, agencies located in states where the standard of proof required by authorities to forfeit assets is greater (e.g., beyond a reasonable doubt) than the preponderance of evidence requirement at the federal level may be more inclined to turn forfeiture cases over to federal authorities even if state law permits agencies to keep a generous portion of the forfeited proceeds. Conversely, agencies located in more generous states with similar standard of proof requirements for seizing assets may be less inclined to turn cases over to federal authorities.

The results of the interaction analysis are reported in Table B2. These interactions must be interpreted with care. Most importantly, the statistical significance of each law variable in isolation cannot be determined by looking at their t-statistics (coefficient divided by standard error) separately. In other words, the fact that the coefficient for the innocent owner variable is not significant does not mean this aspect of forfeiture restrictiveness does not have a significant impact on equitable sharing payments. Rather, the statistical significance of each law variable can only be determined when testing its importance in conjunction (referred to as a joint hypothesis test) with the interaction terms of which it is a part. In this case, the $F$ test of the joint hypothesis for both interactions involving the law variable measuring innocent owner burden were statistically significant. To determine exactly

which parts of the interactions were significant, the $F$ tests were followed by more focused tests (often referred to as "simple slopes" tests). The results of the tests indicated that the interaction between the state profit motive variable was significant regardless of whether state innocent owner statutes place the burden of proof on the property owner or the government. On the other hand, the only part of the interaction that was significant between the state standard of proof and the innocent owner burden occurred when the burden of proof was placed on the government, i.e., the property owner is presumed innocent. In addition, readers should note that each law variable is centered to facilitate interpretation of its marginal effect on equitable sharing payments when evaluated at different values for the other law variables. Lastly, readers should be aware that the interpretations provided in the text above only apply to agencies reporting equitable sharing payments (i.e., the agency received at least one equitable sharing payment between fiscal years 2000 and 2004). Readers interested in changes in the probability of receiving equitable sharing payments for those agencies not receiving payments should focus their attention on the coefficients presented in column (3).



**Plaintiff's Ex. # 1, p. 110**
**Littlepage v. DC, 14-899 (ESH)**

*Table B2 Examining Interaction Effects Between Share of Asset Proceeds Returned to Law Enforcement Agency and Standard of Proof on Per Capita Equitable Sharing Payments, 5-Year Average, FY 2000 to FY 2004*

| | (1)<br>Coefficient [Cluster Robust Standard Error] | (2)<br>Effect of Change in State Asset Forfeiture Laws on Average Per Capita Equitable Sharing Payments, Among Those Receiving Equitable Sharing Payments | (3)<br>Effect of Change in State Asset Forfeiture Laws on Probability of Receiving Equitable Sharing Payments |
|---|---|---|---|
| Independent Variable | | | |
| Percent of Asset Proceeds Returned to Law Enforcement Agency | .001 [.001] | .0003 | .0003 |
| Standard of Proof | .054* [.015] | .025* | .025* |
| Innocent Owner Burden | -.017 [.062] | -.008 | -.008 |
| Percent of Asset Proceeds Returned to Law Enforcement Agency x State Standard of Proof | .0006 [.0004] | .0003 | .0003 |
| Percent of Asset Proceeds Returned to Law Enforcement Agency x Innocent Owner Burden | .003* [.001] | .002* | .002* |
| State Standard of Proof x Innocent Owner Burden | .066* [.013] | .031* | .030* |
| Standard Error of Estimate | 0.80 | | |
| Log-Likelihood Value | -648.24 | | |
| Chi-squared | 241.86 | | |
| Sample Size | 563 | | |

Notes: Robust standard errors clustered at the state level are reported. * significant at .10 level.

Table B3 examines whether the interactions observed in Table B2 persist after controlling for potential confounding factors. With respect to the control variables, the most notable finding is the negative, albeit nonsignificant association between the drug arrest rate and equitable sharing payments. The most likely explanation is that agencies in high drug activity areas are also located in more generous forfeiture states. On the other hand, the coefficient for the violent crime rate variable indicates agencies embedded in high crime areas receive significantly greater equitable sharing payments from DOJ. Lastly, the dummy variable for agency type shows that municipal agencies receive larger equitable sharing payments than sheriff's offices.

110

*Table B3 Effect of State Asset Forfeiture Laws on Equitable Sharing Payments, Controlling for Potential Confounding Factors*

| | (1)<br>Coefficient [Cluster Robust Standard Error] | (2)<br>Effect of Change in State Asset Forfeiture Laws on Average Per Capita Equitable Sharing Payments, Among Those Receiving Equitable Sharing Payments | (3)<br>Effect of Change in State Asset Forfeiture Laws on Probability of Receiving Equitable Sharing Payments |
|---|---|---|---|
| Independent Variable | | | |
| Percent of Asset Proceeds Returned to Law Enforcement Agency | .001*** [.001] | .001*** | .001*** |
| Standard of Proof | .063** [.015] | .030** | .030** |
| Innocent Owner Burden | -.056 [.059] | -.026 | -.026 |
| Percent of Asset Proceeds Returned to Law Enforcement Agency x State Standard of Proof | .0008*** [.0004] | .0004*** | .0004*** |
| Percent of Asset Proceeds Returned to Law Enforcement Agency x Innocent Owner Burden | .004*** [.001] | .002*** | .002*** |
| State Standard of Proof x Innocent Owner Burden | .058*** [.013] | .027*** | .028*** |
| Law Enforcement Agency Responsible for Drug Enforcement, (1=Yes) | .340* [.181] | .142* | .172* |
| Law Enforcement Agency Serves Municipality, (1=Yes) | .192 [.089] | .089 | .093 |
| Full-time Law Enforcement Officers Per 100,000 Population, Special Drug Enforcement Unit | .002 [.004] | .001 | .001 |
| Full-time Law Enforcement Officers Per 100,000 Population, Multi-Agency Drug Task Force | .018 [.012] | .009 | .009 |
| Drug Arrests for Manufacturing and Selling per 100,000 Population, 3-Year Average, 2001 to 2003 | -.0003 [.0002] | -.0002 | -.0002 |
| Violent Crime Rate per 100,000 Population | .0004*** [.0001] | .0002*** | .0002*** |
| Standard Error of Estimate | 0.76 | | |
| Log-Likelihood Value | -620.66 | | |
| Chi-squared | 366.41 | | |
| Sample Size | 563 | | |

Notes: Coefficient estimates for census region dummies are not shown. Robust standard errors clustered at the state level are reported. * significant at .10 level; **significant at .05 level; ***significant at .01 level.

**Plaintiff's Ex. # 1, p. 112**
**Littlepage v. DC, 14-899 (ESH)**

Of course, the most important results in Table B3 pertain to the importance of the interactions observed in Table B2 when addressing potential omitted variable bias. The results for the two-way interaction terms between the innocent owner defense variable and the remaining two law variables remain largely unaffected when controlling for potential confounding factors.



Plaintiff's Ex. # 1, p. 113
Littlepage v. DC, 14-899 (ESH)

# Endnotes

1    Boudreaux, D. J., & Pritchard, A. C. (1996). Civil forfeiture and the war on drugs: Lessons from economics and history. *San Diego Law Review, 33,* 79-135.

2    *Id.*

3    *Id.*

4    *Id.*; Schecter, M. (1990). Fear and loathing and the forfeiture laws. *Cornell Law Review, 75,* 1151-1183; Maxeiner, J. R. (1977). Bane of American forfeiture law: Banished at last? *Cornell Law Review, 62*(4), 768-802.

5    Maxeiner, 1977, p. 782.

6    See, e.g., *The Palmyra,* 25 U.S. (12 Wheat.) 1 (1827).

7    See *United States v. Brig Malek Adhel,* 43 U.S. (2 How.) 210, 233 (1844).

8    *Id.* (emphasis added).

9    Comprehensive Crime Control Act of 1984, Public Law No. 98-473, 98 Stat. 1837 (1984).

10   Some of these expenses included "equipping for law enforcement functions any Government-owned or leased vessel, vehicle, or aircraft" and paying the "overtime salaries, travel, fuel, training, equipment, and other similar costs of State or local law enforcement officers that are incurred in a joint law enforcement operation with a Federal law enforcement agency. . . participating in the Fund." 28 U.S.C. §§ 524(c)(1)(F)(i), (c)(1)(i)(I) (2009).

11   Public Law No. 106-185, 114 Stat. 202 (2000).

12   Among other modest changes, CAFRA shifted the burden of proof in a forfeiture hearing from the claimant to the government, eliminated the requirement that claimants post a cost bond before being able to contest a civil forfeiture in court, and provided representation for indigent claimants under certain circumstances.

13   Buchanan, J. M., & Tullock, G. (1962). *The calculus of consent: Logical foundations of constitutional democracy.* Ann Arbor, MI: University of Michigan Press;  Buchanan, J. M. (1991). *Constitutional economics.* Cambridge, MA: Basil Blackwell.

14   Boudreaux and Pritchard, 1996, p. 91.

15   Mast, B. D., Benson, B. L., & Rasmussen, D. W. (2000). Entrepreneurial police and drug enforcement policy. *Public Choice, 104,* 285–308.

16   Hyde, H. (1995). *Forfeiting our property rights: Is your property safe from seizure?* Washington, D.C.: Cato Institute, p. 6.

17   The U.S. Department of Justice defines *forfeiture* as "the taking of property derived from a crime, involved in a crime, or that which makes a crime easier to commit or detect without compensating the owner," although, as discussed in this report, the degree of certainty required to demonstrate an association with criminal conduct varies and is a matter of some controversy, United States Department of Justice. (2009). *Guide to equitable sharing for state and local law enforcement agencies.* Washington, D.C., p. 8.

18   Cassella, S. (2007). Overview of asset forfeiture law in the United States. *United States Attorneys' Bulletin, 55,* 8-21, emphasis in original, p.14.

19   Edgeworth, D. (2008). *Asset forfeiture:  Practice and procedure in state and federal courts.* Chicago: American Bar Association; Williams, M. (2002). Civil asset forfeiture:  Where does the money go? *Criminal Justice Review, 27,* 321-329.

20   The U.S. Department of Justice indicates that the primary mission of its Asset Forfeiture Program is "to prevent and reduce crime by disrupting, damaging, and dismantling criminal organizations through the use of the forfeiture sanction.  This is accomplished by means of depriving drug traffickers, racketeers, and other criminal syndicates of their ill-gotten proceeds and instrumentalities of their trade," United States Department of Justice. (2008b). *Asset forfeiture fund and seized asset deposit fund annual financial statement: Fiscal Year 2007.* Washington, DC, p. 3. Another forfeiture proponent maintains that asset forfeiture allows the government to be more effective in prosecuting major offenders and removing their sources of income; Williams, H. (2002a). *Asset forfeiture: A law enforcement perspective.* Springfield, IL: Charles C. Thomas.

21   Cassella, 2007; Edgeworth, 2008; United States Department of Justice, 2008b.  In recent

**Plaintiff's Ex. # 1, p. 114**
**Littlepage v. DC, 14-899 (ESH)**

years, the federal government has prevailed in several major financial criminal cases that resulted in forfeitures totaling over $1 billion (U.S Department of Justice, 2008b). These funds were used to return millions of dollars to victims of these crimes. Despite this, few would argue that asset forfeiture, especially the seizure activities of state and local law enforcement, has been most commonly associated with government efforts in the war on drugs (Benson, B., Rasmussen, D., & Sollars, D. (1995). Police bureaucracies, their incentives, and the war on drugs. *Public Choice, 83,* 21-45; Blumenson, E. & Nilsen, E. (1998). Policing for profit: The drug war's hidden economic agenda. *University of Chicago Law Review, 65,* 35-114; Edgeworth, 2008; Hadaway, B. (2000). Executive privateers: A discussion on why the Civil Asset Forfeiture Reform Act will not significantly reform the practice of forfeiture. *University of Miami Law Review, 55,* 81-121). Since drug offenders are easily replaceable, just removing the offender without also removing the proceeds from their activities arguably does little to stop the drug trade. The threat of losing property associated with criminal activity purportedly increases the deterrent value of enforcement and prosecutorial efforts (see Vecchi, G. & Sigler, R. (2001). *Assets forfeiture: A study of policy and its practice.* Durham, NC: Carolina Academic Press). Cassella (2007) argues that, "Taking the criminals' toys away… not only ensures that the criminal enterprise is deprived of its economic resources and makes funds available for restitution to the victims, but it also sends a signal to the community that the benefits of a life of crime are illusory and temporary at best" (pp. 8-9).

22   H. Williams, 2002; Cassella, 2007; Edgeworth, 2008.

23   Edgeworth (2008) notes that law enforcement funds can be expended in six general areas: personnel costs (e.g., for community-oriented policing activities and overtime associated with drug enforcement activities), equipment, matching federal grants such as to pay officer salaries assigned to task forces, informant fees, buy money for drug operations, and other activities such as training, educational expenses, and drug education programs. The U.S. Department of Justice (2009) identifies a number of permissible uses for equitably shared assets, including operating costs associated with criminal investigations, training, equipment, travel and transportation costs associated with law enforcement duties, and accounting expenses associated with forfeiture activities.

24   Benson et al., 1995; Blumenson and Nilsen, 1998; Duffy, M. (2001). Note: A drug war funded with drug money: The federal civil forfeiture statute and federalism. *Suffolk University Law Review, 34,* 511-540; Hadaway, 2000; Worrall, 2001; Worrall, J. (2004). The Civil Asset Forfeiture Reform Act of 2000: A sheep in wolf's clothing? *Policing: An International Journal of Police Strategies and Management, 27:* 220-240.

25   The method for distinguishing state asset forfeiture laws as reported in Tables 1-3 was based on the following research strategy. First, the authors reviewed the civil forfeiture asset statutes in each of the 50 states and coded each of these measures based on legal distinctions similar to those reported in Sorens, J., Muedini, F., & Ruger, W. (2008). State and local public policies in 2006: A new database. *State Politics and Policy Quarterly, 8,* 309-326. Next, several sources (most notably Edgeworth, 2008, Worrall, 2004, and Sorens et al., 2008) that reported similar information were compared for each measure for all states to minimize errors. Where conflicts arose between our determination and that of another source, we independently reviewed the existing state statutes and compared findings. There were very few differences between our coding and that reported in other sources. The differences that did exist were typically the result of either errors by previous researchers or their focus on a different aspect of forfeiture laws.

26   For this table, any percentage of funds required to be allocated to prosecutors and district attorneys were included as "law enforcement." Few states require a specific percentage of net proceeds to be allocated to prosecutors and, where present, are typically marginal (see Edgeworth, 2008, Table 10-1). Some states, however, require all forfeiture proceeds to be distributed by the district attorney associated with the seizing agency, and other states' statutes are quite vague about the distinction between distributions to law enforcement and prosecutorial operations. Given the importance of cooperative relationships between police and prosecutors in forfeiture activities and the lack of distinction in many statutes, prosecution and district attorney allocations were included in law enforcement percentages. Examples of required allocations that were *not* counted as "law enforcement" include drug treatment programs, court expenses and drug education programs (e.g., D.A.R.E. programs). The latter was identified in many statutes as an activity that "may" be funded with forfeiture proceeds, but very few *required* a specific percentage of net proceeds

114

27    All state and the federal forfeiture statutes provide for the initial deduction of certain costs and expenses from the gross proceeds of forfeited assets.  The required expenses to be covered vary but may include property management costs, forfeiture processing expenses, reimbursement of third party interests and victim restitution.  Given that all jurisdictions require initial costs to be deducted from gross forfeiture revenue, these may be best considered the percentage of net proceeds that are minimally allocated to law enforcement.

28    Benson et al., 1995; Blumenson and Nilsen, 1998; Worrall, 2001.

29    Benson et al., 1995; Burnett, J. (2008c). Deputy has Midas touch in asset seizures. *National Public Radio: Dirty money: Asset seizures and forfeitures.* Retrieved April 14, 2009 from www.npr.org/templates/story/story.php?storyId=91582619; Vecchi and Sigler, 2001.

30    While forfeiture activities certainly vary across jurisdictions, it appears that many law enforcement agencies consider asset forfeiture to be an essential revenue stream (Burnett, J. 2008a). Seized drug assets pad police budgets.  *National Public Radio: Dirty money: Asset seizures and forfeitures.* Retrieved April 14, 2009 from www.npr.org/templates/story/story.php?storyId=91490480; Burnett, J. (2008b). Cash seizures by police prompt court fights. *National Public Radio: Dirty money: Asset seizures and forfeitures.* Retrieved April 14, 2009 from www.npr.org/templates/story/story.php?storyId=91555835; Burnett, 2008c; Burnett, J. (2008d). Sheriff under scrutiny over drug money spending. *National Public Radio: Dirty money: Asset seizures and forfeitures.* Retrieved April 14, 2009 from www.npr.org/templates/story/story.php?storyId=91638378; see also Worrall, 2001; Benson et al., 1995).

31    Burnett, 2008a-d.

32    Burnett, 2008d.

33    Vecchi and Sigler, 2001, p. 75.

34    Originally in Hyde, H. (1995). *Forfeiting our property rights*. Washington, D.C.: Cato Institute, quoted in Vecchi and Sigler, 2001, p. 75.

35    AssetRecoveryWatch.com (2009). Justice Department targets assets in all cases with "forfeiture potential." Retrieved from organization website at http://assetforfeiturewatch.com.

36    AssetRecoveryWatch.com promotes itself as "the indispensible source of news, information, and training for law enforcement professionals and others working in the asset forfeiture field."  It is understandable that some lawyers would market themselves as specializing in assisting property owners to defeat forfeiture efforts.  What may be unexpected is the cottage industry that has developed.  In addition to AssetRecoveryWatch.com, the International Association for Asset Recovery (IAAR) claims its mission "is to enhance the capabilities and standards of professionals and agencies worldwide in the battle to win back assets that rightfully belong to governments, organizations or individuals victimized by criminal or wrongful conduct"; International Association for Asset Recovery (IAAR). (2009). Official website. Retrieved from http://www.iaaronline.org/me2/default.asp. Asset forfeiture appears to have become a revenue generator not only for law enforcement but also for independent contractors and organizations affiliated with such activities.

37    Worrall, 2001.

38    Miller, M. & Selva, L. (1994). Drug enforcement's double-edged sword: An assessment of asset forfeiture programs. *Justice Quarterly, 11,* 313-335.

39    Miller and Selva, 1994, p. 325.

40    Blumenson and Nilsen, 1998; Worrall, 2001.

41    Blumenson and Nilsen, 1998; Miller and Selva, 1995.

42    Blumenson and Nilsen, 1998; Benson et al., 1995; Miller and Selva, 1995.

43    Gaumer, C. (2007). A prosecutor's secret weapon: Federal civil forfeiture law. *United States Attorneys' Bulletin, 55,* 59-73, quote from p. 59.

44    The NDAA states that "law enforcement agencies and prosecutors should aggressively pursue forfeiture actions to eliminate the instrumentalities of crime and to confiscate the proceeds from criminal acts" (found in Edgeworth, 2008, p. 294).

45    Edgeworth, 2008.

**Plaintiff's Ex. # 1, p. 116**
**Littlepage v. DC, 14-899 (ESH)**

46   Vecchi and Sigler, 2001.

47   Burnett, 2008a.

48   Blumenson and Nilsen, 1998; Hyde, 1995; Levy, 1996; Worrall, 2004.

49   Blumenson and Nilsen, 1998.

50   Blumenson and Nilsen, 1998.

51   Similarly, pressure from law enforcement interest groups watered down important provisions of the bill that eventually became the federal Civil Asset Forfeiture Reform Act (2000).  In addition, the law enforcement lobby was able to add provisions that actually strengthened forfeiture powers in some circumstances (see Worrall, 2004; Edgeworth, 2008).  Such efforts cannot be satisfactorily explained by altruistic concerns for the public good, since Congress and state legislators are presumably interested in the public good as well.  Concerns about limits on their ability to self-generate revenue for operational, administrative and organizational expenses clearly play a role in law enforcement's continuing efforts to defeat reforms aimed at restricting forfeiture activities (Blumenson and Nilsen, 1998; Dunn, K. (n. d.). Reining in forfeiture: Common sense reform in the war on drugs. Retrieved August 12, 2009 from www.pbs.org/wgbh/pages/frontline/shows/drugs/special/forfeiture.html; Weiser, J. (2000). Commentary: Civil forfeiture laws are rife with abuse. Originally published in *Newsday of Long Island*, retrieved from http://archive.southcoasttoday.com/daily/06-00/06-11-00/a10op041.htm).

52   There are other legal protections, not addressed in this report, that make it easier for property owners to defend their property.  Critics point out, however, that these are typically minimal and may be quite obscure and difficult for some owners to comprehend (Blumenson and Nilsen, 1998; Worrall, 2004).  Furthermore, state and federal courts have consistently ruled that there is no constitutional right to counsel in forfeiture proceedings (Edgeworth, 2008).  CAFRA provides for counsel in a very limited number of federal forfeiture circumstances, while Utah and New Mexico provide for indigent counsel in forfeiture cases more generally.  Otherwise, individuals are typically required to provide for their own legal representation.  The federal government and a few states award attorney fees in cases in which the property owner ultimately prevails.  Even in these limited jurisdictions, critics note that some individuals are unwilling or unable to risk personal resources for attorney's fees (Burnett, 2008b; Worrall, 2004).  Overcoming prosecutorial efforts and resources, bureaucratic red tape and insuring compliance with statutory requirements may be simply too much for many property owners.

53   See Benson et al., 1995; Blumenson and Nilsen, 1998.

54   *Bennis v. Michigan*, 516 U.S. 442 (1996).

55   United States Department of Justice, 2009, p. 6.

56   The Department of Justice Assets Forfeiture Fund accepts funds from the majority of federal law enforcement agencies, including the FBI, DEA and ATF.  The Treasury Forfeiture Fund accepts deposits from Treasury agencies, such as the Secret Service, and financial and consumer agencies within the federal government.

57   Blumenson and Nilsen, 1998; Duffy, 2001; Hadaway, 2001; Levy, 1996; Worrall, 2004.

58   Cassella, 2007; United States Department of Justice, 2008b.

59   Edgeworth, 2008.

60   Blumenson and Nilsen, 1998; Levy, 1996.

61   United States Department of Justice, 2009.

62   Blumenson and Nilsen, 1998; Hadaway, 2001; United States Department of Justice, 2009.

63   Blumenson and Nilsen, 1998; Hadaway, 2001.

64   Vecchi and Sigler, 2001.

65   Edgeworth, 2008, p. 248; see also Duffy (2001) and von Kaenel, F. (1994). Recent development: Missouri ups the ante in the drug forfeiture 'race to the res.' *Washington University Law Quarterly, 72,* 1469-1486.

66   United States Department of Justice. (2008a). *Manual: Asset forfeiture policy manual.* Washington, D.C.

67   U.S. Department of Justice, 2008a, p. H-2.

68   A very limited number of states (see Edge-

116

**Plaintiff's Ex. # 1, p. 117**
**Littlepage v. DC, 14-899 (ESH)**

worth, 2008; von Kaenel, 1996) have statutory language that places seized property immediately under the jurisdiction of the local court.  The result is that law enforcement cannot transfer this property until the court signs a turnover order releasing the property to the federal government.  While this does not guarantee that courts will critically review such requests, it does represent an additional burden to state and local law enforcement for adoptive forfeitures in those jurisdictions.  It appears that state and local law enforcement agencies, however, can avoid turnover requirements by engaging in joint investigative operations with agencies in different jurisdictions (federal or state) that would be the seizing agency of record.  In such cases, state and local law enforcement agencies would receive a portion of forfeiture proceeds without being subject to state restrictions.

69    Worrall, J. & Kovandzic, T. (2008). Is policing for profit? Answers from asset forfeiture. *Criminology and Public Policy, 7,* 219-244.

70    Burnett, 2008a-d.

71    Blumenson and Nilsen, 1998; Vecchi and Sigler, 1994.

72    Dunn, n. d.; see also von Kaenel, 1994.

73    Blumenson and Nilsen, 1998; Duffy, 2001.

74    Blumenson and Nilsen, 1998; Burnett, 2008a-d.

75    LEMAS data are based on a sample that includes all state police agencies (i.e., state trooper or highway patrol) and local police agencies with 100 or more full-time sworn officers.  In addition, a nationally representative sample of smaller police agencies is selected for participation.  The 2003 LEMAS sample was mailed out to 3,154 agencies in December 2003.  The sampling frame for the 2003 LEMAS survey was the 2000 census of state and local law enforcement agencies (CSLLEA).  Of the 3,154 agencies surveyed, 955 employed 100 or more sworn officers as of June 30, 2000.  These 955 self-representing (SR) agencies included 574 local police departments, 332 sheriffs' offices and 49 state law enforcement agencies.  Self-reporting agencies in the LEMAS survey were defined as those agencies with 100 or more sworn full-time equivalent (FTE) employees and all state police agencies.  The SR agencies were supplemented by a nationally representative stratified random sample of 2,199

non-self-representing (NSR) agencies (1,539 local police departments and 660 sheriffs' offices) with less than 100 sworn personnel.  The stratification variables used for the NSR agencies included the type of agency (local or sheriff), size of population served and number of sworn personnel.  The overall response rate for the 2003 LEMAS survey was 90.6 percent ($n$=2,859 agencies).

76    The actual question is, "Enter the total estimated value of money, goods, and property received by your agency from a drug asset forfeiture program during calendar year ____" (previous calendar year).

77    LEMAS data are publicly available from the National Archive of Criminal Justice Data at http:// www.icpsr.umich.edu/NACJD/lemas/.

78    Federal seizures and state and local seizures accepted for equitable sharing by agencies participating in the Department of Justice forfeiture program are initially deposited into the Seized Asset Deposit Fund.  These assets are not moved into the Assets Forfeiture Fund until they are declared forfeit and ownership transfers to the federal government. It appears that Treasury seizures are immediately deposited in the Treasury Forfeiture Fund.  Unless otherwise noted, only forfeited assets are counted in the totals reported here.

79    These figures were determined from the LEMAS data using sample weights. The unweighted data indicate proceeds of $564,363,864 in 2000 and $414,573,647 in 2003.

80    U.S. Department of Justice, 2008, p. 7.

81    U.S. Department of Justice. (1997). Annual report of the Department of Justice asset forfeiture program: Fiscal years 1995 and 1996. Washington, D.C. This report refers to "net deposits," language not used in later Fund reports detailed in this study.

82    http://www.ojp.usdoj.gov/bjs/eande.htm.

83    By contrast, according to the LEMAS data reported for 2000 and 2003, forfeitures declined by $133 million (using weighted data) in that three-year span.  Part, but not all, of the decline may be accounted for by the fact that 126 fewer agencies responded to the 2003 LEMAS survey than in 2000. A more likely explanation is the impact of the federal CAFRA reform bill passed in 2000.  The LEMAS

117

survey asks for previous calendar-year figures, so data are essentially for the year prior to the survey—1999 and 2002.  Government officials have acknowledged significant reductions in forfeitures between 2000 and 2002 and often attribute this to preemptive concerns about CAFRA limitations on forfeiture activities, as well as increasing attention to homeland security following the terrorist attacks of September 11, 2001 (Edgeworth, 2008; United States Department of Justice. (2002). *Asset forfeiture fund and seized asset deposit fund annual financial statement: Fiscal year 2002*. Washington, D.C.).  There is a strong likelihood, if the trends in Table 8 are indicative, that LEMAS data after 2003 will show a sharp increase in forfeiture proceeds.

84   Walters, J. P. (2002, October 2002). Drug use trends. Retrieved October 28, 2009, from http://www.whitehousedrugpolicy.gov/publications/fact-sht/druguse/drugusetrends.pdf.

85   U.S. Census Bureau. (2009). *2009 Statistical Abstracts of the United States*. Washington, D.C.  Specifically, the number of drug arrests has increased 39 percent between 2000 and 2005.  This figure represents the increase in the number of suspects arrested for federal drug offenses and booked by the U.S. Marshals Service.  According to *Statistical Abstracts*, "Persons suspected of violating Federal law may be arrested by any one of the many Federal agencies empowered to make arrests, or by State or local authorities.  Regardless of which agency makes the arrest, Federal suspects are typical transferred to the custody of the U.S. Marshals Service for booking, processing and detention" (p. 198).  As a result, this makes the 39 percent figure most relevant when discussing the amount of money in the federal assets forfeiture fund.  However, if non-federal drug arrests are considered, the increase could be as much 96 percent between 1985 and 2006 (using figures from the 1987 and 2009 *Statistical Abstracts*).  Finally, according to the 2009 *Statistical Abstracts*, total crime between 1985 and 2006 *decreased* by eight percent.  See also,  http://www.ojp.usdoj.gov/bjs/glance/drug.htm, for the increase in drug arrests from 1970 to 2007.

86   Cassella, 2007; Edgeworth, 2008; H. Williams, 2002.

87   Cassella (2007) argues, "[T]here is also the matter of the message that is sent to law abiding citizens when a notorious gangster or fraud artist is stripped of the trappings of what may have appeared to be an enviable lifestyle.  Criminals typically spend their spoils on expensive homes, airplanes, electronic goods, and other 'toys' that everyone wants.  Taking the criminals' toys away… not only ensures that the criminal enterprise is deprived of its economic resources and makes funds available for restitution to the victims, but it also sends a signal to the community that the benefits of a life of crime are illusory and temporary at best" (pp. 8-9).

88   Another prohibitive issue in using the LEMAS data was the "self-referential" nature of one of the measures of the law in relation to the forfeiture proceeds as measured by LEMAS.  Specifically, the LEMAS question that asks about forfeiture proceeds is likely interpreted to be asking for the amount received by the agency through a drug forfeiture program after an administrative or court process decides on the disposition of property—in other words, net forfeiture revenue rather than total assets seized in a given year.  This means the relationship between the percentages measure and the forfeiture proceeds outcome used in this analysis would be perfectly correlated by default.

89   Equitable sharing payments for fiscal years (ending September 30) 2000 to 2004 were obtained from audited reports overseen by the Office of the Inspector General and are available online at  usdoj.gov/jmd/afp/02fundreport/index.htm.

90   In this analysis, states and their laws were coded consistent with Tables 1, 2 and 3, except for Oregon, Colorado and Utah.  In each of these three states, forfeiture laws changed throughout the late-1990s and into the mid-2000s.  For the analysis of equitable sharing, these states were coded consistent with the laws in effect during the time span covered in our analysis.  Specifically, Colorado agencies received 100 percent of forfeiture, standard of proof was coded as preponderance of the evidence and the owner had to prove innocence.  Oregon agencies received 92 percent of forfeiture, and standard of proof was prima facie.  Finally, Utah agencies kept zero percent of forfeiture.

91   In order to make interpretation of the statistical results easier and to minimize harmful collinearity problems between the three state forfeiture law variables in models including interaction terms, all three forfeiture law variables were centered.  "Centering" means that a single value is subtracted from all of the data points.  In our case, we subtracted, 50, four and two, from

118

the forfeiture law variables measuring standard of proof required, innocent owner burden and profit motive, respectively.  By centering the variables this way, the coefficients for the law variables have easy-to-understand interpretations—they are the partial effects for each law variable when evaluated at their medians (i.e., mid-point values).  Centering the variables also makes interpretation of the interaction terms easier to understand.

92    See generally, Edgeworth, 2008; Sorens et al, 2008; Worrall and Kovandzic, 2008. The coding strategy for the burden variables was similar to that utilized by Sorens et al., 2008.

93    E.g., Edgeworth, 2008.

94    Tobin, J. (1958). Estimation of relationships for limited dependent variables. *Econometrica, 26,* 24-36.

95    Wooldridge, J. (2005). *Introductory econometrics: A modern approach*, 3rd edition. Florence, KY:  South-Western College Publishing.

96    McDonald, J. F. & Moffitt, R. A. (1980). The uses of tobit analysis. *The Review of Economics and Statistics, 62,* 318-321.

97    Stata Statistical Software: Release 9. College Station, TX:  StataCorp LP.

98    Moulton, B. R. (1990). An illustration of a pitfall in estimating the effects of aggregate variables in micro units. *Review of Economics and Statistics, 72,* 334-338.

99    Williams, R. (2000). A note on robust variance estimation for cluster-correlated data. *Biometrics, 56,* 645–646.

**Plaintiff's Ex. # 1, p. 120**
**Littlepage v. DC, 14-899 (ESH)**

## Marian R. Williams, Ph.D.

Assistant Professor, Department of Government and Justice Studies; Appalachian State University

Since 2008, Dr. Williams has served as an Assistant Professor in the Department of Government and Justice Studies at Appalachian State University. Previously, Williams was Assistant and Associate Professor of Criminal Justice at Bowling Green State University. While at BGSU, she taught courses on the criminal courts, criminal law and procedure, and race, class and gender in the administration of justice and was heavily involved in the creation of the program's Master's Degree in Criminal Justice.



Williams has co-authored two books, and her research has been featured in a number of peer-reviewed journals, including *Criminology*, *Justice Quarterly*, *Journal of Criminal Justice* and *Homicide Studies*. Her research interests include the application of the death penalty and the impact of race, class and gender on court processes. She received her B.A. in Journalism from the University of Georgia, followed by the M.S. and Ph.D. in Criminology and Criminal Justice from Florida State University.

**About the Author**

## Jefferson E. Holcomb, Ph.D.

Assistant Professor, Department of Government and Justice Studies; Appalachian State University

Dr. Holcomb is an Assistant Professor of Criminal Justice in the Department of Government and Justice Studies at Appalachian State University. Holcomb has also taught at Florida State University and Bowling Green State University, where he was an Associate Professor of Criminal Justice and a Senior Research Fellow at the Social Philosophy and Policy Center at BGSU.



Holcomb's publications have appeared in journals such as *Criminology*, *Justice Quarterly* and the *Journal of Criminal Justice* on a range of topics, including the application of the death penalty, the use of criminal justice discretion and crime prevention. He received his undergraduate degree in Criminology from Auburn University. Prior to attending graduate school, he worked as a probation and parole officer for the state of Florida. He received M.S. and Ph.D. (in 2000) in Criminology and Criminal Justice from Florida State University.

**About the Author**

### Tomislav V. Kovandzic, Ph.D.

**Associate Professor of Criminology, School of Economic, Political and Policy Sciences; University of Texas at Dallas**

Dr. Kovandzic is an Associate Professor of Criminology in the School of Economic, Political and Policy Sciences at the University of Texas at Dallas. His research interests include the impact of firearms and gun control on violence, deterrence, incapacitation, crime control and structural correlates of violence. His work has appeared in *Criminology*, *Justice Quarterly*, *Criminology & Public Policy* and other journals. Kovandzic received his Ph.D. in Criminology from Florida State University in 1999.

### Scott Bullock

**Senior Attorney, Institute for Justice**

Scott Bullock joined the Institute for Justice at its founding in 1991 and now serves as a senior attorney. Although he has litigated in all of the Institute's areas, his current work focuses on property rights and economic liberty cases in federal and state courts.

In property rights, Bullock has been involved in many cases challenging the use of eminent domain for private development. He argued the landmark case *Kelo v. City of New London*, one of the most controversial and widely discussed U.S. Supreme Court decisions in decades. He also served as lead counsel on the Institute's challenges to abusive civil forfeiture schemes in New Jersey and Utah.



Bullock's articles and views on constitutional litigation have appeared in a wide variety of media. He has published articles in *The New York Times* and *The Wall Street Journal*, and he has appeared on *60 Minutes*, ABC *World News* and National Public Radio, among many other publications and broadcasts. He received his law degree from the University of Pittsburgh and his B.A. in economics and philosophy from Grove City College.

Acknowledgments
Drs. Williams, Holcomb and Kovandzic would like to thank Mark Schaffer for his helpful comments and Paul Ford, Michael Chase and Steve DiGiantommaso for their assistance with data entry. Bullock would like to thank Mike Benz, Adam Doverspike and Josh Hess for assistance with legal research.

**Plaintiff's Ex. # 1, p. 122**
**Littlepage v. DC, 14-899 (ESH)**

"This comprehensive statistical and legal study of civil forfeiture in all 50 states is a major contribution to understanding the profit motive driving state and federal forfeiture efforts.  The authors grade the civil forfeiture laws and practices of each state and few get good grades.  A must-read for policy makers."

-DAVID B. SMITH, ENGLISH AND SMITH, ALEXANDRIA, VA; FORMER DEPUTY CHIEF OF THE ASSET FORFEITURE OFFICE OF THE U.S. DEPARTMENT OF JUSTICE; AUTHOR OF *PROSECUTION AND DEFENSE OF FORFEITURE CASES*

"Government abuse is one of the tragic themes of modern America.  Right now, a rising tide of asset forfeitures has become a way for fiscally challenged governments to fill their coffers at the expense of innocent citizens.  In Policing for Profit, the authors offer a hard-hitting, state-by-state account of a growing government abuse.  This tightly reasoned document is a call for action by legislatures, citizens and, in the last resort, the Supreme Court."

-RICHARD A. EPSTEIN, JAMES PARKER HALL DISTINGUISHED SERVICE PROFESSOR OF LAW, UNIVERSITY OF CHICAGO LAW SCHOOL

"This timely report shines a necessary spotlight on the troubling and under-documented problem of asset forfeiture abuse, which disproportionately impacts people of color.  Its review of asset forfeiture laws and practices in the 50 states illustrates why advocates of all political stripes are coming together to demand smart reform of these laws in order to prevent further abuse."

-VANITA GUPTA, AMERICAN CIVIL LIBERTIES UNION

"The late Henry Hyde considered the way many law enforcement agencies abuse civil asset forfeiture laws for their own profit an affront to the constitution and a free people.  Anyone ... conservative, liberal, Republican or Democrat ... who reads this new study will share his outrage.  More important, armed with the empirical evidence of abuse the authors have compiled, it ought to be possible to finally enact the real reforms for which Hyde fought so hard.  The study should be read and the evidence it contains should be acted upon."

-DAVID KEENE, AMERICAN CONSERVATIVE UNION



Institute for Justice
901 N. Glebe Road
Suite 900
Arlington, VA 22203

www.ij.org

p 703.682.9320
f 703.682.9321

**The Institute for Justice**

The Institute for Justice is a nonprofit, public interest law firm that litigates to secure economic liberty, school choice, private property rights, freedom of speech and other vital individual liberties and to restore constitutional limits on the power of government.  Founded in 1991, IJ is the nation's only libertarian public interest law firm, pursuing cutting-edge litigation in the courts of law and in the court of public opinion on behalf of individuals whose most basic rights are denied by the government.

**Plaintiff's Ex. # 1, p. 123**
**Littlepage v. DC, 14-899 (ESH)**